No. 26-1205

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

SANDISK TECHNOLOGIES, INC., SANDISK TECHNOLOGIES, LLC,
SANDISK STORAGE MALAYSIA SDN. BHD.,

*Plaintiffs-Appellants*

v.

VIASAT, INC.,

*Defendant-Appellee*

---

Appeal from the U.S. District Court for the Northern District of California
in Case No. 4:22-CV-04376, District Haywood S. Gilliam, Jr.

---

## APPELLANTS' NONCONFIDENTIAL OPENING BRIEF

---

Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1700 M St, N.W.,
Washington, D.C. 20036
(202) 955-8500

L. Kieran Kieckhefer
Lillian J. Mao
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center,
San Francisco, CA 94111
(415) 393-8200

Ahmed ElDessouki
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave.,
New York, NY 10166
(212) 351-4000

Stuart Rosenberg
GIBSON, DUNN & CRUTCHER LLP
310 University Ave. 3rd Floor
Palo Alto, CA 94301
(650) 849-5300

[Counsel list continued on inside cover]

Robert J. Vincent
Y. Audrey Yang
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue,
Dallas, TX 75201
(214) 698-3400

*Counsel for Sandisk Technologies, Inc., SanDisk Technologies, LLC and SanDisk Storage Malaysia SDN. BHD.*

# REPRESENTATIVE PATENT CLAIMS AT ISSUE

## U.S. Patent No. 9,424,400

1. A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising:

   a first data interface configured to communicate with a portable data storage device;

   a second data interface configured to communicate, over a network, with a remote trusted server; and

   a processor configured to:

   obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;

   authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and

   in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.

**U.S. Patent No. 10,447,667**

1. A media streaming system comprising:

   a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); and

   one or more hardware processors configured to:

   receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;

   transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and

   transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer.

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants Sandisk Technologies, Inc., SanDisk Technologies, LLC and SanDisk Storage Malaysia SDN. BHD. certifies the following:

1. The full name of every entity represented by me is:

   Sandisk Technologies, Inc., SanDisk Technologies, LLC and SanDisk Storage Malaysia SDN. BHD.

2. The parties named in the caption are the real parties in interest. Other parties involved in this matter are Western Digital Corporation, Western Digital Ireland Ltd., Western Digital Technologies, Inc. and SanDisk 3D IP Holdings Ltd.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of Plaintiffs-Appellants are as follows:

   Sandisk Corporation.

4. The names of all law firms and the partners or associates that appeared for Appellee in the trial court or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   Shuo Josh Zhang, Gibson Dunn & Crutcher, LLP

   Spencer Ririe, Mangum Ririe LLC (formerly)

   Aaron Morris, A&O Shearman LLP (formerly)

   Ada Yue Wang, A&O Shearman LLP (formerly)

   Matthew Berkowitz, A&O Shearman LLP (formerly)

   Patrick Colsher, A&O Shearman LLP (formerly)

5. The following case may be affected by this appeal, but there are no other pending cases that may affect or be affected by this appeal:

   *Sandisk Technologies, Inc. and SanDisk Storage Malaysia SDN. BHD. v. Viasat, Inc. and Gigcasters, LLC,* Civ. Action No. 7:26-cv-00019 (WDTX) (pending)

6. There are no organizational victims or bankruptcy case debtors or trustees in this appeal.


Dated: February 25, 2026                          /Brian M. Buroker/
_____
Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
(202) 955-8500
bburoker@gibsondunn.com

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ............................................................ v

TABLE OF AUTHORITIES ............................................................... ix

STATEMENT OF RELATED CASES ............................................... xii

JURISDICTIONAL STATEMENT ...................................................... 1

INTRODUCTION ................................................................................ 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE .............................................................. 4

    I.    Asserted Patents ..................................................................... 4

        A.    The '400 Patent .......................................................... 4

        B.    The '667 Patent .......................................................... 5

    II.    Ownership History ................................................................. 6

    III.    The Accused Systems ........................................................... 10

    IV.    Procedural History ............................................................... 12

        A.    Claim Construction .................................................. 12

        B.    Sandisk's Infringement Contentions & Dr. Easttom's
Infringement Expert Report ..................................... 14

        C.    Motions to Strike and Summary Judgment ............. 18

SUMMARY OF THE ARGUMENT .................................................. 22

STANDARDS OF REVIEW ............................................................. 24

ARGUMENT ..................................................................................... 25

    I.    The District Court's Entry of Summary Judgment on the '400
Patent Should Be Reversed ................................................. 25

        A.    The district court erred in its construction of the
"authenticating" term by conflating authenticate with
authorize, which are two distinct concepts ............. 26

        B.    Even under the district court's erroneous construction,
Sandisk raised a genuine dispute of material fact such
that the district court erred in granting summary
judgment .................................................................. 37

Page

C.    The district court abused its discretion in striking two of Sandisk's '400 Patent authentication infringement theories ..................................................................................41

II.    The District Court's Entry of Summary Judgment on the '667 Patent Should Be Reversed ...............................................................44

A.    The Court Erred in Its Construction of the Term "receive an indication of the NAS device having a secure region" by Rewriting the Language to Require an Indication of the Secure Region ...................................................................45

B.    Even under the district court's erroneous construction, Sandisk presented sufficient evidence to raise a genuine dispute of material fact precluding summary judgment ..........49

III.    The Court Erred in Dismissing SDT LLC from the Case for Lack of Standing ......................................................................55

A.    The District Court Erroneously Considered Only Whether SDT LLC Satisfied Constitutional Standing.............56

B.    SDT LLC Had Statutory Standing............................................58

C.    The District Court Erroneously Found that SDT LLC Lacks Exclusionary Rights .....................................................60

CONCLUSION .......................................................................................61

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 3, 16, 17, 18, 21, 22, 40, 41, 43, 44, 49, 50, 51, 52, and 54 concerns proprietary internal information.

# TABLE OF AUTHORITIES

Page(s)

CASES

*In re Abbott Diabetes Care Inc.*,
    696 F.3d 1142 (Fed. Cir. 2012) ..........................................................35

*Abbott Labs. v. Diamedix Corp.*,
    47 F.3d 1128 (Fed. Cir. 1995) ............................................................61

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
    659 F.3d 1121 (Fed. Cir. 2011) ...............................37, 38, 40, 41, 49

*Adobe Sys. Inc. v. Wowza Media Sys.*,
    No. 11-CV-02243-JST, 2014 WL 709865 (N.D. Cal. Feb. 23, 2014) ..............53

*Alfred E. Mann Found. for Sci. v. Cochlear Corp.*,
    604 F.3d 1354 (Fed. Cir. 2010) .....................................25, 58, 59, 60

*AntennaSys, Inc. v. AQYR Techs., Inc.*,
    976 F.3d 1374 (Fed. Cir. 2020) ..........................................................57

*AntiCancer, Inc. v. Pfizer, Inc.*,
    769 F.3d 1323 (Fed. Cir. 2014) ..........................................................50

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008) ..........................................................43

*Contour IP Holding LLC v. GoPro, Inc.*,
    113 F. 4th 1373 (Fed. Cir. 2024) ..................................................24, 25

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
    438 F.3d 1374 (Fed. Cir. 2006) ..........................................................29

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
    766 F.3d 1338 (Fed. Cir. 2014) ..........................................................47

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    No. 13-CV-03999-BLF, 2015 WL 3640694 (N.D. Cal. June 11, 2015)............53

*Finjan, Inc. v. Proofpoint, Inc.*,
No. 13-CV-05808-HSG, 2015 WL 9023166 (N.D. Cal. Dec. 16, 2015) ........... 53

*Finjan, Inc. v. Symantec Corp.*,
No. 14-cv-02998-HSG, 2018 WL 620169 (N.D. Cal. Jan. 30, 2018) ................ 50

*Groove Dig., Inc. v. United Bank*,
825 F. App'x 852 (Fed. Cir. 2020) ..................................................................... 36

*Guangzhou Yucheng Trading Co., Ltd. v. Dbest Prods., Inc.*,
644 F. Supp. 3d 637 (C.D. Cal. 2022) .......................................................... 42, 43

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) .......................................................................... 29

*Intellectual Tech LLC v. Zebra Techs. Corp.*,
101 F.4th 807 (Fed. Cir. 2024) ...................................................... 25, 57, 58, 60

*Kaufman v. Microsoft Corp.*,
34 F.4th 1360 (Fed. Cir. 2022) .......................................................................... 47

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ........................................................................... 34

*Lone Star Silicon Innovs. LLC v. Nanya Tech. Corp.*,
925 F.3d 1225 (Fed. Cir. 2019) ......................................................................... 56

*Medgraph, Inc. v. Medtronic, Inc.*,
843 F.3d 942 (Fed. Cir. 2016) ........................................................................... 38

*Netflix, Inc. v. DivX, LLC*,
No. 24-1542, 2026 WL 405791 (Fed. Cir. Feb. 13, 2026) ........................... 45, 47

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
467 F.3d 1355 (Fed. Cir. 2006) ......................................................................... 25

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................... 26, 27, 28, 29, 31, 34

x

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Sequoia Tech., LLC v. Dell, Inc.*,
66 F.4th 1317 (Fed. Cir. 2023) ...........................................................................36

*Shared Memory Graphics LLC v. Apple, Inc.*,
812 F. Supp. 2d 1022 (N.D. Cal. 2010) ..................................................19, 42, 43

*Sicom Sys. Ltd. v. Agilent Techs., Inc.*,
427 F.3d 971 (Fed. Cir. 2005) ..........................................................55, 56, 58, 59

*Stumbo v. Eastman Outdoors, Inc.*,
508 F.3d 1358 (Fed. Cir. 2007) .........................................................................29

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
802 F.3d 1283 (Fed. Cir. 2015) .........................................................................43

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015) ............................................................................................24

*The Saunders Grp., Inc. v. Comfortrac, Inc.*,
492 F.3d 1326 (Fed. Cir. 2007) .........................................................................29

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997) .................................................................................38, 39, 40

*WiAV Sols. LLC v. Motorola, Inc.*,
631 F.3d 1257 (Fed. Cir. 2010) ...................................................................56, 57

## STATUTES

35 U.S.C. § 281 ........................................................................................................56

## RULES

Fed. R. Civ. P. 26(a)(2)(B) .....................................................................................42

Fed. R. Civ. P. 56(c)(1) ...........................................................................................49

xi

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellants Sandisk Technologies, Inc., SanDisk Technologies, LLC and SanDisk Malaysia SDN. BHD. (collectively, "Sandisk") state that no other appeals from the proceeding below (No. 4:22-cv-04376 (N.D. Cal.)) were previously before this or any other appellate court. Counsel for Appellants are not aware of any other case pending in this Court that will directly affect or be directly affected by the Court's decision in this appeal and are not aware of any other cases pending in any other tribunal that will direct affect or be directly affected by this Court's decision in this appeal other than the following:

- *Sandisk Technologies, Inc. & SanDisk Storage Malaysia SDN. BHD. v. Viasat, Inc. & Gigcasters, LLC*, No. 7:26-cv-00019 (W.D. Tex.)

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), and this Court has jurisdiction under 28 U.S.C. § 1295(a)(1). The district court issued final judgment on November 17, 2025. Appx1-2.

# INTRODUCTION

Sandisk is a technology company that is an innovator in memory systems and has been awarded thousands of patents for its innovations over its history. To leverage its memory systems, Sandisk also developed methods for securely storing and delivery content to and from its memory systems, including the two patents at issue in this appeal: U.S. Patent Nos. 9,424,400 ("the '400 Patent") and 10,447,667 ("the '667 Patent"). The '400 and '667 Patents describe improved systems for securely storing and delivering media content, such as movies and TV shows. In 2022, Sandisk sued Viasat, Inc. ("Viasat") because Viasat's In-Flight entertainment systems infringed the '400 and '667 Patents. The district court granted summary judgment of noninfringement based on multiple legal errors that require reversal.

***First***, the district court erred in its claim constructions of one term from each of the '400 and '667 Patents by improperly narrowing the terms from their plain and ordinary meaning without support in either the intrinsic or extrinsic record support.

***Second***, to make matters worse, the district court granted summary judgment of noninfringement by misapplying the summary judgment standard by only looking

1

at the infringement contentions rather than evaluating whether there were material issues of disputed fact in the evidence presented under Rule 56 and by finding a lack of evidence on issues that are not required by the claims. Under a proper approach, Sandisk met its burden to present evidence sufficient for a reasonable jury to find infringement. Additionally, the district court abused its discretion in striking additional infringement theories that should be reinstated on remand.

***Third***, the district court legally erred in finding that one of the Sandisk entities, SanDisk Technologies LLC ("SDT LLC"), that was named as a plaintiff lacked standing. The district court legally erred in concluding that a party cannot be a patent plaintiff unless it had exclusionary rights required under constitutional standing principles despite the fact that SDT LLC had an ownership interest under statutory standing principles, which is sufficient for standing. Regardless, even if exclusionary rights were required, the district court reached an incorrect legal determination that SDT LLC lacked exclusionary rights.

This Court should reverse these legal errors made by the district court based on *de novo* review.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in granting Viasat summary judgment of noninfringement of the '400 Patent (1) based on the court's erroneous construction of "authenticat[e/ing] the portable data storage device, using at least the

unique identifier" (the "authenticating term") improperly limiting that phrase to confirming that the portable data storage device is trusted and (2) despite evidence that raised a genuine issue of material fact under either the district court's erroneous construction or the proper construction; and if the Court remands on the '400 Patent, whether the district court's striking of theories on how the accused systems "authenticate … by communicating with the remote trusted server" could be shown under the "software update" and Proprietary Info infringement theories was an abuse of discretion because those theories were adequately presented in the infringement contentions.

2.    Whether the district court erred in granting summary judgment of noninfringement of the '667 Patent (1) based on its erroneous construction of "receive an indication of the NAS device having a secure region" by improperly rewriting the claim language to require "receiv[ing] an indication of *the presence of a secure region within* the NAS device" without support from the intrinsic or extrinsic record and (2) despite Sandisk presenting sufficient facts to raise a genuine issue of material fact even under the district court's construction and (3) further despite additional evidence that should have been considered under the "encryption" and "subfolder" infringement theories that the district court abused its discretion in striking.

3.    Whether the district court erred in granting summary judgment finding that SDT LLC lacked standing despite evidence that SDT LLC held an ownership right in the asserted '400 and '667 Patents that remained after it granted certain exclusionary rights to other Sandisk entities and thus was a proper party for statutory standing purposes and also despite evidence that SDT LLC maintained exclusionary rights in those Patents because it could direct another Sandisk entity to initiate a lawsuit on its behalf.

## STATEMENT OF THE CASE

### I.    Asserted Patents

#### A.    The '400 Patent

The '400 Patent describes a "digital rights management" (DRM) system that allows the secure delivery "of content from one storage device to another storage device." Appx65, Abstract. The system includes two interfaces: one "configured to communicate with a portable storage device," and a second "configured to communicate, over a network, with a remote trusted server." *Id.*, cl. 1. The system further includes a processor that "obtain[s] a unique identifier from the portable device," and "***authenticate[s]*** the portable data storage device, using at least the unique identifier" (the "authenticating term").

Importantly, the specification consistently describes two distinct steps of (1) "authentication" to determine or verify "identity" and (2) "authorization" to confirm

what that entity has access to.[1]  Appx65, Abstract; Appx81-82, 2:51-54, 3:38-41; Appx84, 7:50-54.  The district court improperly conflated these two distinct steps when construing the authenticating term in claims 1 and 9.

## B.    The '667 Patent

The '667 Patent, titled "Secure Stream Buffer on Network Attached Storage," discloses a media streaming system having a "network attached storage (NAS) device operating on a local area network (LAN)," which acts as a buffer for streaming media (*e.g.*, media obtained from a stream provider via the Internet), to another device (*e.g.*, a mobile phone or tablet) on the local network as shown below. Appx106-107, 10:63-11:4.



**FIG. 3**

Appx96.  The media content is stored in a "secure region" of the NAS device, and

---

[1]     The '400 Patent uses "authorization" and "confirming trust" interchangeably.

"access to the secure region is controlled by the media streaming system." Appx107, 11:1-5. As claimed, the media streaming system "receive[s] an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device of the local area network." Appx106-107, cls. 1, 11. Nothing in the specification limits that language to requiring an indication "of the presence of a secure region within the NAS device" as the district court found rather than simply an indication of the NAS device.

## II. Ownership History

The '400 and '667 Patents are the result of development work by employees at Western Digital. The chain of title and rights through the time of judgment is reflected below:



Appx4192 (red annotations added).

At the time of judgment, Sandisk Technologies, Inc. ("SDT Inc.") was the assignee of record; SanDisk Storage Malaysia Sdn. Bhd. ("SDSM") was an exclusive licensee; and SDT LLC held all other rights and interest that had not been assigned to others. Initially, the inventors assigned their interest to Western Digital Technologies, Inc. ("WDT"). However, pursuant to a Research & Development Services Agreement between WDT and Western Digital Ireland Ltd. ("WDI") dated June 30, 2007 ("2007 Agreement"), "all rights, title and interest" in development work performed by WDT and associated intellectual property "shall automatically vest in WDI at the time that such Developed Products or Documentation are first created." Appx7194-7195 §6.2(a). To the extent such rights were not assignable, WDT granted to WDI "an exclusive, irrevocable, worldwide, perpetual, royalty-free

license to all such rights for any purpose whatsoever." *Id.* Next, "[i]n the interest of collectively protecting the freedom of both WDI and WDT" to act under the 2007 Agreement, WDI then granted to WDT the right to enforce intellectual property and the authority to grant non-exclusive licenses in exchange for reasonable consideration. Appx7195 §6.2(b). The 2007 Agreement further provided that, "[f]or the sole purposes of registering, securing, enforcing, and granting licenses to Intellectual Property Rights pursuant to this Section 6.2, WDT is hereby assigned legal title to the Intellectual Property Rights without any rights, with the exception of any rights specifically provided herein." *Id.* Consistent with Section 6.2, the inventors assigned their rights to WDT, and WDT was the original assignee of record before the PTO.

The 2007 Agreement also repeatedly refers to WDI's ownership of the intellectual property rights: Pursuant to Section 6.2(c), "WDT shall take all actions … in order to permit WDI to perfect and protect its ownership of all rights, title and interest in and to all of the Developed Products, Documentation and Intellectual Property Rights related thereto." *Id.* §6.2(c). Conversely, WDT was prohibited from "assert[ing] or represent[ing] to any third party that it has any rights whatsoever in any Intellectual Property Rights" and from "tak[ing], or permit[ting] any third party to take, any action that may limit or impair WDI's sole ownership of all rights, title and interests in and to all such Intellectual Property Rights." Appx7196 §6.3. The

2007 Agreement further provided that WDT was "solely responsible" for pursuing infringement claims but had the "obligation to enforce such Intellectual Property Rights upon the reasonable request of WDI." *Id.* §6.4.

The 2007 Agreement was in operation at the time the inventors assigned the applications resulting in the '400 and '667 Patents to WDT. In 2018, WDI granted an exclusive license to SanDisk 3D IP Holdings Ltd. ("SD3D"). Appx4192. During the pendency of this suit, WDI merged into SDT LLC, which thereby acquired all of WDI's interests in the '400 and '667 Patents. Appx1176 ¶2; Appx1178-1185. Later, when Western Digital Corporation spun off its flash memory business to Sandisk Corporation, WDT transferred its rights in the '400 and '667 Patents to SDT Inc., and SD3D assigned its exclusive license to SDSM. Appx1176 ¶3; Appx1186-1312; Appx7347 ¶¶2-3; Appx7349-7353; Appx7355.

Thus, when the district court granted summary judgment that SDT LLC lacked standing, the allocation of patent rights was as follows: SDT LLC, as WDI's successor-in-interest, held all rights, title and interest that it had not otherwise granted to another entity; SDSM held an exclusive license; and SDT Inc., as WDT's successor in interest, held legal title for registration and enforcement purposes and a right to require SDT Inc. to bring an enforcement action.[2]

---

[2] After judgment was entered below, on January 20, 2026, SDT LLC assigned its rights, title and interests in the '400 and '667 Patents to SDT Inc., including pending causes of action and claims to past damages. Appx7997-8000; Appx8002-8003.

## III. The Accused Systems

Both patents were asserted against certain operations of Viasat's In-Flight entertainment (IFE) and wireless IFE (W-IFE) systems. Appx147-228; Appx5464-5475 ¶¶100-128. Both IFE and W-IFE systems include many components that reside on a commercial airplane. Appx5465 ¶102; Appx6033-6034. The IFE/W-IFE systems enable passengers to access and view media content while on an airplane. *Id.* The on-the-plane components of the IFE/W-IFE systems include a server, called the S4 server. Appx5465 ¶102; Appx6034. The IFE/W-IFE accused systems also include a modem that communicates over a satellite link to the ground. Appx6034. Sandisk contended that the S4 and modem operate as a kiosk. Appx51. The kiosk receives a request for content and a unique identifier of the device that allows data to be cryptographically tied to a device. Appx44; Appx5465 ¶102; Appx6034. The device identifier is sent to a DRM module and a token is generated. Device authentication with the DRM server is via a signed token that is unique to the device. Appx45. Media content is then available for passengers. Passenger devices and seatback devices connect to the server over an interface. Appx5493 ¶175; Appx6034.

The IFE/W-IFE accused systems also include a modem that communicates

---

That transfer does not, however, moot the district court's erroneous dismissal of SDT LLC, who had standing and should have been joined as a party as of the judgment.

over a satellite link to the ground. Appx6034. That modem operates a Viasat Content Delivery System (VCDS) client and also communicates with the on-plane server. The VCDS client communicates, through the modem and a satellite connection, to a ground server, which contains or has access to media content, to retrieve media content. Appx5465 ¶102; Appx5470-5472 ¶¶123, 125; Appx6034. To transfer media content onto the on-plane server, the VCDS client requests and receives the content from the ground server. Appx5468 ¶117; Appx5472-5475 ¶¶126-128; Appx6037; Appx4537, Appx4547-4550. According to Sandisk's contentions in the case, "the accused system distinguishe[d] between secure (encrypted, hidden) storage areas and public areas by using specific file paths and encryption status as satisfying the indication-of-secure-region element." Appx49 (quoting Appx5361-5362).

Viasat's on-plane systems support several use cases. Movies and TV shows can be periodically requested by the IFE/W-IFE system from the ground, delivered to the plane and stored on the plane for later delivery when requested by users. This is Use Case 1 – Pre-stored content delivery. Appx5475-5476 ¶¶129-131. The Viasat on-plane system also supports on-demand content delivery whereby selected movies and TV shows are retrieved from systems on the ground on demand responsive to an in-flight request. *Id.* This is Use Case 2 – InFlight OnDemand. *Id.*

Similarly, Viasat offers a residential system that operates in a user's home for on-demand delivery that was accused of infringing the '400 Patent. Instead of the S4 server and M3 modem, the in-home system has the Viasat WiFi Gateway Modem ('Gateway'). This is Use Case 4 – Home OnDemand.[3] *Id.*

## IV. Procedural History

On July 28, 2022, Sandisk sued Viasat for infringement of the '400 and '667 Patents, and another patent not at issue in this appeal, and filed an amended complaint on May 9, 2023. Appx147-166, Appx298-317. By the time of summary judgment, Sandisk specifically accused Viasat of infringing claims 1-2, 6, 8-10, 13 and 17 of the '400 Patent (the "Asserted Claims of the '400 Patent") and claims 1-7 and 11-16 of the '667 Patent (the "Asserted Claims of the '667 Patent"). Appx25.

### A. Claim Construction

On September 20, 2024, the district court, based on Viasat's argument and over Sandisk's argument that the plain and ordinary meaning applied, construed the '400 Patent term "authenticate the portable data storage device, using at least the unique identifier" ("the authenticating term") to mean "confirming that the portable data storage device is trusted using at least the unique identifier." Appx15. Essentially, the district court rewrote the claims from "***authenticate*** the ... device"

---

[3] The district court struck Use Case 3 - Live-TV/IPTV, because it found the IPTV product was not accused of infringement. Appx38-41. Sandisk is not appealing that determination and has filed a new lawsuit accusing IPTV of infringement.

to "***confirming*** that the ... device ... ***is trusted***." *Id.* In support of its construction, the district court focused on the specification and not the claims and found that "[w]hen the specification uses the word 'authenticate,' it is *always* for the purpose of confirming the trust level of the devices in question, and no embodiment in the specification describes 'authenticating' as a mere identification of devices." Appx15-16 (emphasis in original). The district court concluded that the "patentee intended for the term 'authenticate' to include confirmation that the portable data storage device is trusted or authorized." Appx16.

The district court, based on Viasat's argument and over Sandisk's argument that plain and ordinary meaning applied, construed the '667 Patent term "receive an indication of ***the NAS device*** having a secure region" by rewriting it as "receive an indication of the ***presence of a secure region*** within the NAS device." Appx43. The district court found that "[t]he focus of the '667 Patent ... is a novel NAS device having a secure region to buffer content from streaming services; as such, the claims logically require an indication that the NAS device has such a secure region for this buffer." *Id.* It stated that "if the system did not have an indication of the presence of the secure region, it would not be able to use that secure region to buffer content." *Id.* The district court did not, however, analyze the plain language of the claims nor identify any intrinsic support for its construction.

## B. Sandisk's Infringement Contentions & Dr. Easttom's Infringement Expert Report

In March 2024, Sandisk served amended infringement contentions by agreement of the parties. Appx4583-2366; Appx2368-2452. The expert report issued by Sandisk's technical expert, Dr. Chuck Easttom, later in the case followed those infringement theories and include citations to additional evidence.[4] Both the March 2024 infringement contentions and Dr. Easttom's report contended that, for the '400 Patent, the Accused Instrumentalities include "Viasat's in-flight entertainment ('IFE'), wireless IFE ('W-IFE') systems, Viasat WiFi Gateway Modem ('Gateway'), and all Viasat products incorporating IFE, W-IFE, Gateway, or the functionality described herein." Appx2294; Appx5464-5475 ¶¶100-128. And for the '667 Patent, "the Accused Instrumentalities include Viasat's media streaming software, systems, and services, including systems that implement edge storage, such as and including the Opening Caching standards" which "include the Viasat Content Delivery System ('VCDS')." *Id.* For both the '400 and '667 Patents, the accused IFE/W-IFE and streaming systems operate with the VCDS system to deliver pre-stored media and on-demand media content (*e.g.*, by Disney+) to In-Flight users or home users. Appx2296; Appx2370; Appx2374-2375.

---

[4] Although Sandisk later was denied leave to amend its infringement contentions in early 2025 to add a doctrine of equivalents theory, Sandisk's expert only pursued infringement theories disclosed in its operative contentions.

### 1. Infringement Allegations for the '400 Patent

The Asserted Claims of the '400 Patent require a system with "a second data interface" to be "configured to communicate, over a network, with a remote trusted server." *See, e.g.*, Appx91, cl. 1. The system further includes a processor that "obtain[s] a unique identifier from the portable storage device," and "***authenticate[s]*** the portable data storage device, using at least the unique identifier" by "communicating with the remote trusted server." *Id.* Sandisk explained how these limitations were met in its infringement contentions. Dr. Easttom's expert report then provided opinions based on the same infringement theories and simply included additional evidence to provide the detail necessary to support his opinions. Appx5475-5613 ¶¶129-508. Sandisk accused the Pre-stored use case and the OnDemand use cases of infringement. Appx5520 ¶248.

When the user requests media content, a playback request is initiated and the S4 server first obtains a unique device identifier from the portable data storage device. Appx2341-2342; Appx5520-5522 ¶¶249-252; Appx6012; Appx6724-6736. For the Pre-stored use case, the unique device identifier is evaluated by either a DRM server on the plane (FairPlay and Widevine) or a DRM server on the ground (PlayReady) depending on the device type. Appx2341-2342; Appx5520-5522 ¶¶248-252; Appx6012; Appx5818, 58:3-59:11. When a playback request message is received, a token is created based on the unique device identifier. Appx54;

Appx2343; Appx5521-5524 ¶¶252-257; Appx6011-6016; Appx6724-6736; Appx5817-5818, 57:4–59:7. Subsequently, "'[d]evice authentication with the DRM server is via the signed token – the token created.'" Appx43, Appx45. For DRM servers FairPlay and Widevine, those devices update their policies and they receive updated policies by software update. Appx43; Appx2341-2342; Appx5520 ¶249; Appx6011-6016; Appx6476. The specific name Viasat uses for the DRM updates is called the SSLK. Appx2341-2342; Appx5521-5522 ¶252; Appx6016; Appx6735 §7.6; Appx5781, 135:19-22; Appx6476. The DRM servers use license policies to assist in authenticating tokens. Appx43-24; Appx2343-2345; Appx5520-5523 ¶¶249-252, 254; Appx6011-6016; Appx5937, 111:4-9; Appx6057; Appx6731-6736; Appx6741. Thus, this process confirms whether or not the portable storage device is trusted. Appx2343-2345; Appx5520-5531 ¶¶248-276; Appx6011-6016; Appx5937, 111:4–9; Appx6057; Appx6731-6736; Appx6741. For the OnDemand use cases, the unique identifier (a Disney+ token) is obtained and sent to the ███ Prop. Info ███ that is remote. Appx2327; Appx5523 ¶¶254-255; Appx5847, 176:15-177:22. The infringement contentions disclosed the ███ Proprietary Info ███ as the claimed "remote trusted server" when the term was first introduced with the "second data interface" limitation. It therefore serves as the antecedent basis for "the remote trusted server" as it appears in the authenticating term. The same ███ Proprietary Info ███

is the "remote trusted server" as it is used in the authenticating term and is the same Proprietary Info that is discussed in Dr. Easttom's infringement report.

## 2. Infringement Allegations for the '667 Patent

The asserted claims of the '667 Patent require that a "media streaming system" with "a network attached storage (NAS) device operating on a local area network (LAN)." Appx106-107, cls. 1, 11. The claims further require "receiving an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network." Sandisk's infringement contentions and Dr. Easttom's report explained that Viasat's accused system included a "secure region" and multiple ways in which the "receiving an indication" limitation was met.

First, Sandisk explained that Viasat's on-plane system includes a VCDS client that communicates with a "Proprietary Info," which acts as a buffer for transmitted media. Appx2406; Appx6559. The Proprietary Info is Prop. Info and includes other attributes that Sandisk contended made it a "secure region" within the meaning of the claims. Appx2407-2408, Appx2411; Appx5630-5631 ¶¶564-566.

Next, Sandisk explained that the system received an indication of the presence of this secure region in four ways: (1) by the value of a particular Prop. Info variable, which the district court referred to as the "encryption theory," Appx5627-5628 ¶¶554-557; (2) by the "DRM subfolder theory," Appx5632 ¶¶571-572; (3) by

matching the [Proprietary Info], Appx5629 ¶558; and (4) by another value separate from the [Prop. Info] variable. Appx5629 ¶559. *See also* Appx34-37 (describing "encryption" and "DRM subfolder" theories).

### C. Motions to Strike and Summary Judgment

On June 4, 2025, Viasat moved to strike various infringement theories from Sandisk's expert reports. Appx2517-2518. On June 9, 2025, Viasat moved to strike additional theories and for summary judgment of noninfringement of both the '400 and '667 Patents. Appx2933-2934; Appx2947-2498.

### 1. Motion to Strike Opinions Regarding the '400 Patent

In its June 9, 2025 motion to strike, Viasat argued that several of Sandisk's infringement theories relating to the "authenticating" limitation had not been previously disclosed in its infringement contentions. Appx2933-2934. The Court denied the motion as to one theory[5] but struck the "software update" theory and the [Proprietary Info] theory regarding how authentication involved communication with a remote trusted server. Appx43-47. With respect to the software update theory in which remote trusted servers provide software updates to DRM servers that are used for authentication, the district court found that Sandisk's disclosures relied on implied disclosure that did not meet the standard in the local rules, even though those

---

[5] For the Pre-stored use case, the Court did not strike Dr. Easttom's opinion that the "authenticate" limitation is met when the "kiosk authenticates the portable data storage device by communicating the token to the DRM license server ...." Appx45.

rules only require that the degree of specificity be "sufficient to provide reasonable notice" of plaintiff's infringement theories. Appx44 (citing *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022, 1025 (N.D. Cal. 2010)).

With respect to the ▮Proprietary Info▮ theory, the district court found that Sandisk did not "identify the ▮Proprietary Info▮ as the 'remote trusted server' that communicates with the processor to authenticate the portable data storage device" even though the ▮Proprietary Info▮ was identified as the remoted trusted server earlier in the infringement contentions. *Id.* The district court therefore struck the portions of Dr. Easttom's report regarding the software update theory and the ▮Prop. Info▮ in connection with the authenticating term.

### 2. Summary Judgment of Noninfringement for the '400 Patent

Viasat moved for summary judgment of noninfringement on the remaining unstricken infringement theory. Viasat argued that Sandisk failed to apply the district court's construction for the authenticating term, and instead, treated "authentication" as "mere identification of the device." Appx2966. However, Dr. Easttom "explicitly applied the [district court's] construction by showing that 'unique identifiers' associated with passenger electronic devices" are "used to confirm that the PED … can be ***trusted***." Appx5373 (emphasis added).

Specifically, the DRM servers create a token based on the unique device identifier. Appx54; Appx2341-2342; Appx5520-5524 ¶¶248-257; Appx6011-6016;

Appx5817-5818, 57:4–59:11; Appx6732.  Under Sandisk's theory and the evidence cited below, the token is only created if the device is trusted.  Appx5373 (with additional detail).  Subsequently, "'[d]evice authentication with the DRM server is via the signed token – the token created.'"  Appx43, Appx45.  Sandisk contended that one DRM server authenticated with the token with a remote trusted server.  Appx43.  For DRM servers FairPlay and Widevine, those devices update their policies and they receive updated policies by software update.  Appx43-45; Appx2341-2342; Appx5520 ¶249; Appx6011-6016; Appx6476.  Regardless of which of the three DRM servers is used, it was Sandisk's contention (which was supported by the evidence) that the token is created based on the device having been deemed a trusted device.  Appx5373; Appx2343-2345; Appx5520-5531 ¶¶248-276; Appx6011-6016; Appx5937, 111:4–9; Appx6057; Appx6731-6736; Appx6741.

Of all of the evidence provided by Sandisk, the district court latched on to one statement and faulted Sandisk for "not explain[ing] *how* the token provides more than 'identification' rather than a finding that the device is 'trusted,'" and specifically, "how the token either … or indicates how a device is otherwise trusted." Appx54 (see sealed version from full quote).  Based on this supposed failure, the district court granted Viasat's motion for summary judgment of noninfringement.

### 3. Motion to Strike Opinions Regarding the '667 Patent

On June 4, 2025, Viasat moved to strike the encryption and DRM subfolder infringement theories as allegedly undisclosed in Sandisk's operative infringement contentions. The district court granted both requests. With respect to the encryption theory, the district court acknowledged that Sandisk's operative contentions cited the specific three source code files relied upon but found this was "not sufficient to put Viasat on notice" of the specific lines and functions that Sandisk relied upon for the encryption theory even though it acknowledged that identification of source code, as opposed to functions, could be enough in other cases. Appx34-35. With respect to the DRM subfolder theory, the district court characterized Sandisk's explanation of its operative contentions as "an argument of implicit disclosure" and found that Sandisk's contentions "do not disclose that the Proprietary Info tself is Prop. Info ' and that discussion of subfolders related to different claim limitations. Appx36-37.

### 4. Summary Judgment of Noninfringement for the '667 Patent

Viasat moved for summary judgment of noninfringement arguing that Sandisk's operative infringement contentions failed to demonstrate that the accused system "receive[s] an indication of the presence of a secure region within the NAS device" as required by the district court's erroneous claim construction. Appx2940-

2941.  In response, Sandisk explained that the VCDS terminal was the NAS device, and the ▮Proprietary Info▮ was the secure region within that NAS device.  Appx5361.

Rejecting Sandisk's argument, the district court found it "not persuasive" that the ▮Proprietary Info▮ is ▮Proprietary Info▮ Appx50.  The district court further faulted Sandisk's contentions for being "silent as to how *the processor receives an indication of the* ▮Proprietary Info▮, as required by the Court's construction." *Id.*  The district court relied only on the contentions and did not consider Sandisk's evidence submitted in opposition to summary judgment (which included extensive expert testimony and citation to documents and testimony).  It found a lack of a "cognizable infringement theory satisfying the 'receive an indication of the NAS device having a secure region' claim limitation."  Appx50-51.

## SUMMARY OF THE ARGUMENT

The district court's entry of summary judgment should be reversed on three separate bases.

1.    The district court committed several errors that led to its erroneous entry of summary judgment on the '400 Patent.  First, the district court legally erred in its construction of the claim term "authenticate the portable data storage device, using at least the unique identifier" by limiting the claim to confirming that the device is trusted without support from the intrinsic record when the plain and ordinary meaning should apply.

22

Second, this Court should reverse the district court's judgment of noninfringement because material disputes of fact preclude summary judgment on either the correct construction or the district court's erroneous construction.

Third, the district court also abused its discretion in striking two of Sandisk's infringement theories from its expert's report that the district court incorrectly found were new and not adequately described in the operative infringement contentions; however, Sandisk's expert was merely providing additional detail and evidence to Sandisk's already-disclosed theories that are relevant on remand.

2. The district court also made several legal errors leading to summary judgment of noninfringement on the '667 Patent. First, the district court erred in its construction of "receive an indication of the NAS device having a secure region" by improperly rewriting the claim language to require an indication of the secure region itself, rather than "an indication of the NAS" as stated in the plain language of the claim. It did so without support from the intrinsic or extrinsic record. This Court should reverse the district court's claim construction and enter a construction of plain and ordinary meaning.

Second, even under the district court's erroneous construction, the district court erred in granting summary judgment of noninfringement by identifying purported gaps in Sandisk's infringement contentions but failing to consider the expert testimony and documentary evidence that filled the very gaps the district court

alleged were missing. The district court also abused its discretion in striking additional evidence that demonstrated infringement under the erroneous construction. This Court should therefore reverse the district court's grant of summary judgment of noninfringement.

3. The district court also erred in granting dismissal of SDT LLC. First, the district court misapplied the law because it focused exclusively on constitutional standing (whether SDT LLC had exclusionary rights) and ignored the statutory standing doctrines. Because SDT LLC had ownership rights, it had standing regardless of whether it had exclusionary rights. Second, the district court reached an incorrect legal conclusion when it held that SDT LLC lacked exclusionary rights, even though SDT LLC has an exclusionary right to require that SDT Inc. enforce the asserted patents. Either error warrants reversal.

## STANDARDS OF REVIEW

Claim construction is a question of law that this Court reviews *de novo* when the review is based on intrinsic evidence. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015).

This Court "review[s] the grant of a summary judgment under the law of the applicable regional circuit," and in the Ninth Circuit that review is *de novo*. *Contour IP Holding LLC v. GoPro, Inc.*, 113 F. 4th 1373, 1378 (Fed. Cir. 2024). "Summary

judgment is appropriate in the Ninth Circuit when, drawing all reasonable inferences in favor of the non-moving party, there are no genuine issues of material fact." *Id.*

A district court's decisions regarding standing to sue are reviewed *de novo*. *Alfred E. Mann Found. for Sci. v. Cochlear Corp.*, 604 F.3d 1354, 1358 (Fed. Cir. 2010). When standing determinations depend upon analysis of license agreements, "[t]he interpretation of an unambiguous contract is a legal issue" which is reviewed *de novo*. *Intellectual Tech LLC v. Zebra Techs. Corp.*, 101 F.4th 807, 813 (Fed. Cir. 2024); *Alfred E. Mann*, 604 F.3d at 1359.

This Court evaluates enforcement of local rules to determine whether they are "clearly unreasonable, arbitrary, or fanciful; based on erroneous conclusions of law; clearly erroneous; or unsupported by any evidence." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366-67 (Fed. Cir. 2006).

## ARGUMENT

### I. The District Court's Entry of Summary Judgment on the '400 Patent Should Be Reversed

The district court committed several errors in granting summary judgment finding noninfringement by Viasat of the '400 Patent. First, the district court adopted an incorrect claim construction by conflating the concepts of authenticate and authorize. Second, the district court erred by holding that there was no genuine dispute of material fact despite evidence upon which a jury could find Viasat to be infringing even under the district court's erroneous construction and also under the

proper construction. And third, the district court abused its discretion in striking two of Sandisk's infringement theories that should be restated if the Court remands.

### A. The district court erred in its construction of the "authenticating" term by conflating authenticate with authorize, which are two distinct concepts

The district court erred in its construction of the term "authenticate the portable data storage device, using at least the unique identifier" by conflating two distinct concepts of (1) authenticate and (2) authorize (or confirming trust) and in the process, making two critical errors in contravention of Federal Circuit precedent. First, the district court failed to follow the claim construction procedures this Court articulated in *Phillips*. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). The district court failed to start with the plain meaning of claim language, ignored portions of the intrinsic evidence, and failed to consider the extrinsic evidence. Instead, the district court cherry-picked statements from the specification that it found supported its construction. However, when all of the evidence is properly considered, it overwhelmingly supports Sandisk's position that "authenticate" and "authorize" are two separate and distinct concepts, and it was legal error for the district court to define "authenticate" to require "confirming trust," which is synonymous with "authorize."

Second, the district court's construction is improper because it limited the claims based on a misreading of one embodiment in the specification that

"authenticate" purportedly meant that the system is trusted. This is incorrect because the example goes on to indicate that authenticate and establish trust are different concepts. Appx82, 3:33-35. However, even if the district court's interpretation were correct, the district court further erred in then concluding from this one embodiment that all embodiments use the word "authenticate" for "the purpose of confirming the trust level of the devices in question." Appx15-16 (citing Appx82, 3:23-37). This is also incorrect because the specification includes numerous other examples where authentication does not refer to confirming trust. Finally, regardless of whether it was one embodiment or all embodiments, courts are not supposed to read in embodiments from the specification into the claim, so limiting the claims based on any embodiment is improper. Thus, the district court's construction must be reversed, and this Court should construe the authenticating term to have its plain and ordinary meaning.

1. **The district court erred in construing the authenticating term by not following the procedures outlined in *Phillips***

Claim construction begins with the words of a claim, which should be given "their ordinary and customary meaning" that "the term would have to a person of ordinary skill in the art." *Phillips*, 415 F.3d at 1313. Indeed, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood

words." *Id.* at 1315. The plain meaning of "authenticate" is "confirm the identity," which is separate and distinct from "authorizing," which means "confirming permission to access specific content." Appx82, 3:38-41.

In fact, "authenticate" and "authorize" are terms regularly used by laypeople. Appx799 (definition of "authentication"). For example, when an individual goes through security at an airport, security "authenticates" the individual by checking photo identification to confirm the identity of the individual. Authenticating someone's identity does not involve confirming trust or determining what that individual has access to. "Authorization," on the other hand, is to confirm an entity or individual has permission to access something specific, like content. In the airport scenario, this would be akin to confirming that an individual has permission to board a specific flight. Just because security has verified the identity (*i.e.*, authenticate) of an individual at an airport does not mean she has permission (*i.e.*, authorize) to board any flight that she wants. An individual must both present identification *and* a boarding pass to confirm both (1) the person is who she says she is and (2) the person has permission to board the specific flight. Thus, even to the layperson, these terms have separate and distinct meanings, and the district court erred by combining the claimed concept of "authenticate" with the concept of "authorize" that is separately described and claimed in the '400 Patent.

The fact that "authenticate" and "authorize" are two different concepts is

further underscored when comparing the independent claims with the dependent claims. Under the doctrine of claim differentiation, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1314-15; *see also Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). That "presumption is especially strong" where the additional limitation "is the only meaningful difference between [the] independent and dependent claim." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374 (Fed. Cir. 2014). That is the situation here.

Independent claim 9 recites the step of "*authenticating*" the portable storage device, whereas dependent claim 15 adds the additional step of "*authorizing* copying of the content." Appx92, cls. 9, 15. By construing "authenticating" to encompass "authorizing" (*e.g.*, "confirming trust"), the district court has improperly rendered dependent claim 15 superfluous. *Curtiss-Wright*, 438 F.3d at 1381; *see The Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1331 (Fed. Cir. 2007). "[T]his [C]ourt has denounced" claim constructions that render terms "superfluous." *See Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007). Indeed, it is because authentication and authorization are distinct concepts that the patentee included claim 15. It would have made no sense for the patentee to include claim 15 if authorization/confirming trust were already what the authenticating step

in claim 9 meant. The district court's construction therefore renders claim 15 "superfluous," which means that such an interpretation cannot overcome the presumption that claim 9 must mean something other than authorizing/confirming trust.

Although the plain language of the claims alone demonstrates the impropriety of the district court's construction, the '400 Patent specification repeatedly distinguishes between (1) authentication and (2) authorization/confirming trust and describes them separately. For example:

- "In this embodiment, a trusted server that is [1] *authenticated and* [2] *trusted* by both storage devices brokers the transfer of content." Appx65, Abstract.

- "In this embodiment, the transfer of the content and the content metadata is brokered by a trusted server that is [1] *authenticated and* [2] *trusted* by both sets of storage devices." Appx81, 2:51-54.

- "In one embodiment, the entities of the DRM system employ public key certificates, i.e., digital certificates for [1] *authentication* of their identity *and* [2] determine *authorization* for various uses of their content." Appx82, 3:38-41.

- "For example, the storage device may be an intelligent device that is configured to actively [1] *authenticate and* [2] *establish a trust relation* with a playback device or download server 104 based on a full two-way authentication." Appx84, 7:50-54.

Thus, it was improper for the district court to subsume "authorize"/"confirm trust" into its definition of "authenticate" when they are two separate and distinct concepts. Such a construction is therefore in direct conflict with how the terms are used in the specification.

And finally, while extrinsic evidence, which the district court did not consider at all in its analysis, is "less significant" than the intrinsic evidence, the extrinsic evidence provides further support that the district court's claim construction is incorrect. *Phillips*, 415 F.3d at 1317 (stating that "we have also authorized district courts to rely on extrinsic evidence," however, "it is less significant than the intrinsic record in determining the legally operative meaning of the claim language"). Indeed, Dr. Kevin Almeroth, Viasat's expert, expressly distinguishes between "authentication (identity verification)" and "authorization (access provided to user)." *See* Appx791. Viasat's other extrinsic evidence further confirms that "authentication" is simply the process of verifying an entity's identity. Appx799 (defining "authentication" as "verification of the identity of a person or process"); Appx716 ¶62 (stating that industry standard ISO/IEC 9798 (2010) "specifies an authentication model and general requirements and constraints for entity authentication where the goal is to establish whether the claimant of a certain identity is in fact who it claims to be" (cleaned up)). None of the extrinsic evidence defines authentication in terms of authorization or confirming trust. Thus, the extrinsic evidence further shows that the district court erred in construing the authenticating term in terms of confirming trust, which is an authorization concept.

## 2. The district court erred by misreading the specification and then importing how it interpreted the specification into the term "authenticate"

Rather than focusing on the claims and many examples in the specification demonstrating that "authenticate" and "authorize" (confirming trust) are two different concepts, the district court's construction relied on an incorrect interpretation that an embodiment in the specification equates authentication with confirming trust. Appx15-16 (citing Appx82, 3:23-27). Then, the district court improperly extrapolated from this one example that, for all the embodiments in the specification, "authenticate" means "confirm . . . trust[]," and concluded that "[w]hen the specification uses the word 'authenticate,' it is *always* for the purpose of confirming the trust level of the devices in question." Appx15-16.[6] This analysis is wrong for at least two reasons.

First, the specification does not equate authentication to trust or require that trust be part of authentication. Appx82, 3:23-27. Rather, the specification explains that authentication and trust are separate concepts: "Conventional DVD and Blu ray discs did not contain such features to authenticate **or establish trust** with a player or download server." Appx82, 3:33-35 (emphasis added). If authentication required

---

[6] The district court commented that Sandisk "essentially conceded" at the hearing that all embodiments describe authentication for the purpose of confirming trust but that is not the case because claim 9 was identified as well as an explanation that authentication is separate from confirming trust. Appx1086-1093.

establishing trust, the patentee would not have needed to add "or establish trust." But it did because they are separate concepts.

Second, the district court's determination that authentication is always for the purpose of confirming trust level is contradicted by the examples the district court failed to cite or discuss, which clearly indicate that authentication refers to determining identity whereas authorization is confirming trust. *See, e.g.*, Appx82, 3:38-41 ("In one embodiment, the entities of the DRM system employ public key certificates, i.e., digital certificates for [1] **authentication** of their identity **and** [2] determine **authorization** for various uses of their content.") (emphasis added); Appx65, Abstract ("a trusted server is [1] **authenticated** and [2] **trusted**") (emphasis added); Appx81, 2:51-54 ("authenticated and trusted"); Appx84, 7:50-54 ("[1] **authenticate and** [2] **establish a trust relation**") (emphasis added). As these examples demonstrate, authenticate does not require trust, otherwise, there would be no need to separately identify trust.

Even if the district court were correct that one embodiment in the specification disclosed that authentication included confirming trust, it would be improper to read the one embodiment into the claims—even if it were the preferred embodiment—absent some basis for doing so, and especially where other embodiments indicate that authentication does not include confirming trust. Courts must be careful to "avoid the danger of reading limitations from the specification into the claim."

*Phillips*, 415 F.3d at 1313, 1323. "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).

In *Liebel-Flarsheim*, this Court held that despite all embodiments in the specification describing the opening of an injector with a pressure jacket, nothing in the specification indicated that "the term 'opening' should be understood to carry with it the requirement that it must always be located in the front of a pressure jacket." *Liebel-Flarsheim*, 358 F.3d at 905. The Court therefore declined to restrict the claim by reading in an embodiment—even the preferred embodiment—from the specification. *Id.* Thus, even if every embodiment in the '400 Patent describes authentication as always for the purpose of confirming the trust level of devices, which it does not, it would still be improper for the district court to read those embodiments into the claim. The error here is more acute because the district court relied upon only *one* embodiment from the specification.

While there is an exception if the patentee demonstrates a "clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction," those statements are wholly absent here. *Id.* at 906. Indeed, the patentee made no express statements of exclusion or restriction to narrow the meaning of

authentication to require only confirming trust and therefore the district court's limiting of the claim in that manner was wrong.

The cases relied upon by the district court do not command a different outcome. Appx16. In *Abbott*, this Court found that the specification included statements "disparaging [electrochemical] sensors with external cables or wires." *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012). These statements in combination with the patent's specification consistently "depict[ing] an electrochemical sensor without external cables or wires," led the Court to conclude that the claimed electrochemical sensor did not include external cables or wires. *Id.* This is not the same situation here.

There are no "disparaging" remarks made about authentication being merely identification, and the district court did not point to any such statements. In fact, just the opposite is true. At least independent claim 9 recites only the authentication step with dependent claim 15 adding an authorization step. As a result, the claims themselves provide evidence that the patentee did not teach away from authentication without authorization/confirming trust. There are no disparaging statements in the specification, let alone ones at the level found in *Abbott*, and therefore, the district court erred in limiting the scope of the claims based on its understanding of the specification embodiments.

In *Groove Digital*, this Court determined that it was proper to limit the

construction of "applet" to those being "geotargeted" because the specification had described the "present invention" as applets that were being geotargeted. *Groove Dig., Inc. v. United Bank*, 825 F. App'x 852, 856-57 (Fed. Cir. 2020). Similarly, in *Sequoia*, this Court stated that "a patent's express purpose of the invention 'informs the proper construction of claim terms.'" *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023). In limiting the construction to statements from the specification, this Court in *Sequoia* expressly noted it was "not limit[ing] the claim language based on the preferred embodiment," but instead had relied on statements from the specification directed to "the present invention." *Id.* at 1326-27.

Unlike *Groove Digital* and *Sequoia*, the statements in the specification of the '400 Patent about authentication in connection with authorization and confirming trust were specifically made in the context of "examples" or "embodiments"—not with regard to the present invention as a whole. The following is illustrative:

- "In this ***embodiment***, a trusted server that is [1] authenticated and [2] trusted by both storage devices brokers the transfer of content." Appx65, Abstract.

- "In this ***embodiment***, the transfer of the content and the content metadata is brokered by a trusted server that is [1] authenticated and [2] trusted by both sets of storage devices." Appx81, 2:51-54.

- "In one ***embodiment***, the entities of the DRM system employ public key certificates, i.e., digital certificates for [1] authentication of their identity and [2] determine authorization for various uses of their content." Appx82, 3:38-41.

- "***For example***, the storage device may be an intelligent device that is

36

configured to actively [1] authenticate and [2] establish a trust relation with a playback device or download server 104 based on a full two-way authentication." Appx84, 7:50-54.

There are no statements about the invention as a whole or any indication that the above statements express the entire purpose of the patent. Indeed, the district court does not cite any passages from the specification that describe the entire invention as being directed to authentication for the purposes of confirming trust or authorization rather than as embodiments or examples. Thus, it was improper for the district court to limit the scope of the claim to the embodiments in the specification.

*   *   *

The Court should reverse the district court's construction of the authenticating term and instead construe it to have its plain and ordinary meaning.

## B.   Even under the district court's erroneous construction, Sandisk raised a genuine dispute of material fact such that the district court erred in granting summary judgment

The district court further erred in granting summary judgment of noninfringement because even under that court's erroneous construction, Sandisk presented sufficient evidence to raise a genuine dispute of material fact that the accused Viasat IFE/W-IFE systems infringe the Asserted Claims of the '400 Patent. Infringement is a question of fact. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129-30 (Fed. Cir. 2011). "On appeal from a grant of summary

judgment of non-infringement, we determine whether, after resolving reasonable factual inferences in favor of the patentee, the district court correctly concluded that no reasonable jury could find infringement." *Id.* at 1130. As such, a grant of summary judgment of noninfringement is only appropriate "when no reasonable factfinder could find that the accused product contains every claim limitation or its equivalent." *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949 (Fed. Cir. 2016); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 39 n.8 (1997).

Sandisk presented facts sufficient for a reasonable jury to find infringement under the district court's construction, and thus, the district court here erred by substituting its own analysis for that of the jury—an improper usurpation of the role of the factfinder. Indeed, Sandisk presented evidence for each element in the limitation "authenticat[e/ing] the portable data storage device, using at least the unique identifier, by communicating with the remoted trusted server over the second data interface."

- ***"Portable data storage device."*** Sandisk points to the passenger entertainment devices that facilitate communication with the S4 server or a home gateway router to meet this limitation. Appx44; Appx2312-2318; Appx5508-5510, 5513 ¶¶214, 221, 228.

- ***"Unique identifier."*** Sandisk identified the device's unique ID (UID) within the playback request as an identifier that is unique to the device. Appx2332-2338, Appx5508-5510 ¶¶214-222; Appx5513-5519 ¶¶228-247; Appx6387; Appx6814, 6842, 6844; Appx6086, Appx6269; Appx6012; Appx6732; Appx5816, 53:18-21; Appx5817, 55:16-23, 57:4-59:7; Appx5819, 64:14-22; Appx5848,181:11–16; Appx6746-6749; Appx6741; Appx6403-6405.

- ***"Remote Trusted Server."*** For the three relevant use cases, the ground servers, AWS servers, and/or DRM servers are the "remote trusted servers" connected via the satellite connection, which is the "second data interface." Appx2318-2328; Appx5502-5503 ¶¶196-198; Appx5505-5506 ¶¶202-205; Appx6549; Appx5812, 36:15–24; Appx6470.

Sandisk then provided evidence that the authentication process is initiated when a user's PED or seatback device makes a playback request with a unique device identifier. Appx54; Appx2341-2342; Appx5520-5523 ¶¶249-252; Appx6012; Appx6732. That unique identifier is sent to one of three DRM servers operating on the S4 server. Appx2341-2342; Appx5520-5524 ¶¶248-257; Appx6011-6016; Appx5762, 58:3-59:11. One of those DRM servers transmits the unique identifier to an on-the-ground server for evaluation and application of policies for granting access to DRM-protected content. *Id.* The other two DRM servers evaluate the unique identifier using policies for granting access to DRM-protected materials. *Id.*; Appx6476. Under Sandisk's theory as supported by the evidence cited below, the token is only created if the device is trusted. Appx5373 (with additional detail); Appx2343-2345; Appx5520-5524 ¶¶249-252, 254; Appx6011-6016; Appx5937, 111:4-9; Appx6057; Appx6731-6736; Appx6741. The PED or seatback device, upon receiving the token, makes subsequent requests for that content using that signed token. Appx43, Appx45; Appx2343-2345; Appx5520-5531 ¶¶248-276; Appx6011-6016; Appx5937, 111:4-9; Appx6057; Appx6731-

6736; Appx6741.   The Viasat documentation explains that trust of the device is enforced because the DRM services will <span style="background-color:black;color:white">Proprietary Info</span>.   Appx2341-2342; Appx5520-5521 ¶251; Appx6732; Appx5778, 125:20.   This evidence satisfies the district court's construction requiring "confirming that the portable data storage device is trusted."   *Id.*   And this confirmation of trust is accomplished using the "signed token that is unique to the device," which satisfies the district court's construction requiring the confirmation of trust "using at least the unique identifier." *Id.*   Therefore, even under the district court's construction requiring "confirming that the portable data storage device is trusted using at least the unique identifier," Sandisk put forth sufficient facts on which a reasonable jury could find infringement. The fact that the district court disagreed that these facts prove infringement is a question of fact that should have been left for the jury to decide.   *See Absolute Software*, 659 F.3d at 1129-30.

Not only did the district court improperly step into the role of the factfinder in granting summary judgment of noninfringement, but the district court also faulted Sandisk for not explaining "***how*** the token provides more than 'identification' rather than finding the device is 'trusted.'"   Appx54.   Specifically, the district court stated that "there is no explanation on how the token either <span style="background-color:black;color:white">Proprietary Info</span>… or indicates how a device is otherwise trusted."   *Id.* (cleaned up).   But nothing in the claims recites any limitations on "how" the token indicates whether or not the device is

trusted. Instead, under the district court's construction, all that is required is showing that the "portable data storage device is trusted." Appx15-16. As a result, Sandisk had no further obligation to provide evidence explaining how the device came to be trusted, only that it was. The district court's criticism amounts to creating additional requirements for Sandisk to prove infringement, which is not appropriate. Ultimately, Sandisk presented enough facts that "after resolving reasonable factual inferences in favor of" Sandisk that a reasonable jury could find infringement. *See Absolute Software*, 659 F.3d at 1130. Sandisk therefore respectfully requests that the district court's grant of summary judgment of noninfringement be reversed.

Moreover, the district court's summary judgment determination is premised on its legally incorrect determination that there was no evidence upon which a jury could find that the token demonstrates trust. Under the correct interpretation of the "authenticate" term, the server would not be required to confirm that the device is trusted. Therefore, under the correct interpretation of the "authenticate" term, the summary judgment must be reversed as well.

### C. The district court abused its discretion in striking two of Sandisk's '400 Patent authentication infringement theories

If the Court remands for further proceedings on the '400 Patent, then the Court should also find that the district court abused its discretion in striking the software update and [Proprietary Info] infringement theories from Dr. Easttom's expert report, specifically by making a clearly erroneous conclusion that they were not

disclosed in Sandisk's infringement contentions.  There is no requirement that an infringement expert report repeat the infringement contentions verbatim. *Guangzhou Yucheng Trading Co., Ltd. v. Dbest Prods., Inc.*, 644 F. Supp. 3d 637, 654 (C.D. Cal. 2022) ("The scope of contentions and expert reports are not … coextensive.").  In fact, Dr. Easttom is expected to provide additional details in his expert report above what is disclosed in the contentions to fully explain and support his opinions with evidence under the Federal Rules.  Fed. R. Civ. P. 26(a)(2)(B). Consistent with this, the Northern District of California local rules do "not necessarily require the patent holder to produce evidence of infringement, but it must map specific elements of Defendants' alleged infringing products onto" each claim. *Shared Memory Graphics*, 812 F. Supp. 2d at 1025.  Thus, the rules simply require that Sandisk disclose its infringement theories with "enough specificity to put defendant on reasonable notice" of what its infringement theories are.  *Id.*  Sandisk more than met this standard.

With respect to the software update theory, Sandisk's infringement contentions disclosed that the DRM servers communicate via satellite network with a "remote trusted server," such as the ground servers, AWS servers, DRM servers, and/or the Content Management Server, which can wirelessly update the onboard DRM servers through the satellite network.  Appx4266-4267.  Similarly, Dr. Easttom opined that the unique identifier is the token that is sent to the remote trusted

server (such as the DRM server) on the ground or is sent to the onboard DRM server, which receives the DRM policies as part of software updates. *Id.* These updates are packaged in something called the SSLK. While the word "SSLK" did not appear in Sandisk's infringement contentions, this is merely providing the name of the package through which updates from the ground servers occur, but the underlying infringement theory was already disclosed in the contentions. *See Guangzhou Yucheng Trading*, 644 F. Supp. 3d at 654. Thus, the district court abused its discretion in striking the software update theory from Dr. Easttom's report.

With respect to the [Proprietary Info] theory, the infringement contentions plainly disclosed the [Proprietary Info] as a "remote trusted server" in connection with the limitation reciting the "second data interface" that is "configured to communicate ... with a remote trusted server." Appx2327. The authenticating term requires again communicating with the "remote trusted server," which finds its antecedent basis in the "second data interface" limitation when the remote trusted server was first recited. Appx91, cl. 1. The use of the definite article "the" or "said" "indicates that this portion of the claim limitation is a reference back to the previously claimed" term. *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008) (stating that the claim term "said" is an "anaphoric phrase[], referring to the initial antecedent phrase"). Thus, "the remote trusted

server" in the authenticating term refers back to the initial antecedent phrase in the "second data interface" limitation that introduced "a remote trusted server," and thus, also refers back to the disclosures provided in Sandisk's infringement contentions with respect to the "second data interface" limitation. Thus, the district court abused its discretion in striking the ██Proprietary Info██ opinions with respect to the authenticating term from Dr. Easttom's report. Because the district court abused its discretion in striking Sandisk's "software update" and ██Proprietary Info██ infringement theories, this Court should reverse the district court's grant of Viasat's motion to strike these theories.

## II. The District Court's Entry of Summary Judgment on the '667 Patent Should Be Reversed

In granting summary judgment of non-infringement of the '667 patent, the district court erred (1) by adopting an incorrect claim construction, (2) by holding there was no genuine dispute of material fact despite evidence upon which a jury could find Viasat to be infringing even under the district court's erroneous construction, and (3) by abusing its discretion in striking two of Sandisk's infringement theories that further demonstrate infringement even under that erroneous construction. In addition, under the claims as properly construed, Sandisk presented ample evidence of infringement for the question to go to a jury.

**A.** **The Court Erred in Its Construction of the Term "receive an indication of the NAS device having a secure region" by Rewriting the Language to Require an Indication of the Secure Region**

The asserted claims require one or more processors configured to "receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system." Yet the district court construed the "receive an indication …" language to require that the one or more processors "receive an indication of the presence of a secure region within the NAS device." Appx21. That construction has no support in the claim language, specification or file history, and was legal error.

The plain language of the claims refers to "an indication of the NAS device," not an indication of anything else. *See, e.g.*, *Netflix, Inc. v. DivX, LLC*, No. 24-1542, 2026 WL 405791, at *3-4 (Fed. Cir. Feb. 13, 2026) (analyzing plain language of modifier to apply the closest modificand). In construing the term to require "an indication of the presence of a secure region within the NAS device," the district court completely and improperly rewrote the claim language. Moreover, the district court's construction is at odds with the remainder of the claim language. After reciting "an indication of the NAS device," the claim element recites several additional characteristics of the system, including: (1) the NAS device "having a secure region," (2) the secure region "comprising a buffer for streaming media," (3)

media is streamed "on a separate display device," (4) display device "separate" and "on the local network," and (5) "access to the secure region is controlled by the media streaming system." Appx106-107, cl. 1. Reading the plain language of the claim, none of those characteristics need to be conveyed in the claimed "indication." At most, some of them are characteristics of the NAS device that the "indication" is for. The district court, however, selected just one of those characteristics—the NAS device having a secure region—and incorporated it into the "indication" requirement, while still excluding the other recited characteristics. But there is no basis to incorporate any of the characteristics of the NAS device as being required to be included in the indication.

The specification also weighs against the district court's construction. The specification specifically describes embodiments involving an indication of the NAS device itself, not—as the district court required—an indication of the secure region within the NAS device. For example, the patent describes a NAS device negotiating with a remote content provider and teaches that "[s]uch negotiation may . . . be initiated by the remote content provider after *it has been informed of the presence of the NAS device*." Appx105, 7:24-34 (emphasis added). Consistent with the claim language, the described process involves only an "indication of the NAS device," not an indication of a secure region within the NAS device. The specification confirms this explicitly: "The remote content provider may, for example, *receive an*

*indication of the NAS device* from a display device coupled to the NAS device, *and/or may discover the presence of an NAS* having secure storage in a different manner." *Id.*, 7:34-38 (emphasis added). Again, like the claims, the specification makes clear that the NAS device has a secure region, but the indication is only "of the NAS device." The district court's construction erroneously excluded these explicitly disclosed embodiments. *See, e.g.*, *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022) ("A claim construction that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support." (quoting *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014)).

The district court's justification for its construction—that the "focus" of the patent is "a novel NAS device having a secure region to buffer content from streaming services," and that the processor "must have some indication of the presence of the secure region to use that secure region as a buffer" (Appx21)—is unfounded. As discussed above, the patent teaches that the claimed "indication of the NAS device" may be only the first step of a "negotiation" between the remote content provider and the NAS device. Appx105, 7:24-38. After receiving the indication, the content provider may provide various instructions to the NAS device, such as to limit the amount of data stored in the secure region, specify the encryption type to be used, or move data from the secure region to a user-accessible region. *Id.*,

7:63-14. The district court reasoned that "if the system did not have an indication of the presence of the secure region, it would not be able to use that secure region to buffer content." Appx21. Although the district court's rationale may make sense if one were considering the claims as a whole, the issue at claim construction was the meaning of only the specific limitation "receive an indication of the NAS device having a secure region." The claims and specification do not support requiring that the claimed "indication" be the element that informs the processor of the secure region itself nor single-handedly enable the processor to use the secure region. To the contrary, the claims and specification are clear that the "indication" is of the NAS device and *not*, as the district court construed it, of the secure region.

The district court granted summary judgment under its erroneous claim construction requiring an indication of the presence of a secure region. Applying the correct construction, which requires only an indication of the NAS device, and not of the secure region, eliminates the basis for the district court's grant of summary judgment. In addition, Sandisk presented evidence that the accused products satisfy the requirement to receive an indication of the NAS device. *E.g.*, Appx2399-2405; Appx5627 ¶553. The district court's erroneous claim construction should therefore be reversed, and the case remanded for adjudication under the plain and ordinary meaning of the claim language.

B. **Even under the district court's erroneous construction, Sandisk presented sufficient evidence to raise a genuine dispute of material fact precluding summary judgment**

1. **Sandisk raised a genuine dispute of material fact that Viasat infringes**

Even under the district court's construction of the "indication" term requiring an indication of the secure region, the district court erred in granting summary judgment of noninfringement because Sandisk presented evidence that the limitation was met under the district court's construction. Specifically, Sandisk presented sufficient evidence for a jury to find that the accused devices include a ▪Prop. Info▪ that acts as a secure region, and that the client receives data indicating the presence of that secure region. In rejecting these infringement theories, the district court improperly ignored Sandisk's evidence and failed to consider the reasonable inferences a jury could draw in Sandisk's favor in light of that evidence.

At the outset, the district court erred in its summary judgment analysis because it relied on Sandisk's infringement contentions instead of the expert report and documentary evidence Sandisk submitted in opposition to Viasat's summary judgment motion. Infringement is a question of fact, and summary judgment asks whether there is a genuine dispute of material fact based on the record evidence. *Absolute Software*, 659 F.3d at 1129-30; Fed. R. Civ. P. 56(c)(1). On the other hand, infringement contentions in the Northern District of California are intended to provide notice of infringement theories but "do not need to include proof or direct

49

evidence of infringement." *AntiCancer, Inc. v. Pfizer, Inc.*, 769 F.3d 1323, 1338 (Fed. Cir. 2014); *see also Finjan, Inc. v. Symantec Corp.*, No. 14-cv-02998-HSG, 2018 WL 620169, *2 (N.D. Cal. Jan. 30, 2018) (stating that parties "need not 'prove up' their theories by providing evidence beyond the material they have at the time they make their contentions"). Although the district court struck certain theories from Sandisk's contentions, it found that the contentions disclosed a "Proprietary Info theory." Appx50. The next step should have been to consider the evidence presented at summary judgment in support of that theory, but the district court's analysis cited only Sandisk's contentions, not any expert testimony or other evidence. Appx50-51.

Sandisk submitted evidence, which the district court failed to consider, showing that its Proprietary Info theory was supported by sufficient evidence to go to a jury. The district court found that "Sandisk's infringement contentions are silent as to how *the processor receives an indication of the* Proprietary Info, as required by the Court's construction." Appx50 (emphasis in original). This was a misapplication of the summary judgment standard. The district court's analysis was misdirected because neither the claim language nor its claim construction is directed to "how" the claimed "indication" is received. To prove infringement, Sandisk needed only to adduce evidence that the claimed "indication" is found in Viasat's products. Sandisk did so in at least two ways. First, Dr. Easttom opined, based on the

testimony of a Viasat engineer, that comparison of the Proprietary Info is an indication of a secure region. Appx5629 ¶558; Appx5845, 167:2-168:4. Second, Dr. Easttom opined that another variable (distinct from the Proprietary Info variable in the stricken encryption theory) was "another example of an indication of a secure region." Appx5629 ¶559; Appx8116. A jury could have found that the claim language was met based on either of these examples even under the district court's construction; thus, summary judgment should have been denied.

The district court also wrote that Sandisk had not shown the Proprietary Info was a "secure region" even while acknowledging Sandisk's theory was that "the Proprietary Info is Proprietary Info and having characteristics described in the opinion. Appx50. This reasoning, too, is erroneous and cannot sustain the district court's grant of summary judgment. Sandisk's expert opined that Proprietary Info the Proprietary Info rendered it a secure region. Appx5630-5631 ¶¶564-566; Appx6559; Appx6533. The '667 Patent explicitly teaches that "[a]s part of storing the digital content in the secure region …, the NAS device may store the digital content using encryption." Appx105, 7:52-55. There was no dispute that encryption was a way to make a region "secure." Rather, the district court simply failed to address this theory and stated instead that "[i]dentifying the Proprietary Info" as having a certain property does not mean it is a secure region comprising a buffer. Appx50. But Sandisk did more than identify the Proprietary Info with a certain property and comprising a buffer, and the

evidence presented was sufficient for a jury to find that the Proprietary Info is a "secure region comprising a buffer" as required by the claims.  The district court thus erred in granting summary judgment on this basis.

In light of the evidence Sandisk submitted, even under the district court's claim construction, the issue of infringement should have been sent to the jury, and the district court's grant of summary judgment should be reversed.

>    **2.    The district court abused its discretion in striking Sandisk's encryption and DRM subfolder infringement theories, which would have also raised genuine disputes of material fact**

The district court abused its discretion in striking the encryption and DRM subfolder infringement theories from Dr. Easttom's expert report because they were adequately disclosed in Sandisk's infringement contentions.  Expert reports and infringement contentions are not intended to be coextensive—to the contrary, an expert report is supposed to provide additional details and evidentiary support, whereas infringement contentions are intended to put the defendant on reasonable notice of the infringement theories.  *Supra* § I.C.

With respect to the encryption theory, it is undisputed that the infringement contentions identified the specific source code files—three files out of 46,000—that showed infringement.  Appx34; Appx2416.  The infringement contentions also disclosed the theory that encryption is one of the ways in which the accused products provide the claimed "secure region."  Appx2407-2408, Appx2411.  Dr. Easttom then

provided further explanation and evidence of this theory by describing the specific variable that acted as the claimed "indication" and how the code showed that the "indication" limitation was met. Appx5627-5628 ¶¶554-557; Appx6558, Appx6579-6580; Appx8021-8027; Appx8094-8095; Appx5845, 167:2-168:4. This sequence is in line with the distinct purposes of infringement contentions and expert reports, and the district court abused its discretion in not permitting Sandisk to offer this evidence in light of its disclosed theories.

The district court faulted Sandisk's infringement contentions for not identifying the relevant source code with greater specificity, even while acknowledging that "identification of source code files" ***could***, at other times, "be enough to put a defendant on notice of a plaintiff's infringement theory." Appx34-35 & n.9. That was because decisions from the Northern District of California confirm that Sandisk's identification of specific source code files was more than enough to put Viasat on notice under the local rules. *See, e.g.*, *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-CV-05808-HSG, 2015 WL 9023166, at *3 (N.D. Cal. Dec. 16, 2015) (holding that "citations to source code directories rather than source code files" were sufficient); *Adobe Sys. Inc. v. Wowza Media Sys.*, No. 11-CV-02243-JST, 2014 WL 709865, at *16 (N.D. Cal. Feb. 23, 2014) (holding that "not every bit" of source code is required); *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 3640694, at *3 (N.D. Cal. June 11, 2015) (refusing to strike

expert report that cited to specific function and specific parameter not identified in the contentions). Because Sandisk's infringement contentions discussed encryption and cited specific source code files, the district court abused its discretion in striking the "encryption theory" from Dr. Easttom's report.

The district court similarly abused its discretion in striking the "DRM subfolder theory" from Dr. Easttom's report. Sandisk's infringement contentions identified the "████████ File System" as one of the mechanisms for controlling access to the secure region and cited documentation showing content are stored in ████████████ that provide differentiated access to, for example, different ████████ Appx2413; *see also* Appx2425-2426, Appx2448-2449. Dr. Easttom relied on this same use of ████████████ in his report and simply provided further evidence and explanation, including support from engineer testimony obtained during discovery, of how this satisfied the "indication" limitation, which is consistent with the different purposes of contentions and expert reports. Appx5630 ¶562; Appx5632 ¶¶571-572; Appx6585, Appx6588, Appx6616; Appx5812, 37:5-12; Appx5815, 47:4-48:1; Appx5822, 74:21-25; Appx5773, 103:3-16, 105:4-16. In light of the disclosures in Sandisk's infringement contentions, the exclusion of Sandisk's DRM subfolder theory was also an abuse of discretion.

The district court's grant of Viasat's motion to strike Sandisk's '667 Patent infringement theories should be reversed. Had Sandisk been permitted to present

these theories, they would have served as additional evidence from which a jury could find infringement. Thus, the district court's grant of summary judgment, which disregarded the excluded theories, should be reversed as well.

## III. The Court Erred in Dismissing SDT LLC from the Case for Lack of Standing

SDT LLC should not have been dismissed for lack of standing. The district court made two mistakes that led to the incorrect dismissal. First, the district court misapplied the law because it focused exclusively on constitutional standing (*e.g.*, whether SDT LLC had exclusionary rights) and ignored the rule that "a patent owner [must typically] be joined in any infringement suit brought by an exclusive licensee having fewer than all substantial rights." *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 980 (Fed. Cir. 2005). Because SDT LLC had ownership rights, it had standing in the case regardless of whether it had exclusionary rights. Second, the district court reached an incorrect legal conclusion when it held that SDT LLC lacked exclusionary rights, because SDT LLC can require that SDT Inc. enforce the asserted patents. Either of those two errors warrant reversal and a conclusion that SDT LLC had standing.[7]

---

[7] Viasat did not dispute that the remaining plaintiffs, SDT Inc. and SDSM, have standing, and thus, the district court's dismissal of SDT LLC did not result in dismissal of the infringement claims nor impact the recoverable damages. However, Viasat filed a pending motion for attorneys' fees based in part on Sandisk's allegedly improper inclusion of SDT LLC as a party, and the district court issued a show cause order requiring Sandisk to show why it should not be sanctioned for failure to

## A. The District Court Erroneously Considered Only Whether SDT LLC Satisfied Constitutional Standing

This Court has established multiple standing doctrines applicable in patent cases, of which constitutional standing is only one. Constitutional standing is jurisdictional and "serves to identify which disputes fall within [Article III's reference to 'Cases' or 'Controversies'] and therefore may be resolved by a federal court." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1263-64 (Fed. Cir. 2010). In the patent context, constitutional standing confers standing on "a party holding one of more of those exclusionary rights [created by the Patent Act]—such as an exclusive licensee" who "suffers a legally cognizable injury when an unauthorized party encroaches upon those rights." *Id.* at 1264-65. The so-called "statutory standing," meanwhile, is a non-jurisdictional requirement based on 35 U.S.C. § 281, which allows a "patentee," but not a mere licensee, to bring suit for patent infringement. *Lone Star Silicon Innovs. LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1229, 1235-36 (Fed. Cir. 2019). A patentee is "one with 'all rights or all substantial rights' in a patent" and "can sue in its own name." *Id.* at 1228. "[A]n exclusive licensee having fewer than all substantial patent rights and seeking to enforce its rights in a patent generally must sue jointly with the patent owner." *Sicom*, 427 F.3d

---

dismiss SDT LLC as a party. The issue of whether SDT LLC's inclusion was proper is thus not moot.

at 980.  The statutory and constitutional standing inquiries are "distinct"—that is, a party may satisfy one but not the other.  *Intellectual Tech LLC v. Zebra Techs. Corp.*, 101 F.4th 807, 814 (Fed. Cir. 2024).  Moreover, because the Patent Act places patent co-owners "at the mercy of each other," the rule is that "[a]n action for infringement ... must join as plaintiffs all co-owners."  *AntennaSys, Inc. v. AQYR Techs., Inc.*, 976 F.3d 1374, 1377-78 (Fed. Cir. 2020).

Contrary to this body of law, the district court considered only whether SDT LLC satisfied constitutional standing (*i.e.*, whether it held exclusionary rights) despite Sandisk's urging to the contrary.  Appx60.  The district court acknowledged Sandisk's argument that SDT LLC was a patent owner, *i.e.*, satisfied statutory standing, but rejected that approach by referring to "the touchstone of *constitutional standing*."  Appx59 (quoting *WiAV*, 631 F.3d at 1265).  The district court found that "the question is whether SDT LLC, through its predecessor WDI, holds any exclusive rights to the Asserted Patents."  *Id.*  Finding that "SDT LLC has failed to establish it has any exclusionary rights in the Asserted Patents," and without examining the relevant agreements to determine if SDT LLC was a patentee, the district court granted summary judgment that SDT LLC lacks standing and dismissed SDT LLC from the case.  Appx60.

The focus solely on exclusionary rights was an error.  The district court did not conduct the "distinct" inquiry of whether SDT LLC had statutory standing.

*Zebra*, 101 F.4th at 814. Under the proper standard, the district court should have, but failed to consider, whether SDT LLC possessed "all substantial rights" in the asserted patents and, under the 2007 Agreement, warranting reversal.

### B. SDT LLC Had Statutory Standing

Had the district court undertaken the proper analysis, it would have found that SDT LLC had an ownership interest. The 2007 Agreement establishes WDI, and thus successor-in-interest SDT LLC, as an owner of the asserted patents, and SDT LLC thus should have remained a plaintiff in this case. In performing the analysis to identify the patentee, *i.e.*, the holder of "all substantial rights," this Court has instructed that "[e]ach license and assignment is unique, therefore this court must ascertain the intention of the parties and examine the substance of what the licensing agreement granted." *Sicom*, 427 F.3d at 976 (internal quotations and modifications omitted). This analysis of the relevant agreements is a question of law and reviewed *de novo*. *Zebra*, 101 F.4th at 813; *Alfred E. Mann*, 604 F.3d at 1359. Here, the 2007 Agreement begins by vesting "all rights, title and interest" in WDI upon creation of the intellectual property. Appx7194-7195 §6.2(a). Thus, WDI was initially a patentee.

The 2007 Agreement's assignment of certain rights from WDI to WDT does not change the conclusion that WDI was a patentee. To the contrary, the 2007 Agreement is replete with language underscoring the limited nature of the rights

granted to WDT—for example, specifying the "sole purposes" of assigning WDT legal title and stating that it was "without any rights" except those "specifically provided." Appx7195 §6.2(b). The 2007 Agreement also repeatedly affirms that the provisions serve to "permit WDI to perfect and protect *its* ownership of all rights, title and interest" and prohibit WDT or third parties from "limit[ing] or impair[ing] *WDI's* sole ownership." Appx7195-7196 §§ 6.2(c), 6.3 (emphasis added). It could not be clearer that the "intention of the parties" was for WDI to remain an owner of the asserted patents. *Sicom*, 427 F.3d at 976. SDT LLC stepped into WDI's shoes when the two companies merged, and thus, it became owner of the asserted patents. Neither Viasat nor the district court disputed this analysis below.

To the extent the district court's finding that SDT Inc. and SD3D "split legal title and exclusivity" while SDT LLC "possesses . . . only undefined 'rights and interests' in the patents," Appx60, was an attempt to identify the holder of all substantial rights, it was in error. Where an entity—here, WDI—begins as patent owner and assigns certain rights to others, the inquiry is binary:

> Either the licensor did not transfer 'all substantial rights' to the exclusive licensee, in which case the licensor remains the owner of the patent and retains the right to sue for infringement, or the licensor did transfer 'all substantial rights' to the exclusive licensee, in which case the licensee becomes the owner of the patent for standing purposes and gains the right to sue on its own.

*Alfred E. Mann*, 604 F.3d at 1359-60. The district court, however, did not address whether "legal title and exclusivity," as conveyed by WDI to other entities,

constituted "all substantial rights." Indeed, given the 2007 Agreement's explicit limits on the "legal title" conferred to WDT, as well as its extensive language confirming WDI's ownership, the only possible conclusion is that the 2007 Agreement was not intended to assign away WDI's rights such that it would lose its status as patent owner.

## C. The District Court Erroneously Found that SDT LLC Lacks Exclusionary Rights

Even if SDT LLC was not required to be in the case as a patent owner, the district court legally erred in concluding that SDT LLC lacked exclusionary rights and thus could not be a proper co-plaintiff on constitutional standing grounds. Constitutional standing determinations are reviewed *de novo*. *Zebra*, 101 F.4th at 813; *Alfred E. Mann*, 604 F.3d at 1358. The threshold for constitutional standing is simply "whether a party has *an* exclusionary right." *Zebra*, 101 F.4th at 814. "A patent owner has exclusionary rights as a baseline matter unless it has transferred all exclusionary rights away." *Id.* at 816. SDT LLC's predecessor-in-interest WDI began as the owner of all rights, title, and interest in the asserted patents by operation of the 2007 Agreement. Thus, the proper question was whether WDI transferred *all* of its exclusionary rights to WDT, SD3D, or others. The district court did not even analyze this question, and the record only supports a conclusion that WDI did not transfer all such rights.

Under the 2007 Agreement, WDI explicitly retained at least one exclusionary

right: the right to require that WDT sue an infringer if WDT chose not to. Appx7196 §6.4. Stated differently, WDT did not have the only right to decide whether to file an infringement action on the patents, because WDI could require WDT to initiate enforcement of the patents. This arrangement is similar to that in *Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995), where Abbott had a "right of first refusal in suing alleged infringers" but permitted Diamedix to ask Abbot to bring suit, and if Abbot declined to do so, gave Diamedix the right to sue on its own. There, the court found that Abbott was a licensee with an exclusionary right, not an owner, because "it does not enjoy the right to indulge infringements, which normally accompanies a complete conveyance of the right to sue." *Id.* Similarly, here WDT did "not enjoy the right to indulge infringements" but rather was required to bring suit upon reasonable request from WDI. *Id.* Thus, even under its erroneous standard, the district court should have found that WDI and successor-in-interest SDT LLC still retained exclusionary rights and satisfied constitutional standing.

Because SDT LLC possessed both constitutional standing and statutory standing, the district court erred in dismissing it from the case.

## CONCLUSION

The Court should reverse and remand the district court's judgment of noninfringement on the '400 and '667 Patents and dismissal of SDT LLC for lack

of standing.

Dated:  February 25, 2026

Respectfully submitted,

/Brian M. Buroker/
Brian M. Buroker
GIBSON, DUNN & CRUTCHER
LLP
1700 M Street, N.W.
Washington, DC 20036-4504
(202) 955-8500
bburoker@gibsondunn.com

L. Kieran Kieckhefer
Lillian J. Mao
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center,
San Francisco, CA 94111
(415) 393-8200

Stuart Rosenberg
GIBSON, DUNN & CRUTCHER LLP
310 UNIVERSITY AVE 3RD FLOOR
PALO ALTO, CA 94301
(650) 849-5300

Robert J. Vincent
Y. Audrey Yang
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue,
Dallas, TX 75201
(214) 698-3400

Ahmed ElDessouki
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave,
New York, NY 10166
(212) 351-4000

*Counsel for Sandisk Technologies,*
*Inc., SanDisk Technologies, LLC*
*and Sandisk Malaysia SDN. BHD.*

# NONCONFIDENIAL ADDENDUM

# TABLE OF CONTENTS

| Date | Docket Number | Description | Appx Page No. |
|---|---|---|---|
| 11/17/25 | 295 | Final Judgment | Appx1–Appx2 |
| 09/20/24 | 120 | Claim Construction Order | Appx3–Appx23 |
| 10/21/25 | 274 (public); | Order re: Defendant's Motions to Strike; Plaintiffs and Defendant's Daubert Motions, Motions for Summary Judgment, and Motions to Seal; Plaintiff's Motion for Leave to File Surreply; and Plaintiffs' Motion to Substitute | Appx24–Appx64 |
| 08/23/16 | N/A | U.S. Patent No. 9,424,400 | Appx65–Appx92 |
| 10/15/19 | N/A | U.S. Patent No. 10,447,667 | Appx93–Appx107 |

CONFIDENTIAL MATERIAL OMITTED

The material omitted in Appx34-37, Appx45-47, Appx49-50, Appx53-43, Appx59, and Appx62 describes the parties' proprietary, internal and financial information.

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SANDISK STORAGE MALAYSIA SDN.
BHD., et al.,

        Plaintiffs,

   v.

VIASAT, INC,

        Defendants

Case No. 4:22-CV-4376-HSG

**FINAL JUDGMENT**

WHEREAS Plaintiffs filed a Complaint and Amended Complaint asserting three counts of patent infringement, with Count I alleging infringement of U.S. Patent No. 9,424,400, Count II alleging infringement of U.S. Patent No. 10,447,667 and Count III alleging infringement of U.S. Patent No. 8,504,834; and

WHEREAS the Court entered an order on November 15, 2023 (Docket No. 75) as follows: "grant[ing] Defendant's motion to dismiss Count Three of the Amended Complaint with leave to amend. Any Second Amended Complaint must be filed within 21 days of the date of this order. Failure to remedy the deficiencies described in this order will result in dismissal with prejudice and without further leave to amend.";

WHEREAS Plaintiffs filed a Notice on December 6, 2023 (Docket No. 76) electing not to file a Second Amended Complaint and reserving the right to appeal when Final Judgment is entered;

WHEREAS the Court entered a Claim Construction order (Docket No. 120) on September 20,

1

2025 as well as many other orders entered throughout the case;

WHEREAS the Court entered an Order (Docket No. 275 (under seal)) on October 21, 2025 regarding Defendant's Motion to Strike; Plaintiffs' and Defendant's Daubert Motions, Motions for Summary Judgment, and Motions to Seal; Plaintiffs' Motion for Leave to File Surreply; and Plaintiffs' Motion to Substitute; and

WHEREAS the Court entered a Judgment (Docket No. 276) on October 21, 2025 consistent with the October 21, 2025 order (Docket No. 275):

IT IS HEREBY ORDERED that final judgment is entered in favor of Defendant Viasat, Inc. and against Plaintiffs on Counts I, II and III in accordance with the Orders entered in this case.

This judgment resolves Counts I, II and III in the action and constitutes a judgment and a separate document for purposes of Federal Rule of Civil Procedure 58(a).

Dated at Oakland, California, this 17th day of November, 2025

Honorable HAYWOOD S. GILLIAM, JR.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN DIGITAL TECHNOLOGIES, INC., et al., | Case No. 22-cv-04376-HSG |
| Plaintiffs, | **CLAIM CONSTRUCTION ORDER** |
| v. | |
| VIASAT, INC., | |
| Defendant. | |

On July 28, 2022, Plaintiffs Western Digital Technologies, Inc., SanDisk Technologies LLC, SanDisk3d IP Holdings LTD., Western Digital Ireland LTD., and SanDisk Storage Malaysia SDN. BHD. (collectively, "Western Digital" or "WD") filed this patent infringement action against Defendant Viasat, Inc. ("Viasat"). Dkt. No. 1. The parties now seek construction of eight terms found in two patents: U.S. Patent Nos. 9,424,400 and 10,447,667. This order follows claim construction briefing and a claim construction hearing. *See* Dkt. Nos. 103 ("WD Br."), 104 ("Viasat Br."), and 105 ("WD Reply Brief").

I.    **BACKGROUND**

In this case, Western Digital claims that Viasat infringes two Asserted Patents: U.S. Patent No. 9,424,400 (the "'400 Patent") and U.S. Patent No. 10,447,667 (the "'667 Patent"). The '400 Patent is entitled "Digital Rights Management System Transfer of Content and Distribution" and was issued on August 23, 2016. *See* Dkt. No. 103-1. The '667 Patent is entitled "Secure Stream Buffer on Network Attached Storage" and was issued on October 15, 2019. *See* Dkt. No. 103-2. The Accused Products are Defendant's media streaming software, systems, and services, including specifically in-flight entertainment and communication systems for use in commercial and private aviation. *See* Dkt. No. 38 ¶ 2.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court

Northern District of California

**A.      The '400 Patent**

The '400 Patent relates to "digital rights management (DRM) for content that may be downloaded and securely transferred from one storage to another storage."  '400 Patent Abstract. The claimed invention "performs cryptographic operations and provides a root of trust" which "enables secure copying or transfer of content from one storage device to another storage device." *Id.*  Essentially, the '400 Patent claims a system that enables secure copying or transfer of media content (e.g., video streams) to "portable data storage devices" whereby the system authenticates the portable data storage device in question before providing an access key to decrypt the media content.

The '400 Patent has two independent claims—claim 1 and claim 9.  Claim 1 recites:

> A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising:
>
> a first data interface configured to communicate with a portable data storage device;
>
> a second data interface configured to communicate, over a network, with a remote trusted server; and
>
> a processor configured to:
>
>> obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;
>>
>> authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface;
>>
>> and in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.

'400 Patent cl. 1.  Dependent claims 2–8 of the '400 Patent recite kiosks with additional limitations, including wherein the kiosk comprises "a local data storage," '400 Patent cl. 2, or a "user interface for receiving a selection of the first media content from the local data storage," '400 Patent cl. 3.  Notably for the purposes of claim construction, dependent claim 8 further recites a "kiosk of claim 1, wherein the kiosk is located in a public environment."  '400 Patent cl. 8.  Independent claim 9 recites a *method* for provisioning secure media content to a plurality of

2

1   portable data storage devices from a kiosk, but the limitations are substantially identical to the

2   limitations of claim 1.  Similarly, dependent claims 10–17 are substantially identical to dependent

3   claims 2–8, only they depend on a method rather than system claim.

4       **B.**        **The '667 Patent**

5          The '667 Patent relates to "[a] network attached storage ["NAS"] device coupled to a local

6   area network and including a network interface configured to receive digital content from a remote

7   content provider outside the local network."  '667 Patent Abstract.  According to the specification,

8   the '667 Patent describes a problem whereby internet service providers are incentivized to throttle

9   download speeds for streaming services (e.g., Netflix, Hulu).  This throttling creates Quality of

10  Service issues for consumers, as display devices often have very limited buffers and streaming

11  services generally prefer limited buffers.  As a solution the '667 Patent claims a novel system and

12  method for buffering streaming media content (e.g., movies, tv shows) that "maintain smaller sizes

13  of buffers on display device and [] maintain control over content while ensuring that content can

14  be viewed without deterioration due to throttling through the use of a Network Attached Storage

15  (NAS) device having a secure portion for buffering streaming content."  *Id.* at 2:30–34.

16         The '667 Patent has three independent claims—claim 1, claim 11, and claim 20.  Claim 1

17  of the '667 Patent recites:

18          A media streaming system comprising:

19          a network interface adapter configured to transmit digital content, via
20          a wide area network (WAN), to a network attached storage (NAS)
            device operating on a local area network (LAN); and

21          one or more hardware processors configured to:

22              receive an indication of the NAS device +having a secure
23              region comprising a buffer for streaming media on a separate
                display device on the local area network, wherein access to
24              the secure region is controlled by the media streaming system;

25              transmit the digital content to the secure region within the
                NAS device for playback by the separate display device from
26              the buffer; and

27              transmit instructions to the NAS device to control streaming
                access to the digital content stored on the buffer.

28  *Id.* cl. 1.  Dependent claims 1–9 recite further limitations wherein, e.g., the processors are

**Appx5**

configured to cause the NAS device to use encryption that secures the digital content to the secure region (claim 5); provide instructions to the NAS device for controlling an encryption type used in the secure region (claim 7); or provide instructions to the NAS device to reallocate a portion of the secure region storing the digital object to an accessible region (claim 9).  Independent claim 11 recites a method for transmitting media content from a media streaming system, but the limitations are substantially identical to the limitations of claim 1.  Similarly, dependent claims 12–19 are substantially identical to dependent claims 2–8, only they depend on a method rather than system claim.  Independent claim 20 of the '667 Patent is also a system claim, but is drafted in means-plus-function language versus the "processor configured to" language of claim 1.

## II.    LEGAL STANDARD

Claim construction is a question of law to be determined by the Court.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996).  "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quotation omitted).  Accordingly, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *Id.* at 1362; *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) (finding legal error in trial court's decision not to construe terms despite fundamental dispute between parties).

It is "a basic principle of claim construction . . . that 'the words of a claim are generally given their ordinary and customary meaning.' "  *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (quoting *Philips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)).  There are only two circumstances where a claim is not entitled to its plain and ordinary meaning:  "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

In determining the ordinary and customary meaning, the claim language "provide[s] substantial guidance as to the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314.  Additionally, "the context in which a claim term is used in the asserted claim can be highly

1    instructive." *Id.*  However, a person of ordinary skill in the art is "deemed to read the claim term

2    not only in the context of the particular claim in which the disputed term appears, but in the

3    context of the entire patent, including the specification." *Id*. at 1313.  The specification "is always

4    highly relevant to the claim construction analysis" and is usually "dispositive." *Id*. at 1315.  The

5    scope of the claims must be "determined and confirmed with a full understanding of what the

6    inventors actually invented and intended to envelop with the claim." *Id*. at 1316 (quotation

7    omitted).  Thus, the construction that "stays true to the claim language and most naturally aligns

8    with the patent's description of the invention will be, in the end, the correct construction." *Id*.  In

9    addition to the claims and the specification, the prosecution history may be used "to provide[ ]

10   evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. "[A]ny

11   explanation, elaboration, or qualification presented by the inventor during patent examination is

12   relevant, for the role of claim construction is to capture the scope of the actual invention that is

13   disclosed, described and patented." *Fenner Inv., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed.

14   Cir. 2015) (quotation omitted). The claims, specification, and prosecution history together

15   constitute the "intrinsic evidence" that forms the primary basis for claim construction. *Phillips*,

16   415 F.3d at 1312–17 (citation omitted).

17        Courts may also consider extrinsic evidence, such as dictionaries, treatises, and expert

18   opinions, if it is "helpful in determining the 'true meaning of language used in the patent claims' "

19   and is not contradicted by the intrinsic evidence. *Id.* at 1318 (quoting *Markman*, 52 F.3d at 980).

20   For example, dictionaries may reveal what the ordinary and customary meaning of a term would

21   have been to a person of ordinary skill in the art at the time of the invention.  *Frans Nooren*

22   *Afdichtingssystemen B.V. v. Stopaq Amcorr Inc.*, 744 F.3d 715, 722 (Fed. Cir. 2014) ("Terms

23   generally carry their ordinary and customary meaning in the relevant field at the relevant time, as

24   shown by reliable sources such as dictionaries, but they always must be understood in the context

25   of the whole document—in particular, the specification (along with the prosecution history, if

26   pertinent).").  Expert testimony can also help "to ensure that the court's understanding of the

27   technical aspects of the patent is consistent with that of a person of skill in the art, or to establish

28   that a particular term in the patent or the prior art has a particular meaning in the pertinent field."

United States District Court
Northern District of California

5

**Appx7**

1  *Phillips*, 415 F.3d at 1318. Extrinsic evidence is, however, "less significant than the intrinsic

2  record in determining the legally operative meaning of claim language." *Id.* at 1317 (quotation

3  omitted).

4  **III.    DISPUTED TERMS**

5      **A.    "kiosk" ('400 Patent)**

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Non-limiting preamble, in the alternative, plain and ordinary meaning | "a device whose user interface is used by consumers" |

9       The term "kiosk" appears in the preamble of asserted claims 1, 2, 6, 8-10, 13, and 17 of the

10  '400 Patent. The parties present two disputes as to the interpretation of the term "kiosk." First,

11  the parties dispute whether the term "kiosk" in the preamble is limiting—Western Digital argues

12  that the preamble is not limiting, whereas Viasat argues that it is. *See* WD Br. at 5–6; Viasat Br. at

13  2–3. Second, if the preamble is limiting, Viasat argues that the term "kiosk" should be construed

14  as "a device whose user interface is used by consumers." Viasat Br. at 3–5. Western Digital

15  argues that the plain and ordinary meaning of the word "kiosk" does not include such

16  requirements, and that no construction is necessary. WD Br. at 6–8.

17          **i.    Whether the Preamble is Limiting**

18       The first threshold issue the Court must resolve is whether the preamble is limiting.

19  "Whether to treat a preamble as a limitation is a determination resolved only on review of the

20  entire patent to gain an understanding of what the inventors actually invented and intended to

21  encompass by the claim." *Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d

22  1362, 1367 (Fed. Cir. 2020) (cleaned up). "In general, a preamble limits the invention if it recites

23  essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."

24  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting

25  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). "Conversely,

26  a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim

27  body and uses the preamble only to state a purpose or intended use for the invention.'" *Id.*

28  (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)); *see also Neapco Drivelines LLC v.*

United States District Court
Northern District of California

6

*Am. Axle & Mfg., Inc*., 847 Fed. App'x 856, 858 (Fed. Cir. 2021) (The general rule is that a preamble is not limiting, unless "it recites 'additional structure or steps underscored as important by the specification,' is 'essential to understand limitations or terms in the claim body,' or provides necessary structure absent from the claim body." (quoting *Catalina*, 289 F.3d at 808)). "Moreover, clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." *Catalina*, 289 F.3d at 808.

Viasat argues that the term "kiosk" in the '400 Patent is limiting because of the prosecution history of the '400 Patent's parent application—U.S. Patent No. 8,914,634 (the "'634 Patent"). During prosecution of the '634 Patent, the claims initially recited a "first storage device configured to provide content to a player system for rendering of the content . . ." Dkt. No. 104-2 at 34. These claims were rejected by the USPTO in view of U.S. Patent Publication 2009/0052671 ("Bauchot"), which the examiner found to disclose each of the then-pending claims. *Id.* The applicant then amended the claims, including replacing phrase ""first storage device configured to provide content to a player system" with "[a] ***kiosk*** for provisioning secure media content to a plurality of portable data storage devices." *Id.* at 15 (emphasis in original). The applicant further argued that Bauchot did not disclose the newly-amended claims, including because "Bauchot fails to even mention use of a kiosk." *Id.* at 19. Viasat argues that this statement represents a clear statement that a ""kiosk' is not simply a 'storage device,' such as a 'media center' connected to 'a personal computer' as in Bauchot—the 'kiosk' must be something more than the configuration Bauchot expressly mentioned." Viasat Br. at 3.

The Court finds that the applicants' statements in the prosecution of the '634 Patent suffice to demonstrate a "clear reliance on the preamble . . . to distinguish the claimed invention from the prior art[.]" *Catalina*, 289 F.3d at 808. Western Digital argues that the Court cannot look at the prosecution history of a related patent to find such clear reliance, but the '634 Patent is the parent application of the '400 Patent. In such cases, the Federal Circuit has repeatedly said that statements made in the prosecution of a parent application are to be treated as intrinsic evidence for the purposes of claim construction. *See E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921

7

**Appx9**

1    F.3d 1060, 1069 (Fed. Cir. 2019); *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1384 (Fed.

2    Cir. 1999) (applying statements from prosecution of a parent application where subject matter was

3    common to the continuation-in-part application); *see also Jonsson v. Stanley Works*, 903 F.2d 812,

4    818 (Fed. Cir. 1990) (affirming claim construction relying on "arguments and remarks" made

5    during the prosecution of a parent application for the same claim term).

6         Accordingly, because the patentee clearly used the term "kiosk" in the preamble as a

7    means to distinguish prior art during the prosecution of the '400 Patent's parent application, the

8    Court concludes that the preamble's use of that term is limiting.

9              ii.    **Construction of "Kiosk"**

10        The Court next turns to the proper construction of the term "kiosk."  Western Digital urges

11   that the Court need not construe the term beyond its "plain and ordinary meaning," which it argues

12   would be understood by the jury in light of the specification as being "any device used to access

13   and distribute content provided by the system."  WD Br. at 6–8 (quoting '400 Patent at 6:36–37).

14   Viasat argues that the term should be construed as "[a] device whose user interface is used by

15   consumers."  Viasat Br. at 3–5.  Because the parties "present a fundamental dispute regarding the

16   scope of [the] claim term[,]" *O2 Micro*, 521 F.3d at 1362, the Court must resolve this dispute with

17   sufficient clarity that the issue is not left for the jury to decide.  Accordingly, the Court will

18   proceed as if Western Digital's proposed construction is "any device used to access and distribute

19   content provided by the system."  *See* Dkt. No. 117 ("Hearing Tr.") at 12:10–18.  The Court finds

20   that construction most supported by the intrinsic evidence here. Western Digital's proposed

21   construction is adopted verbatim from the specification, which expressly states that "the kiosk

22   106' may be *any device* used to access and distribute content provided by the system."  '400

23   Patent at 6:36–37 (emphasis added).  A POSITA, reading such a clear statement in the

24   specification, would understand the patentee's intended meaning for "kiosk" to be broad enough to

25   encompass any such device, and that it need not be limited to a device having a "user interface"

26   that is "used by consumers."

27        In contrast, Viasat's construction improperly imports optional features of the "kiosk" as

28   required elements.  Specifically, the '400 Patent states that the kiosk "*may* be implemented as a

self-service computer terminal" and in other embodiments, *may* be placed in a public environment and "*may* comprise various user interface equipment such as a keyboard, display, etc." '400 Patent at 6:37–43 (emphasis added).  The "use of the word 'may' in the specification strongly implies" that such features are not necessarily required.  *Game & Tech. Co. v. Wargaming Grp. Ltd.,* 942 F.3d 1343, 1351 (Fed. Cir. 2019).  Viasat's intrinsic evidence supporting its "user interface" requirement is all written in such permissive language, such that a POSITA reading the specification would understand that while a "kiosk" may have a user interface, such features are not mandatory.  Furthermore, as to whether the "kiosk" must be "used by consumers," Viasat cites to no intrinsic evidence supporting such a requirement, and instead suggests that the plain meaning of a "kiosk" implies such a requirement.  *See* Hearing Tr. at 25:5–10 (suggesting that "kiosk" "had a very specific meaning. . . . before computers, where people would go to a kiosk . . . for a transaction with a consumer.").  The Court finds this argument insufficient to overcome the strong intrinsic evidence supporting Western Digital's broader proposed construction.[1]  Similarly, the Court declines to consider Viasat's extrinsic evidence (e.g., dictionary definitions) in support of its narrow construction.  While courts may consider such evidence on claim construction, it "is generally of less significance than the intrinsic record[.]"  *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019).  Because Viasat's dictionary definitions conflict with the specifications' express statements, the Court concludes that they "do not necessarily reflect the inventor's goal of distinctly setting forth his invention as a person of ordinary skill in that particular art would understand it."  *Phillips*, 415 F.3d at 1322.

The Court finds Viasat's other counterarguments unpersuasive.  Viasat also argues that Western Digital's alternative proposal is untimely because it was not disclosed in the parties' exchange of preliminary claim constructions or March 12, 2024 Joint Claim Construction and Prehearing Statement.  *See* Viasat Br. at 10.  But Viasat cites to no authority suggesting that this failure constitutes a waiver of the argument, and presents nothing to show that it has suffered any real prejudice from such a failure.  And in any case, Western Digital disclosed in the Joint Claim

---

[1] Viasat itself conceded at the hearing that this requirement "could be too narrow" and that it was "not tied to that word[.]"  Hearing Tr. at 25:11–12, 22–23.

9

**Appx11**

Construction and Prehearing Statement that it intended to rely upon the specification's characterization of "kiosk" as "any device used to access and distribute content provided by the system." *See* Dkt. No. 95 at 4 (Appendix 1 citing '400 Patent at 6:35–51 in support of Plaintiffs' proposed construction for "kiosk"). Any prejudice to Viasat from Western Digital's purported untimeliness is therefore minimal, as Viasat was on notice that, at a minimum, Western Digital intended to rely upon that language in support of its "plain and ordinary meaning" construction.

Viasat next argues that this construction "violates black-letter law 'preclud[ing] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.' " Viasat Br. at 10 (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed Cir. 2003)). This argument does not withstand scrutiny. Viasat essentially argues that when the patentee distinguished Bauchot during the prosecution of the '634 Patent for "fail[ing] to even mention use of a kiosk[,]" it effectively disclaimed the broader construction that Western Digital now proposes. But the '634 Patent shares a specification with the '400 Patent, including the characterization of "kiosk" as "any device used to access and distribute content provided by the system." *See* '634 Patent at 6:28–29. For Viasat's argument to prevail, it would have to demonstrate that the patentee's use of the term "kiosk" in the '634 Patent prosecution history meant *something narrower* than what the '634 Patent's specification expressly stated. The Court sees no evidence of this in the intrinsic record.

Accordingly, the Court adopts the construction "any device used to access and distribute content provided by the system."

### B.    "portable data storage device" ('400 Patent)

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "a storage device that can be easily carried or moved about by its user" |

The parties' dispute as to this term boils down to a dispute over the meaning of the word "portable," and is two-fold: Viasat argues that for a "data storage device" to be "portable," it must (1) be *easily* carried or moved around (2) by its user. *See* Viasat Br. at 7–9. Western Digital argues that neither qualification is necessary, that they inject unnecessary ambiguity into the claim

United States District Court
Northern District of California

1   language, and that the term needs no construction.  *See* WD Br. at 9.  Alternatively, Western

2   Digital proposes a construction of "[a storage device] capable of being carried or moved."

3   Hearing Tr. at 41:4–11.  As with the prior term, the Court rejects Western Digital's proposal that

4   no construction is necessary, and instead proceeds with its alternative proposal from the hearing.

5   *See O2 Micro*, 521 F.3d at 1362.

6           The Court turns to the crux of the parties' dispute as to this claim term, beginning with

7   whether a "*portable* data storage device" must be a data storage device that "can be *easily* carried

8   or moved."  Notably, this dispute is almost directly analogous to the claim term at issue in *Eon*,

9   where the Federal Circuit reversed a district court's construction of "portable" and "mobile" terms

10  in the claim language.  In that case, the Federal Circuit held that the district court erred in not

11  construing these terms at claim construction, which permitted the plaintiff to take the position that

12  the terms "portable" and "mobile" "should be broadly interpreted as including, essentially,

13  anything that is theoretically capable of being moved." *Eon*, 815 F.3d at 1321.  In reversing the

14  district court, the Federal Circuit rejected plaintiffs' interpretation as "completely untethered to the

15  context of the invention . . . ." *Id.*

16          Of course, this case is not *Eon*, and this Court must construe the terms in the '400 Patent in

17  accordance with the '400 Patent's intrinsic and extrinsic record.  However, here too, the evidence

18  supports Viasat's position.  First, the '400 Patent specification uses the word "portable" in ways

19  that suggest it means more than being *capable* of being moved or carried.  For example, the

20  specification describes a "client system" in embodiments that "may comprise a computer, a

21  television, a *portable* or mobile device, a video game console, a *portable* video game console, as

22  well as associated storage." '400 Patent at 4:18–22 (emphasis added).  The distinction between

23  "video game console" and "*portable* video game console" suggests that the patentee, when using

24  the word "portable," understood it to mean something beyond the mere capability to be moved or

25  carried.  Similarly, the specification's description of certain devices as "*portable* or mobile

26  device[s]" suggests that a "portable" device is at least similar to, if not synonymous with, a

27  "mobile" device.  This conclusion is later reinforced in the specification, which describes that the

28  "user of client system 106 may then remotely access the content and play it on a mobile device,

1    such as an iPad, iPod, iPhone, a *portable* video game console, such as PlayStation® portable or a

2    Nintendo DS, etc." '400 Patent at 5:21–25.  The portable and mobile devices described in this list

3    are all small devices, designed to be easily carried or moved about.  Accordingly, by the canon of

4    *noscitur a sociis*, the intrinsic evidence strongly supports Viasat's position that a POSITA would

5    understand that a "portable data storage device" is likewise a storage device that can be *easily*

6    carried or moved about, as opposed to anything (no matter how large, heavy, or ungainly) that is

7    capable of being carried or moved about.

8         Western Digital argues that Viasat's construction introduces indefiniteness and

9    unnecessary confusion through the use of the word "easily," and that it deviates from plain

10   English dictionary definitions of the word "portable."  *See* WD Br. at 9.  Neither argument

11   persuades.  First, it is well established that terms of degree, such as "easily," are not inherently

12   indefinite. *See Interval Licensing LLC v. AOL, Inc*., 766 F.3d 1364, 1370 (Fed. Cir. 2014).  Rather,

13   such language "has long been found definite where it provided enough certainty to one of skill in

14   the art when read in the context of the invention." *Id.*  Here, the '400 Patent's descriptions of

15   exemplary portable devices in the specification are sufficient to enable one of ordinary skill in the

16   art to understand, with reasonable certainty, what it would mean for such a device to be "easily

17   carried or moved about."  Second, as to Western Digital's dictionary definitions, these definitions

18   are extrinsic evidence at best, and thus do not give this Court reason to reject its conclusions as to

19   what the intrinsic evidence—the '400 Patent specification—would inform a POSITA as to the

20   scope of the claim term.  *See Allergan Sales*, 935 F.3d at 1373.

21        The Court next turns to the second requirement of Viasat's proposed construction, that the

22   "portable data storage device" be "easily carried or moved about *by its user*."  According to

23   Viasat, this requirement is not strictly necessary for its proposed construction, but rather

24   something added to preclude a hypothetical future argument by Western Digital that objects which

25   can be easily carried or moved about by heavy machinery (e.g., a forklift) are nonetheless

26   "portable."  *See* Hearing Tr. at 38:19–25.  To that extent, Viasat admits that this addition would

27   only provide "additional marginal clarity" to the jury. *Id.*  Here, the Court agrees with Western

28   Digital that this requirement is unnecessary and introduces potential confusion as to who the *user*

1   is.  The Court sees no indication that Western Digital intends to argue that a device that is easily

2   carried or moved about by heavy machinery is still "portable," and the Court need not "resolv[e]

3   all questions of meaning with absolute, univocal finality."  *Eon*, 815 F.3d at 1319; *see also Vivid*

4   *Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999) (the Court need construe

5   "only those terms . . . that are in controversy, and only to the extent necessary to resolve the

6   controversy.").  Because this issue is at best, a hypothetical dispute, the Court declines to adopt

7   Viasat's proposal here.

8       Accordingly, the Court adopts the construction:  "a storage device that can be easily

9   carried or moved about."

10      **C.**   **"authenticate the portable data storage device, using at least the unique**
            **identifier" ('400 Patent)**

11

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "confirming that the portable data storage device is trusted using at least the unique identifier" |

15      The parties' dispute regarding this term relates to the word "authenticate."  Western Digital

16  argues that plain and ordinary meaning of "authenticate" means simply to "confirm the identity"

17  of the portable data storage device, whereas Viasat argues for the additional step of "confirming"

18  that the portable data storage device "is trusted."  *See* WD Br. at 9–11; Viasat Br. at 9–12.

19      A POSITA would understand that, in the context of the '400 Patent, Viasat's construction

20  is more consistent with the intrinsic record.  The '400 Patent's specification makes it clear that the

21  purpose of the claimed invention is to develop a digital rights management ("DRM") system,

22  which is "used to control the use of digital content and devices" and "prevent unauthorized

23  copying of digital content."  '400 Patent at 1:25–27.  The specification further describes problems

24  with existing DRM systems, which "have security weaknesses and have been circumvented."  *Id.*

25  at 1:32–34.  In solving these problems, the '400 Patent describes embodiments in which a trusted

26  content server can authenticate devices "to ensure that entities in the system are trusted" and

27  "ensure[] that the storage device confirms a trust relationship with the player and vice versa."  *Id.*

28  at 3:23–37.  When the specification uses the word "authenticate," it is *always* for the purpose of

13

**Appx15**

United States District Court
Northern District of California

confirming the trust level of the devices in question, and no embodiment in the specification describes "authenticating" as a mere identification of the devices. Western Digital essentially conceded as much at the hearing. *See* Hearing Tr. at 49:10–50:10. If anything, the specification teaches away from mere identification. The Federal Circuit has affirmed narrower constructions based on similar disparaging remarks, combined with "repeated[], consistent[], and exclusive[]" depictions consistent with a narrower construction, and especially when the broader construction runs contrary to the primary purpose of the invention. *In re Abbott Diabetes Care Inc. ("Abbott")*, 696 F.3d 1142, 1149 (Fed. Cir. 2012); *see also Groove Digital v. United Bank*, 825 Fed. App'x 852, 857 (Fed. Cir. 2020) (construing the term "applet" to require geotargeting based on statements in specification that primary object of the claimed invention was geotargeting, and every embodiment disclosed required geotargeting); *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1326 (Fed. Cir. 2023) ("We have explained that a patent's express purpose of the invention 'informs the proper construction of claim terms.' "). Like in *Abbott* and *Groove Digital*, the '400 patent's exclusive use of "authenticat[ion]" to "prevent unauthorized copying of digital content," '400 Patent at 1:25–27, confirms that the patentee intended for the term "authenticate" to include confirmation that the portable data storage device is trusted or authorized.

Accordingly, the Court adopts the construction: "confirming that the portable data storage device is trusted using at least the unique identifier."

### D. "provide to the portable data storage device . . . a corresponding access key" ('400 Patent)

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "provide to the portable data storage device . . . a key for the portable data storage device to decrypt the first media content" |

The parties' dispute as to this claim term relates to what the "corresponding access key" is. Viasat takes the position that the "corresponding access key" must be an access key specific to the portable data storage device, and be used to decrypt the first media content. Viasat Br. at 13–15. Western Digital argues that the access key merely has to "correspond" with the first media content, and does not need to be specific to the portable data storage device. WD Br. at 11–12.

United States District Court
Northern District of California

1    Viasat first argues that the "corresponding access key" must be a key to "decrypt the first

2    media content.  The Court agrees.  The '400 Patent's specification makes it clear that the access

3    key is used for the encryption and decryption of content.  For example, the specification plainly

4    states that the "[t]he access key is used to decrypt and render the [media] content."  '400 Patent at

5    9:30; *see also* 18:6–7 ("Sixth, the host system 400 generates the access key 706 in order to decrypt

6    the content."); 21:38–39 (same).  It further states that the access key may be used to encrypt the

7    content.  *See id.* at 12:20–22 ("The download server 300 may then use the binding key as one

8    component of an access key used to encrypt the content."); 15:7–9 ("For example, the download

9    server 300 may employ AES encryption to encrypt the content 702 based on the access key 706.").

10   Where, as here, "a patentee uses a claim term throughout the entire patent specification, in a

11   manner consistent with only a single meaning, he has defined that term 'by implication.' " *Bell*

12   *Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001); *see*

13   *also Abbott,* 696 F.3d at 1150 (claim term may be defined by implication where patents

14   "repeatedly, consistently, and exclusively" depict embodiments using that definition).

15   Viasat also argues that the "corresponding access key" must be specific to the portable data

16   storage device.  Viasat argues that the specification describes the "access key" as being derived

17   from a "content key"—which is specific to the encrypted media content—and a "binding key"—

18   which is "used to bind content to the storage device . . . ."  '400 Patent at 9:5–6.  According to

19   Viasat, one of the key improvements claimed by the '400 Patent is this two-part "access key,"

20   which prevents *any* portable data storage device from accessing the content.  This improved upon

21   prior art that only utilized a content-specific "content key," which enabled bad actors with access

22   to the key to distribute and access the content with other data storage devices. *See* Viasat Br. at

23   13–14; *see also* Dkt. No. 103-4 ("Almeroth Decl.") ¶¶ 68–71; Hearing Tr. at 59:17–60:2.  Finally,

24   Viasat again cites to the prosecution history of the '634 Patent, wherein the patentee distinguished

25   the patent from prior art by arguing that "Bauchot relies on storing content and keys separately . . .

26   rather than on binding content to a portable storage device . . . and teaches away from binding

27   content specifically to a portable storage device . . . ."  Dkt. No. 103-5 at 7–8.

28   Western Digital counters that Viasat's argument relies upon permissive descriptions of

15

**Appx17**

United States District Court
Northern District of California

1  certain exemplary embodiments in the specification, which the claim language does not require.

2  *See* '400 Patent at 7:63–8:3 ("FIG. 3 shows an *exemplary download system* of the embodiments. . .

3  . In *one embodiment*, download server 30 encrypts the content with an access key that *may be*

4  derived from a binding key and a content key." (emphasis added)); 9:3–10 ("In *one embodiment*, .

5  . . the cryptographic module 409 may be configured to generate a binding key that is used to bind

6  content to the storage device 110." (emphasis added)).  Western Digital further argues that the

7  statements made during prosecution history of the '634 Patent cannot support disclaimer in the

8  '400 Patent, because the '634 Patent expressly claimed a "binding key unique to the portable data

9  storage device . . . ," a limitation notably missing from the '400 Patent.  *See* WD Br. at 13.

10  Finally, Western Digital argues that Viasat's construction would exclude disclosed embodiments

11  in which the "corresponding access key" is used by devices other than the portable data storage

12  device to decrypt content, such as the playback device.  *See* '400 Patent at 9:27–30 ("Responsive

13  to this request, the storage device may then send the binding and content keys to the player so that

14  it can generate the access key.  The access key is used to decrypt and render the content.").

15         On this issue, the Court agrees with Western Digital.  As it argues, the specification's

16  language describing the "access key" being derived from a "content key" and a "binding key" is

17  permissive and only describes exemplary embodiments.  Such language would indicate to a

18  POSITA that the "corresponding access key" claimed in the '400 Patent may be so derived, but

19  need not be.  *See Game & Tech.,* 942 F.3d at 1351.  To adopt Viasat's proposed construction

20  would improperly import limitations from those embodiments into the claim language.  Moreover,

21  such a construction would also improperly exclude embodiments in which the "corresponding

22  access key" is generated and used by the playback device, *not* the portable data storage device, to

23  decrypt and render the content.  *See Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir.

24  2022) ("A claim construction that excludes a preferred embodiment is rarely, if ever correct[.]").

25  The intrinsic evidence does not support such a construction.  As for Viasat's arguments from the

26  '634 Patent prosecution history, the Court does not find the statements made regarding Bauchot's

27  lack of a binding key disclosure relevant to the '400 Patent, which, unlike the '634 Patent, does

28  not expressly recite or claim such a binding key.

United States District Court
Northern District of California

1    Viasat argued at the hearing that unless the "corresponding access key" was specific to the

2    portable data storage device, the construction would "collapse the distinction between an access

3    key and the content key." Hearing Tr. at 61:8–62:6. However, the claim language does not claim

4    that the access key must be distinct from a "content key"—unlike the '634 Patent, the '400

5    Patent's claims do not recite a "content key" or "binding key" anywhere. This argument, like

6    Viasat's arguments from the '634 Patent's prosecution history, presumes that the '400 Patent

7    recites the same claim language as the '634 Patent. But the '400 Patent was drafted using broader

8    language in this regard. A POSITA, having read the intrinsic record of both patents, would not

9    understand that, in the context of the '400 patent, the "corresponding access key" must necessarily

10   be distinct from a "content key."

11   Accordingly, the Court adopts the construction: "provide to the portable data storage

12   device . . . a key to decrypt the first media content."

13   **E.      "public environment" ('400 Patent)**

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a location accessible by the general public" |

16   It is unclear to the Court that there is a genuine fundamental dispute as to the scope of this

17   term. Both parties seem to agree that the term "public environment" should be accorded its plain

18   and ordinary meaning, with the only difference between the parties' respective proposed

19   constructions being the inclusion of the word "general" in Viasat's construction. *See* Hearing Tr.

20   at 76:4–11 (Western Digital proposing construction of "environment accessible to the public.").

21   As with many of Viasat's proposals, the inclusion of the word "general" here appears to be

22   a litigation-driven decision to preclude an as-yet hypothetical position that Western Digital might

23   take. Here, Viasat argues that, without the inclusion of the word "general," Western Digital might

24   try to argue that any location accessible to any singular member (or subset of) the public is a

25   "public environment," such as a person's house. *See* Hearing Tr. 73:6–14. Again, there is no

26   evidence that Western Digital intends to take such a position, and as such, the Court sees no real

27   dispute between the parties as to the scope of the claim. Absent such a dispute, the Court sees no

28

**Appx19**

reason to add a term to the construction that may inject confusion for the jury.

Viasat argues in its briefing that "there is a clear dispute over this term as evidenced by Plaintiffs' infringement contentions where they contend that a server located above the ceiling or under the floor of a plane, and thus completely inaccessible to airline customers, is still somehow in a 'public environment.' " Viasat Br. at 16. But that dispute concerns infringement, not claim scope. Unlike in *Eon*, where the Court's failure to construe the terms "portable" and "mobile" left open infringement positions that would otherwise have been foreclosed, the parties' respective constructions are not so different here as to leave open a dispute of infringement. A location "accessible by the general public" and a location "accessible by the public" are substantially the same, and whether a server on a plane satisfies this accessibility requirement is a fact question for the jury to resolve. Because the parties' dispute has no bearing on their respective proposed constructions, the Court declines to consider it. *See Scripps Clinic & Res. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991) ("the words of the claims are construed independent of the accused product.").

Accordingly, the Court adopts the construction: "location accessible by the public."

### F. "secure region" ('667 Patent)

The parties resolved their dispute as to the scope of this claim term at the hearing, and per the Court's instructions, submitted a stipulated construction of "secure region" as "a region of the NAS device to which access is controlled." *See* Dkt. No. 119.

Accordingly, the Court adopts the construction: "a region of the NAS device to which access is controlled."

### G. "receive an indication of the NAS device having a secure region" ('667 Patent)

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "receive an indication of the presence of a secure region within the NAS device" |

The parties dispute whether the claim term "receive an indication of the NAS device having a secure region" requires that the processor merely receive an indication of the NAS device (which happens to have a secure region), or whether the processor must also receive an indication

18

1   of the presence of the secure region itself.  *See* WD Br. at 17–18; Viasat Br. at 21–23.  Western

2   Digital argues that the plain language of the claim term does not require the processor to receive

3   an indication of the presence of the secure region, and that the claim should not be construed as

4   requiring such an indication every time media is transmitted through the claimed system.  Viasat

5   counters that the novel aspect of the claimed invention is the use of this secure region to buffer

6   content for streaming providers, and that the system would not be able to operate without the

7   processor being aware of the presence of the secure region to stream content to.

8          The Court is persuaded by Viasat's argument.  The focus of the '667 Patent, as described

9   by the specification, is a novel NAS device having a secure region to buffer content from

10  streaming services; as such, the claims logically require an indication that the NAS device has

11  such a secure region for this buffer.  Simply put, the claimed processor must have some indication

12  of the presence of the secure region to use that secure region as a buffer.  Otherwise, the claimed

13  invention would not make sense, because if the system did not have an indication of the presence

14  of the secure region, it would not be able to use that secure region to buffer content.  Because

15  "claims are directed to the invention that is described in the specification[,] they do not have

16  meaning removed from the context in which  they arose."  *Netword, LLC v. Centraal Corp.*, 242

17  F.3d 1347, 1352 (Fed. Cir. 2001); *see also Sequoia*, 66 F.4th 1326.  Viasat's construction most

18  clearly describes what a POSITA would understand the claim language to mean, when viewed

19  "with a full understanding of what the inventors actually invented and intended to envelop with

20  the claim."  *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*,

21  158 F.3d 1243, 1250 (Fed. Cir. 1998)).

22         Accordingly, the Court adopts the construction: "receive an indication of the presence of a

23  secure region within the NAS device."

24  \\

25  \\

26  \\

27  \\

28  \\

19

United States District Court
Northern District of California

**H.**   **"access to the secure region is controlled by the media streaming system" / "control streaming access to the digital content stored on the buffer" ('667 Patent)**

| Western Digital's Proposed Construction | Viasat's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "access to the secure region is managed by the media streaming system"… "manage streaming access to the digital content stored on the buffer" |

Viasat argues this claim term should be construed because the specification describes the secure region as being controlled in a "continuous manner" (i.e., control is maintained) by the media streaming system.  Viasat Br. at 24–25.  Viasat argues that the word "manage" better captures the continuous nature of this control than simply the word "control."  *Id.*  Western Digital argues that no construction is necessary here.  WD Br. at 19–20.

The Court agrees that there is no reason to construe this term.  Western Digital does not dispute that the specification describes the secure region as being continuously controlled by the media streaming system, and Viasat has provided no basis for its assertion that the word "manage" better captures the continuous nature of this control than the plain language of the claim.  Viasat appears to simply request that the Court replace the plain language of the claim with a word that it prefers, but has provided no reason to do so.  *See Solutran, Inc. v. U.S. Bancorp & Elavon, Inc.*, No. 13-CV-2637 (SRN/BRT), 2017 WL 2274959, at *4 (D. Minn. May 24, 2017) (rejecting construction replacing "point of sale" with "point of purchase" as "it does not in any way clarify the original term[.]"); *Tech. Innovations, LLC v. Nstein Techs., Inc.*, No. 2:10-CV-341-FTM, 2015 WL 1910434, at *10 (M.D. Fla. Apr. 27, 2015) ("[S]imply replacing one word of the term at issue with a synonym does not provide any type of a construction.").  Accordingly, because there is no fundamental dispute as to the scope of this claim term, and the plain language of the claim term adequately describes the agreed scope of the term, the Court declines to construe this term.

\\

\\

\\

**Appx22**

## IV.    CONCLUSION

The Court construes the claim terms as follows:

| Claim Term | Adopted Construction |
|---|---|
| "kiosk" ('400 Patent) | "any device used to access and distribute content provided by the system" |
| "portable data storage device" ('400 Patent) | "a storage device that can be easily carried or moved about" |
| "authenticate the portable data storage device, using at least the unique identifier" ('400 Patent) | "confirming that the portable data storage device is trusted using at least the unique identifier" |
| "provide to the portable data storage device . . . a corresponding access key" ('400 Patent) | "provide to the portable data storage device . . . a key to decrypt the first media content" |
| "public environment" ('400 Patent) | "location accessible by the public" |
| "secure region" ('667 Patent) | "a region of the NAS device to which access is controlled" |
| "receive an indication of the NAS device having a secure region" ('667 Patent) | "receive an indication of the presence of a secure region within the NAS device" |
| "access to the secure region is controlled by the media streaming system" / "control streaming access to the digital content stored on the buffer" ('667 Patent) | No construction necessary |

The Court further **SETS** a telephonic case management conference on October 15, 2024, at 2:00 p.m.  The hearing will be held by Public Zoom Webinar.  All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg.  All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities. The Court further **DIRECTS** the parties to meet and confer and submit a joint case management statement by October 8, 2024.

        **IT IS SO ORDERED.**

Dated:    9/20/2024

HAYWOOD S. GILLIAM, JR
United States District Judge

United States District Court
Northern District of California

1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7    SANDISK3D IP HOLDINGS LTD., et al.,          Case No.  22-cv-04376-HSG

8                         Plaintiffs,             **ORDER RE: DEFENDANT'S
                                                  MOTIONS TO STRIKE; PLAINTIFFS
9              v.                                 AND DEFENDANT'S *DAUBERT*
                                                  MOTIONS, MOTIONS FOR
10   VIASAT, INC.,                                SUMMARY JUDGMENT, AND
                                                  MOTIONS TO SEAL; PLAINTIFF'S
11                       Defendant.               MOTION FOR LEAVE TO FILE SUR-
                                                  REPLY; AND PLAINTIFFS' MOTION
12                                                TO SUBSTITUTE**

13                                                REDACTED VERSION

14
                                                  Re: Dkt. Nos. 199, 200, 201, 204, 205, 206,
15                                                207, 208, 209, 210, 211, 220, 221, 222, 226,
                                                  231, 232, 233, 234, 241, 243, 249, 250, 253,
16                                                256, 261, 263, 265, 269

17          Pending before the Court are: (1) Defendant's motions to strike (Dkt. Nos. 199, 200, 204);

18   (2) the parties' motions to exclude expert opinions and testimony (Dkt. Nos. 206, 208); (3) the

19   parties' motions for summary judgment (Dkt. Nos. 205, 210, 222); (4) the parties' motions to seal

20   (Dkt. Nos. 201, 207, 209, 211, 220, 226, 231, 232, 233, 234, 241, 243, 249, 250, 253, 256, 261,

21   263, 265); (5) Plaintiffs' motion for leave to file a sur-reply (Dkt. No. 265); and (6) Plaintiffs'

22   motion to substitute (Dkt. No. 269).  For the following reasons, the Court **GRANTS IN PART**

23   and **DENIES IN PART** Defendant's motion to strike portions of Plaintiffs' expert reports (Dkt.

24   No. 199); **DENIES AS MOOT** Defendant's motion to strike Lauren Kindler's May 5, 2025

25   supplemental expert report (Dkt. No. 200); **GRANTS IN PART** and **DENIES IN PART**

26   Defendant's motion to strike Plaintiffs' '400 patent authenticating theories (Dkt. No. 204);

27   **DENIES AS MOOT** Defendant's motion to exclude certain opinions of Chuck Easttom and

28

*United States District Court*
*Northern District of California*

Lauren Kindler (Dkt. No. 206); **DENIES AS MOOT** Plaintiffs' motion to exclude certain opinions of Gareth Macartney (Dkt. No. 208); **GRANTS** Defendant's motion for summary judgment of noninfringement (Dkt. No. 205); **GRANTS IN PART** and **DENIES IN PART AS MOOT** Plaintiffs' motion for summary judgment on Defendant's affirmative defenses (Dkt. No. 210); **GRANTS** Defendant's motion for leave to file a second motion for summary judgment (Dkt. No. 221); **GRANTS** Defendant's motion for summary judgment on standing (Dkt. No. 222); **DENIES** Plaintiffs' motion for leave to file a sur-reply (Dkt. No. 265); **GRANTS** the parties' motions to seal (Dkt. Nos. 201, 207, 209, 211, 226, 231, 232, 233, 234, 241, 243, 249, 256, 261, 263); **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion to seal (Dkt. No. 241); **DENIES** Defendant's motions to seal (Dkt. Nos. 220, 250); **DENIES AS MOOT** Plaintiffs' motion to seal (Dkt. No. 253); and **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion to substitute (Dkt. No. 269). Plaintiffs' counsel is **ORDERED TO SHOW CAUSE** why they should not be sanctioned to cover the costs related to Dkt. Nos. 222 and 269.

## I.    BACKGROUND

Plaintiffs Sandisk 3D IP Holdings Ltd. ("SD3D"), Sandisk Technologies LLC ("SDT LLC"), Sandisk Storage Malaysia SDN BHD ("SDSM"), and Sandisk Technologies, Inc. ("SDT Inc.") (collectively, "Sandisk") accuse Defendant Viasat, Inc. ("Viasat") of infringing U.S. Patent Nos. 9,424,400 (the "'400 Patent") and 10,447,667 (the "'667 Patent") (collectively, the "Asserted Patents").[1] Dkt. No. 73 ("SAC") ¶ 1. Sandisk specifically accuses Viasat of infringing claims 1–2, 6, 8–10, 13 and 17 of the '400 Patent (the "Asserted Claims of the '400 Patent") and claims 1–7 and 11–16 of the '667 Patent (the "Asserted Claims of the '667 Patent"). Dkt. No. 145.

Sandisk accuses Viasat's in-flight entertainment ("IFE"), wireless IFE ("W-IFE") systems, and WiFi Gateway Modem ("Gateway"), and all products incorporating IFE, W-IFE, and

United States District Court
Northern District of California

---

[1] Sandisk previously asserted U.S. Patent No. 8,504,834 (the "'834 Patent"). SAC ¶ 1. On May 24, 2024, Defendant moved to dismiss Plaintiffs' '834 Patent infringement claim. Dkt. No. 40. The Court granted Defendant's motion after finding the '834 Patent was "directed to a patent ineligible abstract idea" with "no inventive concept." Dkt. No. 75 at 10.

2

**Appx25**

1    Gateway, of infringing the '400 Patent.[2]  Dkt. No. 145-2 at 2.  The IFE and W-IFE systems

2    "include the Mobile Application Server [], the Network Access Unit [], and the Viasat S4 Server

3    []."  *Id*.  The IFE and W-IFE systems connect to the Viasat Content Delivery System ("VCDS"),

4    "which 'supports delivering live video content,' such as 'broadcast television stations being sent

5    OTT, or sporting events, or custom content being broadcast live.'"  *Id*. (citation omitted).  The

6    Gateway "also connects to VCDS and further performs functions similar to W-IFE and IFE."  *Id*.

7        Sandisk accuses the VCDS and Viasat Open Stream ("Open Stream") of infringing the

8    '667 Patent.  Dkt. No. 145-4 at 2.  The VCDS "is a cloud-hosted service that is responsible for

9    transferring content from CMS (via Amazon S3) over a satellite link to a modem device."  *Id*.

10   (citation omitted).  Open Stream "is 'an extension of the Content Delivery Network (CND) into

11   the satellite network' to 'include support for multicasting and caching content over the satellite

12   system.'"  *Id*. (citation omitted).

13       **A.    '400 Patent**

14       The '400 Patent is entitled "Digital Rights Management System Transfer of Content and

15   Distribution" and issued on August 23, 2016.  Dkt. No. 103-1 ("'400 Patent") at 1.  The '400

16   Patent relates to "digital rights management (DRM) for content that may be downloaded and

17   securely transferred from one storage to another storage."  '400 Patent, Abstract.  The claimed

18   invention "performs cryptographic operations and provides a root of trust" which "enables secure

19   copying or transfer of content from one storage device to another storage device."  *Id*.  Essentially,

20   the '400 Patent claims a system that enables secure copying or transfer of media content (e.g.,

21   video streams) to "portable data storage devices" whereby the system authenticates the portable

22   data storage device in question before providing an access key to decrypt the media content.  The

23   '400 Patent has two independent claims—claim 1 and claim 9.  Claim 1 recites:

24          A kiosk for provisioning secure media content to a plurality of
              portable data storage devices, the kiosk comprising:
25

26   _____

27   [2] Sandisk previously moved to amend its infringement contentions to add "clarifying
     parentheticals" accusing Viasat's residential products of infringement.  Dkt. No. 146.  The Court
28   denied Sandisk's motion and noted its "skeptic[ism] that [Sandisk] previously identified [Viasat']s
     'residential applications' as infringing products."  Dkt. No. 182 at 7 n.8.

**Appx26**

a first data interface configured to communicate with a portable data storage device;

a second data interface configured to communicate, over a network, with a remote trusted server; and

a processor configured to:

obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;

authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and

in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.

*Id*. cl. 1.[3]  Dependent claims 2, 6, and 8 recite kiosks with additional limitations, including wherein "a local data storage storing a plurality of encrypted media content" (cl. 2), "the second data interface is a network interface (cl. 6), and "the kiosk is located in a public environment" (cl. 8).  Dependent claims 10, 13, and 17 recite the method of independent claim 9 with limitations identical to those in dependent claims 2, 6, and 8.  *See id*. cls. 10, 13, 17.

**B.     '667 Patent**

The '667 Patent is entitled "Secure Stream Buffer on Network Attached Storage" and issued on October 15, 2019.  Dkt. No. 103-2 ("'667 Patent") at 1.  The '667 Patent relates to "[a] network attached storage ["NAS"] device coupled to a local area network and including a network interface configured to receive digital content from a remote content provider outside the local network."  '667 Patent, Abstract.  The '667 Patent describes a problem whereby internet service providers are incentivized to throttle download speeds for streaming services (e.g., Netflix, Hulu).  *Id*. at 15–38.  This throttling creates Quality of Service issues for consumers, as display devices often have very limited buffers and streaming services generally prefer limited buffers.  *Id*.  As a solution, the '667 Patent claims a novel system and method for buffering streaming media content

---

[3] Independent claim 9 recites a method for provisioning secure media content to a plurality of portable data storage devices from a kiosk, but the limitations are substantially identical to the limitations of claim 1.

**Appx27**

1    (e.g., movies, tv shows) that "maintain smaller sizes of buffers on display device and [] maintain

2    control over content while ensuring that content can be viewed without deterioration due to

3    throttling through the use of a Network Attached Storage (NAS) device having a secure portion

4    for buffering streaming content." *Id.* at 2:30–34. The '667 Patent has three independent claims—

5    claim 1, claim 11, and claim 20. Claim 1 of the '667 Patent recites:

6            A media streaming system comprising:

7            a network interface adapter configured to transmit digital content, via
        a wide area network (WAN), to a network attached storage (NAS)

8            device operating on a local area network (LAN); and

9            one or more hardware processors configured to:

10               receive an indication of the NAS device +having a secure region
            comprising a buffer for streaming media on a separate display

11               device on the local area network, wherein access to the secure
            region is controlled by the media streaming system;

12

13               transmit the digital content to the secure region within the NAS
            device for playback by the separate display device from the
            buffer; and

14

15               transmit instructions to the NAS device to control streaming
            access to the digital content stored on the buffer.

16   *Id.* cl. 1.[4] Dependent claims 2–7 recite media streaming systems with additional limitations,

17   including wherein "the separate display device comprises a smart television" (cl. 2), "transmitting

18   the digital content comprises time-shifting to a time with more available bandwidth on a

19   connection to the NAS device" (cl. 3), "the secure region is inaccessible by a user of the NAS

20   device without permission form the media streaming system" (cl. 4), "the one or more processors

21   are further configured to: cause the NAS device to use encryption that secures the digital content

22   to the secure region" (cl. 5), "the one or more processors are further configured to: provide

23   instructions to the NAS device for controlling an amount of data stored in the secure region" (cl.

24   6), "the one or more processors are further configured to: provide instructions to the NAS device

25   for controlling an encryption type used in the secure region" (cl. 7). Dependent claims 12–16

26   recite the method of independent claim 11 with limitations identical to those in dependent claims

27   _____

28   [4] Independent claim 11 recites a method for transmitting media content from a media streaming
system, but the limitations are substantially identical to the limitations of claim 1.

5

**Appx28**

3–7. *See id*. cls. 12–16.

## II.    MOTIONS TO SEAL

### A.    Legal Standard

Courts apply different standards when assessing motions to seal depending on whether the materials are contained or attached to a dispositive or nondispositive motion. Courts generally apply a "compelling reasons" standard when considering motions to seal documents attached to dispositive motions. *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010). "This standard derives from the common law right 'to inspect and copy public records and documents, including judicial records and documents.'" *Id*. (quoting *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)). "[A] strong presumption in favor of access is the starting point." *Kamakana*, 447 F.3d at 1178 (quotations omitted). To overcome this strong presumption, the party seeking to seal a document attached to a dispositive motion must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process" and "significant public events." *Id*. at 1178–79 (quotations omitted). "In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id*. at 1179 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)).

The Court must "balance[] the competing interests of the public and the party who seeks to keep certain judicial records secret. After considering these interests, if the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Id*. Civil Local Rule 79-5 supplements the compelling reasons standard set forth in *Kamakana*: the party seeking to file a document or portions of it under seal "must explore all reasonable alternatives to filing documents under seal, minimize the number of documents filed under seal, and avoid wherever possible

6

**Appx29**

1    sealing entire documents . . . ."  Civil L.R. 79-5(a).  The party must further explain the interests

2    that warrant sealing, the injury that will result if sealing is declined, and why a less restrictive

3    alternative to sealing is not sufficient.  See Civil L.R. 79-5(c).

4        Records attached to nondispositive motions must meet the lower "good cause" standard of

5    Rule 26(c) of the Federal Rules of Civil Procedure, as such records "are often unrelated, or only

6    tangentially related, to the underlying cause of action."  *See Kamakana*, 447 F.3d at 1179–80

7    (quotations omitted).  This requires a "particularized showing" that "specific prejudice or harm

8    will result" if the information is disclosed.  *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*,

9    307 F.3d 1206, 1210–11 (9th Cir. 2002); *see also* Fed. R. Civ. P. 26(c).  "Broad allegations of

10   harm, unsubstantiated by specific examples of articulated reasoning" will not suffice.  *Beckman*

11   *Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quotation omitted).

12       **B.    Discussion**

13       The parties seek to seal portions of the briefs and exhibits related to (1) Viasat's motions to

14   strike, Dkt. Nos. 199, 200, 204; (2) the parties' *Daubert* motions, Dkt. Nos. 206, 208; and (3) the

15   parties' motions for summary judgment, Dkt. Nos. 205, 210, 222.

16       Sandisk seeks to seal excerpts of service and assignment agreements contained in Viasat's

17   motion for summary judgment on standing.  Dkt. No. 256.[5]  These include the Research &

18   Development Services Agreement between WDI and WDT and the Assignment Agreement

19   between WDI and SD3D.  *Id*. at 2–3.  Sandisk argues that sealing these materials would "protect

20   [Sandisk's] interests in maintaining the confidentiality of their, and their predecessor's, corporate

21   organizational structure, particularly how various R&D services are allocated among companies in

22   the corporate family."  *Id*. at 3.  Sandisk argues it "would be harmed by the disclosure of the

23   information sought to be sealed because outside observers would be able to access highly

24   confidential inter-company agreements, allowing outsiders to glean details about [Sandisk's] (and

25   their predecessor's) organizational structure that is otherwise valuable, highly confidential, and not

26   disclosed publicly, and use that information to Plaintiffs' detriment."  *Id*.  Sandisk only "seeks to

27   _____

28   [5] This motion supersedes Sandisk's motion to seal at Docket Number 253.  Dkt. No. 256 at 2.  The
     Court therefore **DENIES AS MOOT** that motion to seal.  Dkt. No. 253.

United States District Court
Northern District of California

**Appx30**

1    seal the underlying agreements that pertain to R&D services and IP ownership and the allocation

2    of the R&D services and IP ownership as between different companies in the corporate family."

3    *Id.* at 4.  The Court finds Sandisk's request is narrowly tailored and satisfies the compelling

4    reasons standard.  *See Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733-JST, 2019 WL 9443777, at

5    *2 (N.D. Cal. June 18, 2019) (finding "compelling reasons" supported sealing materials

6    containing "highly sensitive non-public information concerning . . . corporate structure").  The

7    Court therefore **GRANTS** Sandisk's motion to seal (Dkt. No. 256).

8         Sandisk also seeks to seal Viasat's "highly confidential source code" and "product

9    operation" information, Dkt. No. 218 at 4; Dkt. No. 239 at 7; Dkt. No. 257 at 14; Dkt. No. 266 at

10   4; "confidential contractual terms of Viasat's agreements with third parties," Dkt. No. 218 at 7;

11   Dkt. No. 239 at 10; Dkt. No. 257 at 13; and references to Viasat's confidential "financial

12   information, internal metrics, security practices, and contractual dealings" contained in Sandisk's

13   various filings. Dkt. No. 239 at 10; Dkt. No. 257 at 13.[6]  Viasat represents that these confidential

14   materials, if filed publicly, "could be used by Viasat's competitors to Viasat's detriment . . . .."

15   Dkt. No. 218 at 6, 8; Dkt. No. 239 at 9, 11; Dkt. No. 257 at 13; Dkt. No. 266 at 4.  The Court finds

16   Viasat has satisfied the compelling reasons standard for dispositive motions and the good cause

17   standard for nondispositive motions.  *See Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-

18   LHK, 2012 WL 6115623, at *2 (N.D. Cal. Dec. 10, 2012) (finding compelling reasons supported

19   sealing materials containing confidential source code); *Unlockd Media, Inc. Liquidation Tr. v.*

20   *Google LLC*, No. 21-CV-07250-HSG, 2023 WL 2600464, at *1 (N.D. Cal. Mar. 21, 2023)

21   (finding compelling reasons supported sealing confidential business and financial information);

22   *Day v. GEICO Cas. Co.*, No. 21-CV-02103-BLF, 2023 WL 6558404, at *1 (N.D. Cal. Sept. 21,

23

24   [6] This information is contained in: (1) portions of Sandisk's *Daubert* motion and attached exhibits,
     Dkt. No. 209; (2) exhibits attached to its motion for summary judgment on validity, Dkt. No. 211;
25   (3) portions of its opposition to Viasat's motion to strike portions of Sandisk's expert reports and
     attached exhibits, Dkt. No. 231; (4) exhibits attached to its opposition to Viasat's motion to strike
26   Lauren Kindler's supplemental expert report, Dkt. No. 232; (5) portions of its opposition to
     Viasat's motion to strike Sandisk's '400 Patent authenticating theories and attached exhibits
27   attached, Dkt. No. 233; (6) portions of its opposition to Viasat's *Daubert* motion and attached
     exhibits, Dkt. No. 234; (7) portions of its reply brief in support of its *Daubert* motion, Dkt. No.
28   243; and (8) portions of its reply brief in support of its motion for summary judgment, Dkt. No.
     263.

8

Appx31

1    2023) ("Courts in this circuit have held that confidential business information in the form of

2    'license agreements, financial terms, details of confidential licensing negotiations, and business

3    strategies' satisfies the 'compelling reasons' standard.") (citation omitted).  The Court therefore

4    **GRANTS** Sandisk's motions to seal. Dkt. Nos. 209, 211, 231, 232, 233, 234, 243, 263.

5         Sandisk further seeks to seal "Viasat's highly confidential source code, or [descriptions of]

6    product operations, or financial and contract details" contained in Sandisk's opposition to Viasat's

7    motion for summary judgment on noninfringement and attached exhibits. Dkt No. 241 (motion for

8    summary judgment), Dkt. No. 257 at 10.  Although these materials satisfy the compelling reasons

9    standard, *see Apple*, 2012 WL 6115623, at *2; *Unlockd Media, Inc. Liquidation Tr.*, 2023 WL

10   2600464, at *1; *Day*, 2023 WL 6558404 at *1,  Sandisk's motion to seal is not narrowly tailored.

11   Dkt. No. 257 at 2–3.  Viasat notes that Sandisk attached 31 exhibits to its opposition brief, totaling

12   over 2,000 pages, but only cited to 200 of those pages.  *Id*.  Viasat argues that Sandisk failed to

13   comply with Civil Local Rule 79-5 "[b]y not minimizing their submission of confidential

14   material" and "unduly burdened Viasat and the Court" in failing to do so.  *Id*. at 2.  Viasat asks the

15   Court to order Sandisk refile certain exhibits "in excerpted form, such that only the portions

16   referenced in their opposition are included."  *Id*.  The Court agrees with Viasat.  The Court

17   **DENIES** Sandisk's motion to seal with respect to Exhibits 14–18, 20, 22, 23–25, 27, and 32 but

18   otherwise **GRANTS** the motion. Dkt. No. 241.  Sandisk shall file an amended motion to seal

19   Exhibits 14–18, 20, 22, 23–25, 27, and 32, which shall be appropriately excerpted, within one

20   week of the date of this order.

21        Viasat seeks to seal "confidential contractual terms of Viasat's agreement with third

22   parties[,]" and "highly confidential source code and product operation information[,]" Dkt. No.

23   207 at 6, Dkt No.249 at 4–5; and information about "source code variables and how those

24   variables relate to the way that Viasat's products operate."  Dkt. No. 207 at 5, Dkt. No. 249 at 5,

25   Dkt. No. 261 at 3; *see also* Dkt. No. 201 at 4–5, Dkt. No. 226 at 6–7.[7]  Viasat argued that these

26

27   ───────────────────
     [7] These materials were contained in: (1) portions of Viasat's motions to strike portions of
     Sandisk's expert reports and attached exhibits, Dkt. No. 201; (2) portions of its motions to strike

28   new '400 Patent authenticating theories and attached exhibits, Dkt. No. 207; (3) portions of its
     motion for summary judgment on noninfringement and attached exhibits, Dkt. No. 207; (4)

**Appx32**

United States District Court
Northern District of California

materials "are not publicly available and would provide Viasat's competitors with an unfair advantage in competitive bidding against Viasat."  Dkt. Nos. 207 at 6, 249 at 4–5; *see also* Dkt. Nos. 201 at 4–5, 226 at 5–6.  Viasat further asserts that "the architecture of Viasat's products, and the source code, operation of, and inner workings of Viasat's products and proprietary technology—including details of how Viasat's system is architected (e.g., where specific pieces of source code run), which third-parties Viasat's products interact with, and how Viasat actually hosts and distributes content—are not apparent from normal consumer operation[,]" and if made public, "malicious actors could try to identify security vulnerabilities, while competitors could try to co-opt Viasat's technical operations and security features for its own competing products."  Dkt. No. 249 at 5; Dkt. No. 261 at 2–3.  The Court finds there are compelling reasons to seal these materials.  *See Apple*, 2012 WL 6115623, at *2; *Unlockd Media, Inc. Liquidation Tr.*, 2023 WL 2600464, at *1; *Day*, 2023 WL 6558404 at *1.  The Court therefore **GRANTS** Viasat's motions to seal. Dkt. No. 201, 207, 226, 249, 261.

Viasat also seeks to seal (1) portions of its motion for summary judgment on standing and attached exhibits, Dkt. No. 220, and (2) portions of its opposition to Sandisk's motion for partial summary judgment and an attached exhibit, Dkt. No. 250.  These materials reflect information Sandisk has designated "Highly Confidential – Attorneys' Eyes Only."  Dkt. Nos. 220, 250.  Sandisk did not file a declaration in support of these sealing motions.  According, the Court **DENIES** Viasat's motions to seal. Dkt. Nos. 220, 250.

### III.    MOTIONS TO STRIKE

Viasat raises several disputes with respect to Dr. Chuck Easttom and Ms. Lauren Kindler's expert reports.  Viasat seeks to strike Dr. Easttom's expert report on five grounds: (1) Dr. Easttom's allegedly new "encryption theory" related to the '667 Patent, Dkt. No. 199; (2) Dr. Easttom's allegedly new "DRM sub-folder / file path theory" related to the '667 Patent, *id*.; (3) Dr. Easttom's allegedly new opinions regarding the "portable storage device" limitation of the '400

---

portions of its opposition to Sandisk's *Daubert* motion and attached exhibits, Dkt. No. 226; (5) portions of its reply briefs in support of its motions to strike and its reply brief in support of its *Daubert* motion, Dkt. No. 249; and (6) portions of its reply brief in support of its motion for summary judgment on noninfringement, Dkt. No. 261.

United States District Court
Northern District of California

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

Patent, *id.*; (4) Dr. Easttom's and Ms. Kindler's discussions of Viasat's IPTV product, *id.*;  (5) Ms. Kindler's supplemental expert report, Dkt No. 200; and (6) Dr. Easttom's allegedly new "authentication" theories related to the '400 Patent, Dkt. No. 204.  These motions highlight the constant shape-shifting in this case, which stands out even in a practice area in which that practice is unfortunately all too common.  The Court **GRANTS** the motions, with the exception of portions related to damages, which are **DENIED AS MOOT**.

> **A.    Dr. Easttom's Encryption Theory Regarding the '667 Patent (Dkt. No. 199)**

Dr. Easttom opines that the "receiving an indication of the NAS device having a secure region" limitation of the '667 Patent is met "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Dkt. No. 199 at 7.[8]  Viasat refers to this theory as the "encryption theory."  *Id.*  Viasat argues that this theory should be stricken from Dr. Easttom's expert report, because it "is the same theory of infringement that [Sandisk] proposed in their January 2025 request to amend their infringement contentions, and exactly the theory the Court denied leave to add."  *Id.* at 8.  Sandisk counters that its March 2024 infringement contentions "explicitly disclosed this theory and even cited Viasat's documentation and specific source code files in support."  Dkt. No. 227 at 15.  Sandisk specifically argues that its March 2024 infringement contentions cited three source code files—

████████████████████████████████████████████████████████████████████████

██████████████████████████████████—which "are the operative files that contain the ██████ ████████████ that Viasat alleges was not disclosed."  *Id.* at 17.  Sandisk further argues that Viasat's argument is contradicted by the fact that it relied on the encryption theory for invalidity and non-infringement.  *Id.* at 18-19.

Sandisk's arguments are not persuasive.  Sandisk emphasizes that it "identified only three source code files in support of this limitation out of more than 46,000 source code files that Viasat made available for inspection" to suggest that the identification of these source code files was

---

[8] Docket entries in this section refer to the publicly filed versions, even when the quoted material is sealed.

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

"sufficient to put Viasat on notice of Sandisk's infringement theories." Dkt. No. 227 at 17-18. Sandisk's argument, however, ignores the fact that the three identified source code files include 4,600 lines of code defining 136 functions, but the encryption theory only relies on 12 of the 4,600 lines of code and 2 of the 136 functions. Dkt. No. 247 at 5. It is unreasonable to assert that Viasat should have known that Sandisk was specifically accusing the ███████████ of satisfying the "receiving an indication of the NAS device having a secure region" limitation of the '667 Patent, particularly when the ████████████ was not identified in any other part of Sandisk's infringement contentions. Sandisk's identification of exemplary source code files was not sufficient to put Viasat on notice of Sandisk's encryption theory. In fact, Sandisk's suggestion that it "was not required to specifically identify the Boolean itself," Dkt. No. 227 at 17, is flatly inconsistent with this District's patent rules, which require "the party claiming infringement to crystallize its theories of the case early in the litigation . . . ." *Shared Memory Graphics LLC v. Apple, Inc.*, 812 F. Supp. 2d 1022, 1024 (N.D. Cal. 2010) (quotations and citation omitted); *see also Xiaohua Huang v. Nephos Inc.*, No. C 18-06654 WHA, 2019 WL 2996432, at *2 (N.D. Cal. July 9, 2019), *aff'd sub nom. Xiaohua Huang v. MediaTek USA, Inc.*, 815 F. App'x 521 (Fed. Cir. 2020) ("[T]he degree of specificity under Local Rule 3-1 must be sufficient to provide reasonable notice to the defendant why the plaintiff believes it has a reasonable chance of proving infringement.") (citation omitted).[9]

    Sandisk's argument that Viasat relied on this theory for invalidity and noninfringement also fails to persuade the Court. Sandisk argues that Dr. Almeroth, Viasat's technical expert, relied on the encryption theory in his expert report, which shows that "Viasat [] knew of this theory well before Sandisk served Dr. Easttom's report on infringement." Dkt. No. 227 at 18. Sandisk further argues that Viasat's non-infringement interrogatory responses "addressed the same ██████████████ that Viasat claims was not disclosed and explained why the file path would, in Viasat's view, not 'result in a true 'encrypted' value[,]" which further shows that

_____

[9] To be clear, the Court does not conclude that the identification of source code files could never be enough to put a defendant on notice of a plaintiff's infringement theory, only that Sandisk did not do so in this case.

United States District Court
Northern District of California

United States District Court
Northern District of California

Viasat's "claims of untimely disclosure are [] baseless." Dkt. No. 231-2 at 22. The Court disagrees.

In January 2025, Sandisk moved for leave to amend its infringement contentions to add, in part, the following citation and explanation (in blue) to its contentions:



Dkt. No. 145-5 at 48. This amendment clearly set forth Sandisk's encryption theory, but on March 12, 2025, the Court denied Sandisk's motion, finding Sandisk was "not diligent in seeking to amend [its] infringement contentions . . . ." Dkt. No. 182 at 7. However, it was not until the Court decided Sandisk's motion that Viasat knew whether it would need to address the encryption theory. Viasat therefore decided to preemptively address this theory in its noninfringement interrogatory responses and Dr. Almeroth's opening expert report. That Viasat took proactive measures in the event the Court permitted Sandisk's amendments does not undermine Viasat's motion to strike. At bottom, Sandisk's March 2024 infringement contentions failed to set forth its encryption theory. For that reason, Viasat's motion to strike on this ground is **GRANTED**.

**B. Dr. Easttom's DRM Subfolder Theory Regarding the '667 Patent (Dkt. No. 199)**

Dr. Easttom also opines that the "receiving an indication of the NAS device having a secure region" limitation of the '667 Patent is met when "movies and TV shows ███████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████████" Dkt. No. 201-2 at 6. Viasat refers to this theory as the "DRM sub-folder / file path." *Id*. Viasat argues that this theory should be stricken from Dr. Easttom's expert report because Sandisk "did not include [it] in their March 2024 contentions, did not try to add [it] in their January 2025 request to amend those contentions, and never disclosed [it] anywhere before serving Dr. Easttom's March 2025 report." *Id*. at 8. Sandisk counters that its contentions explained "that access to the ████████
████████████████████████████████████████████████

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

1    ████████████████████████████████████████ and

2    therefore, its contentions ██████████████████████████████

3    ████████████████████████████████████████████████

4    ██████████    Dkt. No. 227 at 16.

5        Sandisk's arguments essentially amount to an argument of implicit disclosure.  Sandisk

6    argues that Viasat was on notice of the DRM subfolder theory because Sandisk's infringement

7    contentions (1) identified the ████████ as the "claimed 'buffer' of the secure region[,]" (2)

8    explained that the ████████████████, (3) explained that access to the "████████

9    ████████████████████████████████" and (4)

10    explained "████████████████████████████████" *Id.*  As an

11    initial matter, Sandisk's infringement contentions nowhere state that the ████████ must be

12    encrypted.  Rather, the contentions state that "████████████████████

13    ████████████████████████████" Dkt. No. 189-4 at 40.  But, according

14    to the contentions, the ████████ is part of the user hub or Viasat IFEC server(s). *Id.* at 39.

15    These allegations do not disclose that the VCDS cache itself is encrypted.  Additionally, pages 58–

16    59 and 81–82 of the contentions, on which Sandisk relies to argue that it "████████████████

17    ████████████████████████████" are related to entirely different

18    claim limitations.  For example, pages 58–59 relate to the "transmit instructions to the NAS device

19    to control streaming access to the digital content stored on the buffer" limitation of claim 1, and

20    pages 81–82 relate to claim 6. *See id.* at 58–59, 81–82.  The Court finds the DRM sub-folder / file

21    path theory was not adequately disclosed in Sandisk's infringement contentions.  Accordingly,

22    Viasat's motion to strike on this ground is **GRANTED**.

23        **C.**    **Dr. Easttom's "Portable Storage Device" Theories Regarding the '400 Patent**

24            **(Dkt. No. 199)**

25        Viasat moves to strike Dr. Easttom's "new theory regarding the 'portability' of storage

26    devices in the '400 [P]atent[,]" arguing that "the Court previously denied [Sandisk] leave to

27    amend [its] infringement contentions to add this very theory." Dkt. No. 199 at 10.  Sandisk

28    counters that Dr. Easttom's theories are not new, as the March 2024 infringement contentions

1    "explicitly state that 'seatback' devices are 'portable'" and Dr. Easttom "explain[s] why the

2    seatback devices meet the Court's claim construction . . . ." Dkt. No. 227 at 20.

3         As noted above, Sandisk moved for leave to amend its infringement contentions in January

4    2025. Dkt. No. 146. Sandisk sought to amend its contentions to "clarify its [doctrine of

5    equivalents] position in view of arguments that were made during claim construction." Dkt. No.

6    157 at 1. The Court denied Sandisk's motion, finding that Viasat would "suffer undue prejudice"

7    if Sandisk were permitted to amend its contentions at such a late stage of the case. Dkt. No. 182 at

8    8. Sandisk now seeks to introduce, through Dr. Easttom, the same theories as to which the Court

9    previously denied leave to amend. Sandisk does not address the Court's prior denial of leave to

10   amend and instead argues that "Viasat was clearly on notice of Sandisk's infringement theories."

11   Dkt. No. 227 at 20. The Court reiterates its conclusion that "[e]ven a limited amendment

12   addressing only the Court's construction" of "portable storage device" would prejudice Viasat.

13   Sandisk cannot circumvent the Court's prior ruling by arguing that Viasat "was clearly on notice"

14   of this theory. Accordingly, Viasat's motion to strike on this ground is **GRANTED**.

15        **D.    Dr. Easttom and Ms. Kindler's Discussion of Viasat's IPTV Product (Dkt. No.**

16        **199)**

17        Dr. Easttom, Sandisk's technical expert, and Ms. Kindler, Sandisk's damages expert, both

18   discuss Viasat's IPTV product in their opening expert reports.[10] Dr. Easttom identifies IPTV as

19   one of four use cases in which the accused Viasat systems infringe the '400 Patent, Dkt. No. 201-3

20   ("Easttom Rep.") ¶¶ 129; and one of two use cases in which the accused Viasat systems infringe

21   the '667 Patent. *Id*. ¶¶ 509–10. Ms. Kindler relies on Dr. Easttom's analysis of Viasat's IPTV

22   product in calculating and apportioning Sandisk's claimed damages. Dkt. No. 201-4 ("Kindler

23   Rep.") ¶¶ 70, 219–21. Viasat argues that "Dr. Easttom's and Ms. Kindler's discussions of

24   Viasat's IPTV product should [] be stricken because [Sandisk] did not identify that IPTV product

25   as an Accused Instrumentality in their infringement contentions, or explain in those contentions

26

27   _____

     [10] According to Viasat, "Viasat's IPTV product delivers live TV broadcasts via satellite to a

28   customer aircraft so that passengers can watch TV in real time on either the aircraft's seatback
     screens or on their personal devices." Dkt. No. 199 at 15.

United States District Court
Northern District of California

how IPTV purportedly met every limitation of any asserted claim." Dkt. No. 199 at 12. Viasat

argues that its IPTV product "is not mentioned at all in [Sandisk's] damages contentions or . . .

interrogatory responses[,]" and "nowhere in [Sandisk's] operative infringement contentions (or

rejected infringement contentions) do[es] [Sandisk] state that IPTV is an Accused Instrumentality

. . . ." *Id*. at 13. Sandisk counters that its infringement contentions "identified the IFE, W-IFE,

and VCDS systems as the accused systems and disclosed [its] contention that such systems

infringe when they deliver IPTV/Live TV content[,]" and argues that this disclosure was

sufficient. Dkt. No. 227 at 13. Sandisk further argues that "[t]here is no distinction between

revenue earned by Viasat's delivery of IPTV/Live TV content using the accused systems and the

revenue earned by a purported 'IPTV Product.'" *Id*.

The parties' previous discovery disputes regarding Viasat's IPTV product, which "delivers

live TV broadcasts via satellite to a customer aircraft so that passengers can watch TV in real time

on either the aircraft's seatback screens or on their personal devices," are relevant to this dispute.

Dkt. No. 199 at 12. On March 25, 2025, after the February 7, 2025 deadline for fact discovery,

Sandisk raised a discovery dispute regarding Viasat's production of documents related to IPTV.[11]

Dkt. No. 188. Sandisk specifically sought (1) the deposition of a Viasat witness on the topic of

IPTV, (2) the production of IPTV source code, and (3) all technical documents for IPTV. *Id*. at 3.

Viasat took the position that IPTV was not identified as an accused product. *Id*. at 5. Sandisk

argued there, as it does here, that its March 2024 infringement contentions sufficiently identified

IPTV as an accused instrumentality. *Id*. at 2. Sandisk specifically argued that it "expressly

identif[ied] the entirety of 'Viasat's in-flight entertainment' offerings as Accused Instrumentalities

for the '400 Patent[,]" and IPTV, as "an IFE product," was therefore accused. *Id*. Sandisk further

argued that the '667 Patent infringement contentions identified the "Live Video implementation"

"for pre-loading content to airplanes," which was sufficient to identify IPTV as an accused

product for the '667 Patent.

Judge Kang denied Sandisk's request, finding that neither the '400 Patent infringement

---

[11] Discovery disputes in this case were referred to the Honorable Peter H. Kang, U.S. Magistrate Judge. Dkt. No. 173.

1    contentions nor the '667 Patent infringement contentions accused the IPTV product of

2    infringement.[12]  Dkt. No. 215.  With respect to the '400 Patent, the court found it "evident" that

3    Sandisk was "accusing the VCDS (and not the IPTV product) of receiving the IPTV content."  *Id.*

4    at 9.  The court found that the infringement contentions "ma[d]e only a passing reference to IPTV

5    as one example (among other listed streaming services) of a media streaming service for purposes

6    of 'provisioning secure media content' as required by the preamble of [] claim 1" and "contain[ed]

7    no accusations as to how any IPTV product infringes any of the hardware or functional claim

8    limitations of the '400 claims."  *Id*. at 8–9.  The court explained that "[t]he contention that IPTV

9    content c[an] be delivered is not the same thing as accusing the IPTV product[,]" as "media

10   content which is configured for distribution through the Internet can be received and decoded by a

11   variety of different devices (set top-boxes, dedicated devices, general purpose computers running

12   apps) . . . ."  *Id*. at 9.  The court found Sandisk's arguments with respect to the '667 Patent "even

13   less compelling[,]" as the '667 Patent infringement contentions "nowhere mention[ed] or use[d]

14   the term IPTV (even as a type of formatted content)."  *Id*.  Sandisk did not seek reconsideration or

15   review of any of these determinations.

16         Now, Sandisk seeks to introduce expert opinions based on Viasat's IPTV product.

17   Specifically, Dr. Easttom's expert report opines that the IPTV product infringes both the '400 and

18   '667 Patents, and Ms. Kindler's expert report provides a damages estimate based on Viasat's

19   IPTV product.  Sandisk once again argues that it identified the IPTV product as accused when it

20   "accurately identified the IFE, W-IFE, and VCDS systems and explained that these systems

21   infringe when they provide Live TV/IPTV content."  Dkt. No. 230 at 14.

22         The Court is not persuaded.  Sandisk's argument again essentially asserts implicit

23   disclosure.  Sandisk does not dispute that IPTV was not expressly identified as an accused product

24   in either the '400 or '667 Patent infringement contentions, but argues that identifying the IFE, W-

25   IFE, and VCDS systems as accused products should have put Viasat on notice that IPTV was

26   accused.  This argument fails for at least two reasons.  First, the infringement contentions for the

27

28   [12] Judge Kang "ma[d]e no findings regarding which products . . . were adequately accused of
     infringement."  Dkt. No. 215 at 10.

**Appx40**

United States District Court
Northern District of California

1    '400 Patent appear to distinguish between the Accused Products and IPTV.  For example, in

2    discussing the preamble, the infringement contentions state that "the '400 Accused Products

3    provide access to media streaming services (e.g., IPTV, Disney+, Apple Music and/or Apple TV+)

4    . . . ."  Dkt. No. 145-2 at 4.  The infringement contentions therefore identify IPTV as a type of

5    content that can be accessed via the Accused Products but do not identify IPTV itself as an

6    Accused Product.  As Judge Kang explained, the "contention that IPTV content could be delivered

7    is not the same thing as accusing the IPTV product" of infringement.  Dkt. No. 215 at 9.

8        Second, Sandisk's argument that it adequately disclosed IPTV as an infringing product

9    through its general identification of Viasat's W-IFE and IFE systems is again inconsistent with the

10   Patent Local Rules directives "to require the plaintiff to crystallize its theories of the case early in

11   the litigation and to adhere to those theories once disclosed."  *Geovector Corp. v. Samsung Elecs.*

12   *Co.*, No. 16-CV-02463-WHO, 2017 WL 76950, at *3 (N.D. Cal. Jan. 9, 2017).  Sandisk's

13   infringement contentions required specificity as to the IPTV product.  Accordingly, the Court

14   finds that Dr. Easttom and Ms. Kindler have no basis to opine on infringement and damages,

15   respectively, based on IPTV.  Viasat's motion on this ground is **GRANTED**.  The Court

16   **STRIKES** Paragraphs 91, 129, 133-35, 139, 140, 158, 162-63, 172, 173, 183, 185, 186, 195-97,

17   199-201, 203, 207-08, 213-14, 225-26, 245, 248, 265-69, 277-78, 300-01, 307, 316, 319, 321, 325,

18   327-28, 357-59, 383-85, 387-89, 391, 396, 408-09, 419, 434, 451-55, 463-64, 490-91, 497-98,

19   506, 509-11, 516, 520, 568, 571, 583, 650, 653, 696, 750, 779, 782, 853, 856-59, 864, 889-90,

20   900, 902-03 of the Easttom Report and Paragraphs 70 and 219–21 of the Kindler Report.

21       **E.    Motion to Strike Lauren Kindler's Supplemental Expert Report (Dkt. No. 200)**

22       Viasat moves to strike Ms. Kindler's supplemental expert report under Federal Rules of

23   Civil Procedure 26, 37(c)(1), and 16.  Dkt. No. 200 at 11.  Viasat argue the supplemental report "is

24   neither a timely opening report under Rule 26(a) nor a proper supplemental under Rule 26(e)" but

25   "an unauthorized, untimely reply report" that should be excluded under Rule 37.  As explained

26   below, *see infra* Section IV.B., the Court grants Viasat's motion for summary judgment of

27   noninfringement.  Accordingly, Viasat's motion to strike is **DENIED AS MOOT**.

28

United States District Court
Northern District of California

**Appx41**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### F.    Motion to Strike Sandisk's '400 Patent Authenticating Theories (Dkt. No. 204)

Viasat moves to strike Dr. Easttom's opinions regarding "four 'use cases'" that allegedly satisfy the "authenticate" limitation of claims 1 and 9 of the '400 Patent.[13]  Dkt. No. 204 at 2. Viasat contends that "[e]ach of th[e] four 'use cases' are based on new theories that [Sandisk] did not disclose in [its] operative . . . infringement contentions."  *Id*.  Sandisk counters that Dr. Easttom's opinions regarding the four use cases "appl[y] the same previously disclosed theory from Sandisk's March 2024 [i]nfringement [c]ontentions."  Dkt. No. 229 at 1.  Sandisk argues that its infringement contentions "identified how a unique identifier such as a token is received by the IFE/W-IFE system or the Gateway server system from a mobile phone or seatback device a [sic] first data interface as required by the claim elements 1[d] and 9[c][,]" and "[t]hen, for the authenticating elements 1[e] and 9[d] . . .  identified that the unique identifier is authenticated based on a communication with a remote trusted server (e.g., on the ground servers of Viasat and others) via a second data interface (e.g., the satellite network)."  *Id*. at 4.  Sandisk argues that the Easttom Report "provides the same infringement theory" and then provides "additional evidentiary proof to support that theory," which is permissible.  *Id*.

For background, Sandisk's infringement contentions identified "Viasat's IFE, W-IFE, Gateway, and all Viasat products incorporating IFE, W-IFE, Gateway, or the functionality described herein" as the accused products.  Dkt. No. 145-2 at 2.  "The IFE and W-IFE systems are 'in-flight' entertainment systems that are installed on commercial airplanes, whereas the 'Gateway' system is Viasat's home internet and entertainment system."  Dkt. No. 229 at 3.  The IFE, W-IFE, and Gateway systems distribute "secure media content" to users.  *Id*.  According to Sandisk, the IFE and W-IFE systems rely on the VCDS client "for obtaining media from remote sources on the ground that include other aspects of the VCDS system."  *Id*.  "The secure media content can be provisioned to various users either from content stored on the airplane or through the VCDS as on-demand media content or Live/IPTV content."  *Id*.  Sandisk contends that the

---

[13] The "authenticate" limitation refers to the claim limitation of claim 1 requiring "a processor configured to . . . authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface . . . ."  '400 Patent cl. 1.

1    "use cases" simply "describe how different content is delivered to users."  *Id*. at 4.

2            **i.    Use Case #1**

3            The first use case refers to in-flight S-4 server pre-stored video content using VCDS

4    ("Inflight-Pre-stored").  Viasat argues that Dr. Easttom's opinions regarding the Inflight-Pre-

5    stored use case are "based on two different untimely theories: (1) the 'software update' theory, and

6    (2) the 'HLS/DASH' theory."  Dkt. No. 204 at 4.

7                    a.   Software Update Theory

8            Dr. Easttom opines that in the Inflight-Pre-stored use case, the "authentication" limitation

9    is met when the DRM servers for FairPlay and Widevine receive software updates via an SSLK

10   package from a remote trusted server.  Easttom Rep. ¶ 249 ("For Use Case 1, depending on the

11   DRM service, the kiosk . . . ha[s] the onboard DRM server authenticate the token and update

12   DRM server policies as part of software updates by communicating with a remote trusted server

13   over the second data interface (the satellite internet connection) to obtain the software update."),

14   ¶ 252 ("In the case of Fairplay (Apple) and WideView (Google) DRM license servers, the license

15   servers are necessarily updated whenever new media is loaded onboard . . . . . Viasat Updates to

16   the DRM license policy may be done Over The Air as part of the 'SSLK' updates containing

17   Configuration Updates in a bundle.").

18           Viasat argues that this "theory of 'software updates' via 'SSLK' packages, whereby a local

19   'onboard' server somehow infringes by communicating with an unnamed 'update' server, is not

20   disclosed in [Sandisk's] operative infringement contentions[,]" as the contentions "never mention

21   'software updates' or 'SSLK' or updating a 'license policy.'"  Dkt. No. 204 at 5.  Sandisk counters

22   that its infringement contentions "clearly lay out a theory that the 'authenticating element' is met

23   because the accused Viasat IFE/W-IFE system uses an onboard DRM server that communicates

24   with a remote trust server via a second data interface to authenticate the portable data storage

25   using the token."  Dkt. No. 229 at 6.  More specifically, Sandisk argues that its infringement

26   contentions "disclosed that the DRM [s]ervers, which could be part of the onboard servers, []

27   communicate via a satellite network with a remote trusted server, an example of which is a

28   Content Management Server, which can wirelessly update the onboard DRM [s]ervers through the

United States District Court
Northern District of California

1    satellite network[,]" and therefore, "[t]h[e] update would be 'software updates' to the DRM

2    [s]ervers, which use license policies to assist in authenticating tokens." *Id*. at 8-9.

3            With respect to the "authenticate" limitation, Sandisk's infringement contentions allege

4    that "Viasat's Sponsored Access Privacy Notice notes that 'to deliver the Sponsored Access

5    services to you, we collect a unique identifier associated with the device that you use to access the

6    Services.'" Dkt. No. 146-4. The contentions also cite portions of a technical document, which

7    state that "[d]evice authentication with the DRM server is via a signed token that is unique to the

8    device" and that a "device's unique ID (UID) . . . allows data to be cryptographically tied to a

9    particular device." *Id*. Notably, the contentions do not expressly state that this limitation is met

10    when the DRM server receives software updates from the Content Management Server.

11            Once again, Sandisk relies on implied disclosure. Essentially, Sandisk argues that because

12    its infringement contentions cited a document that (1) identified the DRM License Server as one

13    of the onboard servers, (2) "highlighted a satellite network communicating between the ground

14    servers . . . and the onboard servers," and (3) reflected that the "Content Management Server [],

15    which is an example of the remote trusted server, can remotely manage content, provide tools for

16    self or partner administration, and 'update via satellite[,]'" its infringement contentions disclosed a

17    theory in which the DRM servers (i.e., the onboard servers) communicate with the Content

18    Management Server (i.e., the remote trusted server) via a satellite network so that the Content

19    Management Server provides software updates to the DRM servers, which would necessarily "use

20    license policies to assist in authenticating tokens." *Id*. at 9-12. This again fails to meet the

21    standard demanded by the District's Patent Local Rules. *Shared Memory Graphics LLC*, 812 F.

22    Supp. 2d at 1025 ("[D]egree of specificity . . . must be sufficient to provide reasonable notice to

23    the defendant why the plaintiff believes it has a 'reasonable chance of proving infringement.'")

24    (citation omitted). The Court finds that the software update theory was not disclosed in Sandisk's

25    infringement contentions, and therefore, Dr. Easttom may not provide any opinion based on this

26    theory. Viasat's motion to exclude on this ground is therefore **GRANTED.**

27            b.   HLS/Dash Theory

28    Dr. Easttom also opines that the Inflight-Pre-stored use case satisfies the "authenticate"

**Appx44**

United States District Court
Northern District of California

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

limitation when "the kiosk authenticates the portable data storage device by communicating with the PlayReady Token API on the ground (a remote trusted server) the token the HLS or DASH string, which is at least based on the unique identifier of the portable data storage device, over the second data interface (satellite network)."  Easttom Rep. ¶ 252.  Viasat argues that this theory should be stricken, because Sandisk's infringement contentions "never disclose the theory that the 'unique identifier' required by claim 1[e] or 9[d] is an 'HSL or DASH string.'"  Dkt. No. 204 at 5. Sandisk argues that the Easttom Report contains an error and is meant to reflect that the unique identifier is the token, not the HLS or DASH string.  Dkt. No. 229 at 10 ("Dr. Easttom's report indicates that the unique identifier is the token obtained from the Token API.").  Viasat counters that this theory should be stricken nonetheless, because "[a] 'token' is not the same as an HLS or DASH string" and "replacing [HLS or DASH string] with 'token' is a substantive change.'"  Dkt. No. 244 at 4.

Sandisk represents that Dr. Easttom will not opine that the "HSL or DASH string" functions as the unique identifier.  The issue then is whether Dr. Easttom may opine that the kiosk authenticates the portable data storage device using the token.  The Court finds that Sandisk's infringement contentions disclosed a theory that "[d]evice authentication with the DRM server is via a signed token that is unique to the device."  Dkt. No. 146-4.  The Court will therefore permit Dr. Easttom to opine that the "authenticate" limitation is met when the "kiosk authenticates the portable data storage device by communicating the token to the DRM license server . . . ." Dkt. No. 229-4.  Viasat's motion on this ground is therefore **DENIED** as to the token theory and **GRANTED** as to the HLS/DASH string theory.

### ii.    Use Cases #2 and #4

The second use case refers to OTT/video on Demand (e.g., Disney+) using VCDS ("Inflight OnDemand"), and the fourth use case refers to Video on Demand via Disney+ provided by Stream for Home ("HomeonDemand").  Under the Inflight OnDemand and HomeonDemand use cases, the "authenticate" limitation is met when the "███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████."  Easttom Rep. ¶ 254.  Viasat argues that

22

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

the ████████ is "never mentioned in [Sandisk's] infringement contentions for limitations 1[e] or 9[d]." Dkt. No. 204 at 6. Although Viasat acknowledges that Sandisk "mention[ed] '█████

████' [] once in their contentions," its notes that it was "for a different claim limitation—claim 1[b]." *Id*. n.2. Viasat argues that "[d]isclosing this component elsewhere, for a different claim limitation, shows that if [Sandisk] believed it also played a role for claim 1[e] or claim 9[d], [it] w[as] perfectly capable of disclosing this theory in [its] infringement contentions for those claim limitations[,]" but it did not do so. *Id*. Sandisk counters that it "identified ████████ as a remote trusted server for the 'remote trusted server' limitation. . . namely, in element 1[b][,]" and given the connection between limitation 1[b] and 1[e], such a disclosure was sufficient to put Viasat on notice of this theory. Dkt. No. 229 at 10-11.

The Court agrees with Viasat. With respect to limitation 1[b], Sandisk's infringement contentions identify several possible servers that may function as the "remote trusted server." Dkt. No. 146-4. But identifying certain servers' relation to limitation 1[b] is not the same as identifying them in relation to limitation 1[e]. This is consistent with claims 1 and 9 of the '400 Patent, as the claim language makes clear that there can be more than one "remote trusted server." *See* '400 Patent cls. 1 ("a second data interface configured to communicate . . . with *a* remote trusted server) (emphasis added), 9 ("establishing communications with *a* remote trusted server") (emphasis added). Although the infringement contentions identify the ████████ as an example of a "remote trusted server" with respect to limitation 1[b], the contentions do not identify the ████████ as the "remote trusted server" that communicates with the processor to authenticate the portable data storage device. Sandisk's interpretation of the Patent Local Rules would permit it to identify several "remote trusted server(s)" in its infringement contentions without having to identify which of those servers communicates with the processor to authenticate the portable data storage device. If Sandisk intended to allege that the ████████ is the "remote trusted server" that participates in authenticating the portable data storage device, it should have said so in its infringement contentions.[14] The Court finds that Sandisk's

---

[14] Notably, Sandisk identified the Viasat data center as a "remote trusted server" with respect to limitation 1[b] and 1[e].

**Appx46**

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

1 ████████████ theory was not disclosed in its infringement contentions, and as such, Dr.

2 Easttom may not opine that "████████████████████████████████████

3 █████████████████████████████████████████████

4 ████████████████." Easttom Rep. ¶ 254.  Accordingly, Viasat's motion on this

5 ground is **GRANTED**.

        **iii.**    **Use Case #3**

7       The third use case refers to IPTV/Live TV ("IPTV-Live").  As discussed above, *see supra*

8 Section III.D, the Court finds that Sandisk's infringement contentions failed to identify IPTV as an

9 accused product.  Accordingly, the Court strikes Dr. Easttom's opinions regarding the IPTV-Live

10 use case.  Viasat's motion on this ground is **GRANTED**.

**IV.**    **MOTIONS FOR SUMMARY JUDGMENT**

    **A.**    **Legal Standard**

13       Summary judgment is proper when a "movant shows that there is no genuine dispute as to

14 any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

15 A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*

16 *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if there is evidence

17 in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.*

18 But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from

19 the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec.*

20 *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence

21 or make credibility determinations." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997),

22 *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008).  If a court

23 finds that there is no genuine dispute of material fact as to only a single claim or defense or as to

24 part of a claim or defense, it may enter partial summary judgment.  Fed. R. Civ. P. 56(a).

25     **B.**    **Viasat's Motion for Summary Judgment on Noninfringement (Dkt. No. 205)**

26       Viasat moves for summary judgment on three grounds: (1) the Accused Products do not

27 meet the "receive an indication of the NAS device having a secure region" limitation of the '667

28 Patent; (2) the Accused Products do not do not meet the "kiosk" limitation of the '400 Patent; and

United States District Court
Northern District of California

1    (3) the Accused Products do not meet the "authenticating the portable data storage device, using at

2    least the unique identifier, by communicating with the remote trusted server over the second data

3    interface" limitation of the '400 Patent.  Dkt. No. 205 at 2-3.[15]

4              i.    '667 Patent: "receive an indication of the NAS device having a secure
                     region"

5

6         Claim 1 of the '667 Patent claims "[a] media streaming system comprising . . . one or more

7    processors configured to: ***receive an indication of the NAS device having a secure region***

8    ***comprising a buffer for streaming media*** on a separate display device on the local area network,

9    wherein access to the secure region is controlled by the media steaming system . . . ."  '667 Patent

10   cl. 1 (emphasis added).  During claim construction, the parties disputed the meaning of the term

11   "receive an indication of the NAS device having a secure region."  Dkt. No. 120 at 18–19.

12   Sandisk argued that this claim term only "require[d] that the processor [] receive an indication of

13   the NAS device (which happens to have a secure region)," but Viasat argued that this term

14   required the processor to "receive an indication of the presence of the secure region itself."  *Id*.

15   The Court agreed with Viasat and adopted the construction "receive an indication of the presence

16   of a secure region ***within*** the NAS device."  *Id*. at 18 (emphasis added).  The Court found that

17   "[t]he focus of the '667 Patent . . . [was] a novel NAS device having a secure region to buffer

18   content from streaming services[,]" and "as such, the claims logically require an indication that the

19   NAS device has such a secure region for this buffer."  *Id*. at 19.

20        Viasat argues that Sandisk has failed to submit any evidence demonstrating that the '667

21   Accused Products "receive an indication of the presence of a secure region within the NAS

22   device."  Dkt. No. 205 at 5-10.  More specifically, Viasat argues that (1) Sandisk's operative

23   infringement contentions "never attempt to show that the accused products contain a processor

24   configured to receive an indication of the presence of a secure region" and instead "focus on their

25

26   [15] "[A] court may determine infringement on summary judgment 'when no reasonable jury could
     find that every limitation recited in the properly construed claim either is or is not found in the
     accused device.'"  *EMD Millipore Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196, 1200 (Fed. Cir.
27   2014) (*quoting Innovention Toys, LLC v. MGA Entmn't, Inc.*, 637 F.3d 1314, 1319 (Fed. Cir.
     2011).  Accordingly, summary judgment of noninfringement is warranted with respect to each
28   patent if there is no genuine issue of fact as to even one limitation in the asserted claims  In order
     to make a complete record, however, the Court will address each argument.

United States District Court
Northern District of California

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

1   rejected construction" of this limitation, *id*. at 6; and (2) Sandisk's Encrypted Boolean and DRM

2   Subfolder theories—which Viasat contends were disclosed for the first time in Dr. Easttom's

3   opening expert report, Dkt. No. 199—also fail to satisfy this claim limitation.  Dkt. No. 205 at 7-

4   10.  For the reasons below, the Court **GRANTS** Viasat's motion for summary judgment regarding

5   the '667 patent.

6           a.   Sandisk's March 2024 Infringement Contentions

7           First, Viasat argues that Sandisk's March 2024 infringement contentions "only purport to

8   provide evidence that the accused products contain a processor that 'receive[s] an indication of the

9   NAS device,' not an indication that the NAS device has a secure region."  Dkt. No. 205 at 6.

10   According to Viasat, Sandisk's infringement contentions only allege that VCDS "receives an

11   indication that local storage exists in the form of a user hub—there are no contentions that VCDS

12   receives an indication that the user hub has a secure region to store secure media content as the

13   claims require."  *Id*.  Viasat argues that this deficiency warrants summary judgment of

14   noninfringement of the '667 Patent.  *Id*.  Sandisk counters that the language of claims 1 and 11

15   require that "the secure region comprises . . . a buffer for streaming media" and its infringement

16   contentions identified the ███████████████████████████████████."  Dkt. No. 240

17   at 5-6.  Sandisk argues that its infringement contentions identified the VCDS terminal "as the

18   claimed NAS device[] and described a secure portion of that storage—the ███████████████

19   ██████████████████████"  Dkt. No. 240 at 6.  Sandisk argues that it "specifically

20   noted [] the ████████████████████████████████████████████████

21   ████████████████████████████."  *Id*.  According to Sandisk, its

22   infringement contentions "pointed to the fact that the accused system distinguishe[d] between

23   secure (encrypted, hidden) storage areas and public areas by using specific file paths and

24   encryption status as satisfying the indication-of-secure-region element."  *Id*. at 6-7.

25           To resolve this dispute, the Court must first examine the disclosures made in Sandisk's

26   infringement contentions.  Sandisk's infringement contentions break this limitation into three

27   parts: (1) "receive an indication of the NAS device" (2) "having a secure region comprising a

28   buffer for streaming media on a separate display device on the local area network" (3) "wherein

26

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

access to the secure region is controlled by the media streaming system." '667 Patent cl. 1.  The Court focuses its analysis on the "secure region comprising a buffer" portion of this limitation.

Sandisk's infringement contentions identify "a user hub or within one or more Viasat IFEC servers  (*i.e.*, NAS)."  Dkt. No. 145-5 at 32–38.  The contentions further disclose that "local storage, such as a user hub or within one or more Viasat IFEC servers (i.e., NAS), includes a secure region comprising a buffer for streaming media on a separate display device on the local area network."  *Id*. at 40.  Sandisk's contentions provide four examples which allegedly meet this limitation: (1) "a user hub or one or more Viasat IFEC services [that] include a ███████████ ███ . . . [which] may receive content multi-casts and subsequently 'serve' that content to one or more 'players viewing the same live video stream'"; (2) "user hubs and/or Viasat IFEC servers include 'attached external storage (e.g., HDD) for caching and serving content,' and are required to 'encrypt the attached external storage device'"; (3) "in an Open Stream implementation, the VCDS (i.e., media streaming system) may perform a number of additional steps to 'ensure the identity of the user requesting the resources [are] trusted' and 'verify that requests made to a[nd] from the system are legitimate"; and (4) "the Open Caching standard . . . requires that opening caching nodes (e.g., Viasat IFEC system) are secure."  *Id*. at 40–44.

The Court finds there is no genuine dispute that Sandisk's ███████ theory, as disclosed in Sandisk's infringement contentions, fails to satisfy the "receive an indication of the NAS device having a secure region" limitation.  As framed in Sandisk's infringement contentions, Sandisk's ████████ theory does not disclose that the accused processor receives an indication of the presence of a ***secure region*** within "a user hub or within one or more Viasat IFEC servers" (i.e., the NAS device).  Sandisk argues that it "specifically noted that the ████████████████ ███████████████████████████████████, thereby characterizing it as a secure storage region."  Dkt. No. 240 at 6.  Sandisk's arguments are not persuasive.  Identifying the ██████████████████████████████████████████████████████ Moreover, even accepting as true Sandisk's contention that the ████████████████████ ██████████, Sandisk's infringement contentions are silent as to how ***the processor receives an indication of the*** ████████████, as required by the Court's construction.  Sandisk's infringement

27

1    contentions fail to set forth a cognizable infringement theory satisfying the "receive an indication

2    of the NAS device having a secure region" claim limitation.  Accordingly, Viasat's motion for

3    summary judgment on this ground is **GRANTED**.

4            b.   Sandisk's Encryption and DRM Subfolder Theories

5        As explained above, *see supra* Section III.B., the Court strikes Sandisk's encryption theory

6    and DRM subfolder theory from Dr. Easttom's expert report.  Accordingly, the Court need not

7    decide whether these theories raise a genuine dispute of material fact precluding summary

8    judgment on the issue of noninfringement.

9        ii.   **'400 Patent: "kiosk" and "authenticating the portable data storage device,**
10                **using at least the unique identifier, by communicating with the remote**
                **trusted server over the second data interface"**

11        The parties presented two separate grounds for summary judgment regarding the '400

12    patent: one related to "kiosk" and another related to "authenticating the portable data storage

13    device, using at least the unique identifier, by communicating with the remote trusted server over

14    the second data interface."

15        Claim 1 of the '400 Patent claims "[a] kiosk for provisioning secure media content to a

16    plurality of portable data storage devices . . . ."  Dkt. No. 205 at 10.  Viasat argues there is no

17    genuine dispute that the Accused Products do not have a "kiosk."  Viasat's argument comes down

18    to an issue of claim construction.  The parties previously disputed the construction of the term

19    "kiosk."  Dkt. No. 120.  Sandisk argued that the term should be construed according to its plain

20    and ordinary meaning (i.e., "any device used to access and distribute content provided by the

21    system"), and Viasat argued that the term should be construed as "[a] device whose user interface

22    is used by consumers."  Dkt. No. 120 at 8.  The Court adopted Sandisk's construction, finding it

23    was "adopted verbatim from the specification . . . ."  *Id*.  Viasat now argues that Sandisk fails to

24    identify a singular device that serves as the claimed "kiosk."  Viasat argues that the Court's

25    construction of "kiosk" "makes clear that 'a kiosk' is a singular device, not a collection of

26    devices[,]" but Sandisk "points to multiple devices—'the VCDS running on the M3 modem in

27    conjunction with the S4 server'—as the claimed 'kiosk.'"  Dkt. No. 205 at 11.  Sandisk contests

28    Viasat's argument that the "kiosk" must be a singular device and further argues that even if the

United States District Court
Northern District of California

28

United States District Court
Northern District of California

1    "kiosk" must be a singular device, "summary judgment is not warranted because the evidence of

2    record presents a triable issue of material fact as to whether there is a single device that serves as

3    the kiosk." Dkt. No. 240 at 12.

4          The Court finds Viasat's claim construction arguments untimely. If Viasat "wanted to tee

5    up summary judgment positions based on particular constructions, they 'could (and should) have

6    sought . . . construction[s] to [those] effect[s].'" *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-

7    00630-LHK, 2014 WL 252045, at *3 (N.D. Cal. Jan. 21, 2014) (quoting *ePlus, Inc. v. Lawson*

8    *Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012)). The Court finds that Viasat waived this

9    argument by failing to raise it during claim construction. *Cent. Admixture Pharmacy Servs., Inc.*

10   *v. Advanced Cardiac Sols.*, P.C., 482 F.3d 1347, 1356 (Fed. Cir. 2007) ("The district court found

11   that [defendant] waived any argument with respect to this term by failing to raise it during the

12   claim construction phase. We agree."); *see also Apple*, 2014 WL 252045, at *3 ("The Federal

13   Circuit has held that it can be error to engage in hypertechnical refinements of the meaning of

14   claims following claim construction to support a grant of summary judgment.") (citing *AFG*

15   *Industries, Inc. v. Cardinal IG Co.*, 375 F.3d 1367 (Fed.Cir. 2004)). Accordingly, Viasat's motion

16   for summary judgment on this ground is **DENIED**.

17         Claim 1 of the '400 Patent claims "[a] kiosk for provisioning secure media content to a

18   plurality of portable data storage devices, the kiosk comprising . . . a processor configured to . . .

19   authenticate the portable data storage device, using at least the unique identifier, by

20   communicating with the remote trusted server over the second data interface . . . ." '400 Patent, cl.

21   1. During claim construction, the parties disputed the construction of the phrase "authenticating

22   the portable data storage device, using at least the unique identifier, by communicating with the

23   remote trusted server over the second data interface." Dkt. No. 120 at 13–14. Sandisk argued that

24   the phrase should be construed in accordance with its plain and ordinary meaning and further

25   argued that the plain and ordinary meaning "mean[t] simply to 'confirm the identity' of the

26   portable storage device." *Id*. at 13. Viasat argued that the term should be construed as

27   "confirming that the portable data storage device is trusted using at least the unique identifier." *Id*.

28   The Court adopted Viasat's construction, explaining that the specification's use of the word

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

"authenticate" was "always for the purpose of confirming the trust level of the devices in question." *Id*. The Court further noted that "the '400 [P]atent's exclusive use of 'authenticat[ion]' to 'prevent unauthorized copying of digital content,' confirm[ed] that the patentee intended for the term 'authenticate' to include confirmation that the portable data storage device is trusted or authorized." *Id*. at 14.

Viasat argues that it is entitled to summary judgment of noninfringement for the '400 Patent for two reasons: (1) Sandisk does not apply the Court's construction of "authenticate[,]" and (2) Sandisk cannot show a "remote trusted server" that uses the "unique identifier" to "authenticate the portable data storage device." Dkt. No. 205 at 15–17. For the reasons below, the Court **GRANTS** Viasat's motion for summary judgment regarding the '400 patent.

      a. "Authenticate"

First, Viasat argues that Sandisk's infringement contentions "never address or apply the Court's construction of this term[,]" and "instead treat[] 'authenticate' as mere identification of the device, never discussing whether the device is 'trusted.'" *Id*. at 16. Viasat further argues that "Dr. Easttom likewise never applies, addresses, or even mentions the Court's construction of this term." *Id*. Viasat contends that "[b]ecuase [Sandisk's] contentions and Dr. Easttom's opinions all treat 'authenticating' as simply requiring identification of the portable data storage device, rather than analyzing whether or how Viasat supposedly 'confirm[s] that the portable data storage device is trusted,' [Sandisk] ha[s] not met their burden to show infringement." *Id*. Sandisk counters that Dr. Easttom opines that the "███████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████." Dkt. No. 241-2 (citing Easttom Rep. ¶¶ 195–206, 213–76).

As explained above, *see supra* Section III.C., the Court struck Dr. Easttom's opinions regarding the Inflight-Pre-stored, Inflight OnDemand, HomeonDemand, and IPTV use cases. However, the Court declined to strike Dr. Easttom's opinions regarding the token theory under the Inflight-Pre-stored theory. The issue then is whether Sandisk's token theory satisfies the "authenticate" limitation. The Court finds it does not.

United States District Court
Northern District of California

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

To satisfy this limitation under the Court's construction, the kiosk must comprise a processor that is "configured to [confirm that the portable data storage device is trusted using at least the unique identifier] by communicating with the remote trusted server over the second data interface." Dkt. No. 120 at 13–14.  It is not enough that the processor is configured to "confirm the identify of the portable data storage device." *Id.*  Sandisk does not explain how the token provides more than "identification" rather than finding the device is "trusted."  For example, there is no explanation how the token either "███████████████████████████████" or indicates how a device is otherwise "trusted."  *Id.* at 21-22. Viasat's motion for summary judgment on this ground is **GRANTED**.

           b.  "Remote Trusted Server"

Viasat argues that Sandisk "never identified a 'remote trusted server' that uses the 'unique identifier' to authenticate the portable storage device. Dkt. No. 205 at 17.  Sandisk explains that Viasat S4 server and the M3 modem communicate with ground servers that are the "remote trusted server." Dkt. No. 240 at 19.  These ground servers include a set of servers with separate functions, including one for "digital rights management" or DRM.  *Id.*  When a playback request message is sent, a token is created based on the unique device identifier, which is then sent to those ground servers.  In reply, Viasat discounts Sandisk's explanation as a "kitchen-sink allegation," but Viasat fails to explain why the "remote trusted servers" identified, specially one for DRM, would not qualify under the patent claim.  The Court finds that Sandisk's explanation of the DRM server's role as the Remote Trusted Server is not a conclusory opinion and adequately raises a genuine issue of material fact. *Id.* at 19-22.  Viasat's motion for summary judgment on this ground is **DENIED**.

<div align="center">***</div>

Sandisk had to show a genuine issue of material fact as to every limitation of the patent to prevail at summary judgment on infringement. Viasat prevailed on at least one argument regarding both the '667 and '400 patents.  Therefore, Viasat's motion for summary judgment of noninfringement is **GRANTED.**

**Appx54**

United States District Court
Northern District of California

**C.    Sandisk's Motion for Summary Judgment on Affirmative Defenses (Dkt. No. 210)**

Sandisk seeks summary judgment on Viasat's first affirmative defense of invalidity of the '400 patent, third affirmative defense of invalidity of the '667 patent, fifth affirmative defense of failure to state a claim and fourteenth affirmative defense of failure to mark.  Dkt. No. 210 at 7.

When invalidity arguments are presented as affirmative defenses rather than counterclaims and the Court finds noninfringement, invalidity arguments are no longer material to the case's outcome.  *See Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242 (1939); *Cardinal Chem. Co. v. Morton Intern., Inc.*, 508 U.S. 83, 93-94 (1993) (distinguishing when invalidity is raised as a counterclaim as opposed to an affirmative defense once the court has found noninfringement). Having found that Sandisk is entitled to summary judgment on the issue of noninfringement, *see supra* Section IV.B., Sandisk's motions on these grounds are **DENIED AS MOOT**.

Separately, Sandisk argues that failure to state a claim is not an affirmative defense, such that it is entitled to summary judgment on this ground.  Dkt. No. 210 at 27–28.  Viasat does not address the substance of Sandisk's argument and instead counters that this affirmative defense is proper because Sandisk has not shown standing.  Dkt. No. 248 at 20.  The Court agrees with Sandisk.  "Failure to state a claim is not a proper affirmative defense but, rather, asserts a defect in [the] prima facie case."  *Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1174 (N.D. Cal. 2010).  Accordingly, Sandisk's motion for summary judgment on this ground is **GRANTED**.

**D.    Viasat's Motion for Summary Judgment on Standing[16] (Dkt. No. 222)**

Viasat moves for summary judgment on the issue of SDT LLC's standing.  Dkt. No. 222. The Court provides a brief overview of the standing issues in this case.  When this case was initially filed on July 28, 2022, there were five named plaintiffs: Western Digital Technologies, Inc. ("WDT"), Western Digital Ireland Ltd. ("WDI"), SD3D, SDSM, and SDT LLC.  Dkt. No. 1.

---

[16] Viasat moves for leave to file this second motion for summary judgment.  Dkt. No. 221.  Viasat has shown that "[g]ood cause exists to allow a second motion on the distinct issue of patentee standing."  *Id.* at 4.  Therefore, Viasat's motion for leave is **GRANTED**.

1    The original complaint generally alleged that "[o]ne or more Plaintiffs h[e]ld[] title to" the

2    Asserted Patents. *Id*. ¶¶ 17, 35, 47.  Viasat moved to dismiss the complaint for lack of standing.

3    Dkt. No. 27.  The Court granted Viasat's motion, finding "Plaintiffs' claim that 'one or more' of

4    them holds the rights in the asserted patents, without identifying which entity holds which rights to

5    which patents, and why, simply state[d] a conclusion and [was] insufficient" to establish standing.

6    Dkt. 36 at 5.  Plaintiffs amended their complaint on May 9, 2023 to allege facts regarding WDT,

7    WDI, and SD3D's rights in the '400 and '667 Patents and SDT LLC and SDSM's rights in the

8    '834 Patent.  Dkt. No. 38 ¶¶ 20, 37, 50.  Viasat once again moved to dismiss for lack of standing,

9    arguing that the "amended complaint failed to explain how WDI could possibly hold any

10   exclusionary rights in the '400 and '667 [P]atents . . . ."  Dkt. No. 222 at 3; *see also* Dkt. No. 45.

11   On November 8, 2023, the Court denied Viasat's motion.  Dkt. No. 72.  The Court explained that

12   "[w]hile [it] continue[d] to view Plaintiffs' allegations that WDT and WDI 'together are owner

13   and patentee' of the '400 and '667 patents as needlessly cagey, those allegations, taken in the light

14   most favorable to the non-moving party, [were] sufficient to support a plausible inference that

15   WDI holds some exclusionary rights in these patents."  *Id*. at 4.  Although the Court denied

16   Viasat's motion, it noted that "if facts c[a]me to light during discovery that undermine[d]

17   [Plaintiffs' allegations regarding standing], the Court would consider entertaining a partial motion

18   for summary judgment as to issues of patentee standing."  *Id*. at 5.

19        On September 20, 2024, Plaintiffs filed a motion to substitute SDT LLC for WDI and SDT

20   Inc. for WDT.  Dkt. No. 121.  The Court granted Plaintiffs' motion after finding WDT transferred

21   its rights in the Asserted Patents to SDT Inc. and WDI "merged with and into" SDT LLC.  Dkt.

22   No. 130 at 1–2.  WDT and WDI were subsequently terminated from the docket, and SDT Inc. was

23   added as a plaintiff.  *Id*. at 3.  There are currently four named plaintiffs: SDT LLC, SD3D, SDSM,

24   and SDT Inc.  The chart below represents each Sandisk entity's rights in the '400, '667, and '834

25   Patents at the time of the first amended complaint up to July 7, 2025.

26

27

28

United States District Court
Northern District of California

33

**Appx56**

| U.S. Patent No. | May 9, 2023 | July 7, 2025 |
|---|---|---|
| 9,424,400 | WDT – legal title<br>SD3D – exclusive licensee<br>WDI – all other rights and interests | SDT Inc. – legal title<br>SD3D – exclusive licensee<br>SDT LLC – all other rights and interests |
| 10,447,667 | WDT – legal title<br>SD3D – exclusive licensee<br>WDI – all other rights and interests | SDT Inc. – legal title<br>SD3D – exclusive licensee<br>SDT LLC – all other rights and interests |
| 8,504,834 | SDT LLC – owner and patentee<br>SDSM – exclusive licensee | SDT Inc. – owner and patentee<br>SDSM – exclusive licensee |

Dkt. No. 252 at 4.

Viasat contends that "SDT LLC lacks any exclusionary rights in the '400 and '667 Patents "and thus lacks standing to bring this patent infringement suit." Dkt. No. 222 at 6. Viasat argues that WDI, SDT LLC's predecessor, "passed legal title of the [A]sserted [P]atents to" SDT Inc., "gave an exclusive license to the [A]sserted [P]atents to" SDSM, and left SDT LLC "unspecified 'other rights and interests'" to the Asserted Patents. Viasat argues that these "other rights and interests" are insufficient to establish standing. *Id*. at 10. Sandisk's counters that SDT LLC has standing in each of the '400, '667, and '834 Patents. Dkt. No. 252 at 4-9.

### i. SDT LLC's Rights in the '834 Patent

It is undisputed that SDT LLC transferred its rights in the '834 Patent to SDT Inc. on December 27, 2024. Dkt. No. 252 at 3. Sandisk argues that under Rule 25(c), SDT LLC, having owned the '834 Patent at the onset of this case, may proceed as a plaintiff with SDT Inc.[17] Dkt. No. 252 at 5. Sandisk specifically argues that because "[t]he Court has not substituted SDT Inc. for SDT LLC, nor has it joined SDT Inc. (who is already a party) with SDT LLC as to the '834 Patent . . . the action 'may be continued by' SDT LLC." *Id*. (quoting Fed. R. Civ. P. 25(c)). Viasat counters that SDT LLC divested itself of standing when it assigned its rights in the '834

---

[17] Sandisk argues that "the Court's order dismissing the '834 Patent did not end the action as to that claim[,]" and "[w]hen the Court enters final judgment in this case, SDT LLC—or its successor-in-interest SDT Inc.—will have standing to appeal the decisions as to the '834 Patent, and thus should be kept in the case until that time." Dkt. No. 252 at 5 (quotations and citation omitted). Viasat does not dispute that the Court's order of dismissal does not "end the action" but instead argues that Sandisk has failed to show that SDT LLC owned the '834 Patent. Dkt. No. 259 at 8.

1    Patent to SDT Inc.[18]  Dkt. No. 259 at 8-9.

2        The Court agrees with Viasat.  Viasat relies on two cases, *Pi-Net Int'l, Inc. v. Focus Bus.*

3    *Bank*, No. 5:12-CV-04958-PSG, 2015 WL 1538259, at *1 (N.D. Cal. Apr. 6, 2015), and *Schreiber*

4    *Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1202 (Fed. Cir. 2005), which the Court finds

5    persuasive.  In *Schreiber Foods*, the plaintiff owned the asserted patent at the onset of the case.

6    402 F.3d at 1200.  But "while the case was being litigated, [the plaintiff] assigned the [] patent,

7    including all claims and causes of action thereunder, to its subsidiary . . . ."  *Id*.  The Federal

8    Circuit found that the plaintiff's assignment to its subsidiary divested it of standing, as the

9    assignment "explicitly included an assignment of all causes of action."  *Id*.  Similarly, in *Pi-Net*

10    *Int'l*, the plaintiff "owned both the asserted patents at the time it initiated the[] suit[][,]" but during

11    the pendency of the lawsuit, the plaintiff "executed agreements which assigned to [third party] 'the

12    entire right, title and interest in and to the [p]atent[s], including all right[s] to sue for past

13    infringement.'"  2015 WL 1538259, at *4.  The Court found that the plaintiff, having "assigned

14    away all substantial rights in the asserted patents, including the right to use for past

15    infringement[,]" "lacke[ed] legal capacity to maintain the[] action[] . . . ."  *Id*.

16        Here, SDT LLC does not dispute that it "assigned away all substantial rights in the asserted

17    patents, including the right to sue for past infringement[,]" 2015 WL 1538259 at *4, like the

18    plaintiffs in *Schreiber Foods* and *Pi-Net*.  In fact, SDT LLC's sur-reply focuses only on the fact

19    that SDT LLC owned the '834 Patent at the time this case was filed and does not identify a single

20    exclusionary right it still holds in the '834 Patent.  Accordingly, the Court finds SDT LLC lacks

21    standing to assert the '834 Patent.  *See Schreiber Foods*, 402 F.3d at 1203 ("Thus, when [plaintiff]

22    transferred the [] patent and became a mere non-exclusive licensee, [plaintiff] lost standing to sue

23    for infringement and the case became moot.").

24    ───────────────

25    [18] Viasat also argues that Sandisk "cite[s] no evidence supporting the assertion that 'SDT LLC had standing to assert the '834 [P]atent when this case was filed' or that SDT LLC ever owned the '834 Patent."  Dkt. No. 259 at 9.  In response, Sandisk filed a motion for leave to file sur-reply "to address a new argument raised for the first time in Viasat's reply."  Dkt. No. 265 at 1.  Viasat opposed Sandisk's motion for leave, arguing that it pointed out that no evidence supported Sandisk's arguments regarding the '834 patent and that Sandisk should not be allowed to use unproduced documents now. The Court agrees with Viasat. Sandisk's motion to file a sur-reply is **DENIED.** Dkt. No. 265.

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

### ii.    SDT LLC's Rights in the '400 and '667 Patents

Having found SDT LLC lacks exclusionary rights in the '834 Patent, the Court next addresses whether SDT LLC has exclusionary rights in the Asserted Patents. The following facts are undisputed and pertinent to the current dispute:



Viasat argues that WDI, and its successor SDT LLC, were left without any exclusionary rights in the Asserted Patents, such that SDT LLC lacks standing in this case. Sandisk counters that "[a]lthough WDT possessed the right to formally enforce the patents or grant licenses, it did so for WDI's benefit, and because WDI is an owner of rights in the patents, its interests are impacted by litigation such that it should be joined as a party." *Id*. Sandisk further argues that "WDI did not assign all substantial rights to WDT nor SD3D and thus 'remain[ed] [an] owner of the patent,' along with WDT which held legal title and enforcement rights." Dkt. No. 252 at 8.

Sandisk's arguments are not persuasive. As stated by the Federal Circuit, "the touchstone of constitutional standing in a patent infringement suit is whether a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1265 (Fed. Cir. 2010). Here, the question is whether SDT LLC, through its predecessor WDI, holds any exclusive rights to the Asserted Patents. It is undisputed that WDT transferred legal title of the Asserted Patents to SDT Inc. Dkt. No. 220-2 at 6. It is also undisputed that WDT granted WDI "an exclusive, irrevocable, worldwide, perpetual, royalty-free license" to the Asserted Patents,

36

1   which WDI subsequently transferred to SD3D, which SD3D subsequently transferred to SDSM.

2   *Id*. at 8–9.  It is also undisputed that WDT retained "the right to enforce" the Asserted Patents

3   "against any third party for the benefit of WDI, WDT, and their respective Affiliates" and WDT

4   was "solely responsible for the prosecution, settlement and discharge of all infringement claims,

5   suits, actions and proceedings relating to enforcement of" the Asserted Patents.  Dkt. No. 253-4 at

6   5–6.

7          The Court finds that SDT LLC has failed to establish it has any exclusionary rights in the

8   Asserted Patents.  Sandisk argues that "Viasat's focus on 'exclusionary rights' misses the point[,]"

9   Dkt No. 252 at 8, but the Court disagrees.  "The essential issue regarding the right to sue on a

10  patent is who owns the patent" and possesses "all substantial rights."  *Aspen Eyewear, Inc. v.*

11  *Miracle Optics, Inc.,* 434 F.3d 1336, 1338, 1341-42 (Fed. Cir. 2006).  Where those rights are split

12  through exclusive license agreements, the licensor and the licensee must be joined as parties.  *Id.* at

13  1344.  SDT Inc. and S3SD split legal title and exclusivity.  But SDT LLC possesses neither, only

14  undefined "rights and interests" in the patents.  Dkt. No. 252 at 4.  Accordingly, the Court finds

15  SDT LLC lacks standing to assert the '400 and '667 Patents.  The Court therefore **GRANTS**

16  Viasat's motion for summary judgment on standing and dismisses SDT LLC from the case.

17  

18  **V.    MOTION TO SUBSTITUTE**

19         **A.    Legal Standard**

20         Federal Rule of Civil Procedure 25(c) states "[i]f an interest is transferred, the action may be

21  continued by or against the original party unless the court, on motion, orders the transferee to be

22  substituted in the action or joined with the original party."  Fed. R. Civ. P. 25(c).  "Rule 25(c) is not

23  designed to create new relationships among parties to a suit but is designed to allow the action to

24  continue unabated when an interest in the lawsuit changes hands."  *In re Bernal*, 207 F.3d 595, 598

25  (9th Cir. 2000) (quoting *Collateral Control Corp. v. Deal*, 638 F.2d 1362, 1364 (5th Cir. 1981)).  Rule

26  25(c) "leaves the substitution decision to the trial court's sound discretion."  *Uniloc USA Inc. v. LG*

27  *Elecs. U.S.A. Inc.*, No. 18-CV-06737-JST, 2019 WL 690290, at *1 (N.D. Cal. Feb. 19, 2019) (quoting

28  *In re Bernal*, 207 F.3d at 598).  Accordingly, the court "may allow the transferee to be substituted for

the transferor or . . . it may retain the transferor as a party and order that the transferee be made an additional party." *McKesson Info. Sols., Inc. Bridge Med., Inc.*, No. CIVS022669 FCD KJM, 2006 WL 658100, at *2 (E.D. Cal. Mar. 13, 2006).

### B.    Discussion

On August 22, 2025, two months after Viasat filed its motion for summary judgment on standing, Sandisk filed a motion to substitute SDT LLC with SDT Inc. with respect to the '834 Patent and SD3D with SDSM with respect to the '400 and '667 Patents. Dkt. No. 269 at 2. Sandisk argues that SDT LLC should be substituted with SDT Inc., because "[p]ursuant to an intellectual property transfer agreement, SDT LLC assigned all of its rights . . . to SDT Inc." *Id*. at 4. Sandisk also argues that SD3D should be substituted with SDSM, because SD3D transferred its rights in the '400 and '667 Patents to SDSM "by way of an Intellectual Property Assignment Agreement." *Id*. at 5.

The Court has already dismissed SDT LLC as a plaintiff for lack of standing. *See supra* Section IV-D. Accordingly, Sandisk's motion as to SDT LLC is **DENIED AS MOOT**. However, the Court finds it appropriate to substitute SD3D with SDSM. SD3D no longer holds any rights in the '400 and '667 Patents, and Viasat will not be prejudiced by this substitution. Sandisk's motion as to SD3D is therefore **GRANTED**.

The Court has serious concerns about Sandisk's tactics leading up to the filing of this motion. On February 13, 2025—nearly three years after initiating this case—Sandisk served a supplemental interrogatory response setting forth each Sandisk entity's exclusionary rights in the '400, '667, and '834 Patents. Dkt. No. 220-2. On March 28, 2025, Viasat asked Sandisk to "explain [its] basis for continuing to include SDT LLC as a plaintiff in this action." Dkt. No. 220-4 at 4. Sandisk did not respond until May 28, 2025, at which point it offered to stipulate to SDT LLC's dismissal, subject to "Viasat agree[ing] that the remaining Plaintiffs have standing to maintain this action . . . ." *Id*. at 4. Viasat refused those terms, explaining that "[s]tanding exists or it doesn't." *Id*. at 3. On June 8, 2025, Viasat asked Sandisk to confirm it would "drop SDT LLC as a party . . . ." *Id*. at 2. Sandisk did not respond to Viasat. Dkt. No. 258 at 2. Not having received a response from Sandisk, Viasat filed its motion for summary judgment on standing on

United States District Court
Northern District of California

**CONFIDENTIAL INFORMATION OMITTED ON THIS PAGE.**

United States District Court
Northern District of California

1    June 20, 2025.  Dkt. No. 222.  On June 25, 2025, Sandisk reached out to Viasat to once again

2    propose a stipulation dismissing SDT LLC, premised on Viasat's agreement not to further

3    challenge standing.  Dkt. No. 258-3.  Viasat's motion for summary judgment on standing was

4    fully briefed by July 14, 2025 (Dkt. No. 259), but on August 22, 2025, Sandisk filed the pending

5    motion to substitute.  Dkt. No. 269.

6         Sandisk's conduct has wasted the parties' and the Court's time and resources.  Despite

7    initially offering to dismiss SDT LLC from this case, Sandisk appears to have reneged on its offer

8    after Viasat declined to agree not to further challenge the standing of other Sandisk entities.

9    Sandisk's proposed quid pro quo was unjustifiable.  As Viasat stated, "[s]tanding exists or it

10   doesn't."  Dkt. No. 220-4 at 3.[19]  If Sandisk knew that SDT LLC did not have standing—which

11   appears to be the case—Sandisk should have voluntarily dismissed SDT LLC.  Instead, Sandisk

12   subjected the parties and the Court to an unnecessary series of motions regarding SDT LLC's

13   standing.  Accordingly, Sandisk's counsel is **ORDERED TO SHOW CAUSE** why they should

14   not be sanctioned to cover, at a minimum, the costs of Viasat's motion for summary judgment on

15   standing and Viasat's opposition to Sandisk's motion to substitute.  Sandisk's counsel shall file a

16   statement of five pages or less within one week of the date of this order. Once the Court receives

17   Sandisk's response, it may set an in-person show cause hearing.

18   **VI.    MOTIONS TO EXCLUDE EXPERT OPINIONS AND TESTIMONY**

19        Viasat moves to exclude certain technical and damages opinions disclosed in the Easttom

20   Report and Kindler Report.  Dkt. No. 206 at 3-6.  Viasat specifically seeks to exclude the opinions

21   set forth in Paragraph 97 of the Easttom Report and Paragraphs 12.a., 13.a., 78, 177–82, 213a.i.,

22   218, 220.a., 221.a. and Exhibit 10.2 of the Kindler Report.  *Id.*  Sandisk moves to exclude certain

23   opinions of Viasat's damages expert, Dr. Gareth Macartney.  Dkt. No. 208.  Sandisk specifically

24   seeks to exclude three of Dr. Macartney's opinions: "(1) reliance on an agreement with a company

25   called ███ as comparable to the technology of the '400 patent" ("Opinion 1"); "(2) the use of

26

27   ───────────────────
     [19] Further underlining the impropriety of Sandisk's conduct is the fact that SD3D transferred its
     rights in the '400 and '667 Patents to SDSM in January 2025.  Dkt. No. 269 at 3.  Had Viasat
28   agreed not to challenge the standing of any other Sandisk entities, Viasat would have been left
     unable to (rightfully) challenge SD3D's standing.

                                              39

1    an agreement with a company called Arconics as a 'reality check' on the opinions of Sandisk's

2    damages expert, Lauren Kindler" ("Opinion 2"), and "(3) his criticism that Ms. Kindler

3    'disregard[s] standard video compression' in relying on certain Viasat data in her report"

4    ("Opinion 3"). *Id.* at 5.

5         As explained above, *see infra* Section IV.B., the Court grants Viasat's motion for summary

6    judgment of noninfringement. The Court did not need to rely on any of these materials in granting

7    summary judgment of noninfringement. Accordingly, Sandisk and Viasat's *Daubert* motions are

8    **DENIED AS MOOT**.

9    **VII.    CONCLUSION**

10        The Court **GRANTS IN PART** and **DENIES IN PART** Viasat's motion to strike portions

11   of Plaintiffs' expert reports (Dkt. No. 199); **DENIES AS MOOT** Viasat's motion to strike Lauren

12   Kindler's May 5, 2025 supplemental expert report (Dkt. No. 200); **GRANTS IN PART** and

13   **DENIES IN PART** Viasat's motion to strike Plaintiffs' '400 patent authenticating theories (Dkt.

14   No. 204); **DENIES AS MOOT** Viasat's motion to exclude certain opinions of Chuck Easttom and

15   Lauren Kindler (Dkt. No. 206); **DENIES AS MOOT** Sandisk's motion to exclude certain

16   opinions of Gareth Macartney (Dkt. No. 208); **GRANTS** Viasat's motion for summary judgment

17   of noninfringement (Dkt. No. 205); **GRANTED IN PART** and **DENIED IN PART AS MOOT**

18   Sandisk's motion for summary judgment on affirmative defenses (Dkt. No. 210); **GRANTS**

19   Viasat's motion for leave to file a second motion for summary judgment (Dkt. No. 221);

20   **GRANTS** Viasat's motion for summary judgment on standing (Dkt. No. 222); **DENIES**

21   Sandisk's motion for leave to file sur-reply (Dkt. No. 265); **GRANTS** the parties' motions to seal

22   (Dkt. Nos. 201, 207, 209, 211, 226, 231, 232, 233, 234, 243, 249, 256, 261, 263); **GRANTS IN**

23   **PART** and **DENIES IN PART** Plaintiffs' motion to seal (Dkt. No. 241); **DENIES** Defendant's

24   motions to seal (Dkt. Nos. 220, 250); **DENIES AS MOOT** Sandisk's motion to seal (Dkt. No.

25   253); and **GRANTS IN PART** and **DENIES IN PART** Sandisk's motion to substitute (Dkt. No.

26   269).

27        Sandisk is **DIRECTED** to file an amended motion to seal with respect to Docket Number

28   241 within one week of the date of this order. The amended motion shall contain excerpted

40

versions of Exhibits 14–18, 20, 22, 23–25, 27, and 32 to Sandisk's opposition to Viasat's motion for summary judgment on noninfringement.

Sandisk is further **DIRECTED** to file a statement in response to the Court's order to show cause within one week of the date of this order.

The Clerk is **DIRECTED** to terminate SanDisk3D IP Holdings Ltd. and SanDisk Technologies LLC from the docket.  The Clerk is further **DIRECTED** to update the case caption to "SANDISK TECHNOLOGIES, INC., et. al., v. VIASAT, INC."

The Clerk is **DIRECTED** to enter judgment in favor of Defendant Viasat, Inc. and against Plaintiffs and to close the case.

**IT IS SO ORDERED.**

Dated:     10/21/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge



US009424400B1

(12) **United States Patent** (10) **Patent No.:** **US 9,424,400 B1**
Blankenbeckler et al. (45) **Date of Patent:** *Aug. 23, 2016

(54) **DIGITAL RIGHTS MANAGEMENT SYSTEM TRANSFER OF CONTENT AND DISTRIBUTION**

(71) Applicant: **Western Digital Technologies, Inc.,** Irvine, CA (US)

(72) Inventors: **David L. Blankenbeckler**, Longmont, CO (US); **Danny O. Ybarra**, Mission Viejo, CA (US); **Lambertus Hesselink**, Portola Valley, CA (US)

(73) Assignee: **Western Digital Technologies, Inc.,** Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/571,178**

(22) Filed: **Dec. 15, 2014**

**Related U.S. Application Data**

(63) Continuation of application No. 13/460,805, filed on Apr. 30, 2012, now Pat. No. 8,914,634.

(60) Provisional application No. 61/622,312, filed on Apr. 10, 2012, provisional application No. 61/636,460, filed on Apr. 20, 2012.

(51) **Int. Cl.**
**H04L 9/32** (2006.01)
**G06F 21/10** (2013.01)

(52) **U.S. Cl.**
CPC ................ **G06F 21/10** (2013.01); **H04L 9/32** (2013.01); *G06F 2221/07* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,205,550 | B1 | 3/2001 | Nardone et al. |
| 6,499,054 | B1 | 12/2002 | Hesselink et al. |
| 6,609,199 | B1 | 8/2003 | DeTreville |
| 6,732,158 | B1 | 5/2004 | Hesselink et al. |
| 6,832,319 | B1 | 12/2004 | Bell et al. |
| 7,024,393 | B1 | 4/2006 | Peinado et al. |
| 7,120,692 | B2 | 10/2006 | Hesselink et al. |
| 7,155,616 | B1 | 12/2006 | Hamlin |
| 7,215,771 | B1 | 5/2007 | Hamlin |
| 7,356,143 | B2 | 4/2008 | Morten |
| 7,454,443 | B2 | 11/2008 | Ram et al. |

(Continued)

OTHER PUBLICATIONS

Office Action dated Oct. 29, 2013 from U.S. Appl. No. 13/460,766, 19 pages.

(Continued)

*Primary Examiner* — Brandon Hoffman

(57) **ABSTRACT**

The present invention relates to digital rights management (DRM) for content that may be downloaded and securely transferred from one storage to another storage. The storage may be a disk drive, or network attached storage. The storage performs cryptographic operations and provides a root of trust. The DRM system enables secure copying or transfer of content from one storage device to another storage device. In this embodiment, a trusted server that is authenticated and trusted by both storage devices brokers the transfer of content. The trusted server may be a separate entity of the DRM system or may be a component or function of an existing server of the DRM system. In another embodiment, the storage devices may transfer content in a peer-to-peer fashion. The transfer of content may be authorized and controlled based on a digital certificate associated with the content.

**17 Claims, 14 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| 7,467,187 | B2 | 12/2008 | Hesselink et al. |
| 7,467,304 | B2 | 12/2008 | Bar-El et al. |
| 7,546,353 | B2 | 6/2009 | Hesselink et al. |
| 7,587,467 | B2 | 9/2009 | Hesselink et al. |
| 7,594,275 | B2 | 9/2009 | Zhu et al. |
| 7,600,036 | B2 | 10/2009 | Hesselink et al. |
| 7,788,404 | B2 | 8/2010 | Hesselink et al. |
| 7,917,628 | B2 | 3/2011 | Hesselink et al. |
| 7,925,894 | B2 | 4/2011 | Thibadeau |
| 7,934,251 | B2 | 4/2011 | Hesselink et al. |
| 7,949,564 | B1 | 5/2011 | Hughes et al. |
| 8,004,791 | B2 | 8/2011 | Szeremeta et al. |
| 8,255,661 | B2 | 8/2012 | Karr et al. |
| 8,285,965 | B2 | 10/2012 | Karr et al. |
| 8,341,117 | B2 | 12/2012 | Ram et al. |
| 8,341,215 | B2 | 12/2012 | Hesselink et al. |
| 8,352,567 | B2 | 1/2013 | Hesselink et al. |
| 8,526,798 | B2 | 9/2013 | Hesselink |
| 8,631,284 | B2 | 1/2014 | Stevens |
| 8,646,054 | B1 | 2/2014 | Karr et al. |
| 8,661,507 | B1 | 2/2014 | Hesselink et al. |
| 8,688,797 | B2 | 4/2014 | Hesselink et al. |
| 8,713,265 | B1 | 4/2014 | Rutledge |
| 8,762,682 | B1 | 6/2014 | Stevens |
| 8,780,004 | B1 | 7/2014 | Chin |
| 8,793,374 | B2 | 7/2014 | Hesselink et al. |
| 8,819,443 | B2 | 8/2014 | Lin |
| 8,831,217 | B2 | 9/2014 | Blankenbeckler et al. |
| 8,831,218 | B2 | 9/2014 | Blankenbeckler et al. |
| 8,914,634 | B2 | 12/2014 | Blankenbeckler et al. |
| 2002/0168070 | A1 | 11/2002 | Bernsen |
| 2004/0030650 | A1 | 2/2004 | Okuyama et al. |
| 2005/0071032 | A1 | 3/2005 | Urabe |
| 2005/0144195 | A1 | 6/2005 | Hesselink et al. |
| 2005/0144200 | A1 | 6/2005 | Hesselink et al. |
| 2006/0020578 | A1 | 1/2006 | Hood |
| 2006/0291653 | A1 | 12/2006 | Kawada et al. |
| 2007/0030781 | A1 | 2/2007 | Benedikt |
| 2008/0263356 | A1 | 10/2008 | Overby |
| 2009/0052671 | A1 * | 2/2009 | Bauchot ................. G06F 21/10 |
| | | | 380/277 |
| 2010/0174910 | A1 | 7/2010 | Little |
| 2012/0036041 | A1 | 2/2012 | Hesselink |
| 2012/0047396 | A1 | 2/2012 | Garani et al. |
| 2012/0066754 | A1 | 3/2012 | Karaoguz et al. |
| 2012/0303974 | A1 | 11/2012 | Lin et al. |
| 2013/0163764 | A1 | 6/2013 | van den Berg et al. |
| 2013/0212401 | A1 | 8/2013 | Lin |
| 2013/0215448 | A1 | 8/2013 | Gentile et al. |
| 2013/0266137 | A1 | 10/2013 | Blankenbeckler et al. |
| 2013/0268749 | A1 | 10/2013 | Blankenbeckler et al. |
| 2013/0268759 | A1 | 10/2013 | Blankenbeckler et al. |
| 2013/0268771 | A1 | 10/2013 | Blankenbeckler et al. |
| 2014/0052996 | A1 | 2/2014 | Nin et al. |
| 2014/0095439 | A1 | 4/2014 | Ram |
| 2014/0169921 | A1 | 6/2014 | Carey |
| 2014/0173215 | A1 | 6/2014 | Lin et al. |

OTHER PUBLICATIONS

Office Action dated May 13, 2013 from U.S. Appl. No. 13/460,766, 19 pages.

Interview Summary dated Aug. 16, 2013 from U.S. Appl. No. 13/460,766, 2 pages.

Interview Summary dated Aug. 15, 2013 from U.S. Appl. No. 13/460,616, 3 pages.

Office Action dated Oct. 28, 2013 from U.S. Appl. No. 13/460,616, 18 pages.

Office Action dated May 16, 2013 from U.S. Appl. No. 13/460,616, 14 pages.

Notice of Allowance dated Aug. 12, 2014 from U.S. Appl. No. 13/460,805, 11 pages.

Non-Final OA dated Feb. 6, 2014 from U.S. Appl. No. 13/460,805, 17 pages.

Non-Final OA dated Aug. 6, 2013 from U.S. Appl. No. 13/460,805, 10 pages.

* cited by examiner



**FIG. 1**



**FIG. 1A**



**FIG. 1B**



**FIG. 1C**



**FIG. 2**



**FIG. 3**



**FIG. 4**



110

PRIMARY STORAGE DEVICE

CONTROLLER                                          408

CRYPTOGRAPHIC MODULE                                409

SECURED
MEMORY              502

STORAGE MEDIA                                       402

NON-USER AREA                                       506

USER AREA                                           504

**FIG. 5**



**FIG. 6**



**FIG. 7**



**FIG. 7A**



**FIG. 7B**



**FIG. 7C**



**FIG. 8**

1

# DIGITAL RIGHTS MANAGEMENT SYSTEM TRANSFER OF CONTENT AND DISTRIBUTION

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 13/460,805, filed on Apr. 30, 2012 entitled, "DIGITAL RIGHTS MANAGEMENT SYSTEM TRANSFER OF CONTENT AND DISTRIBUTION," issued on Dec. 16, 2014 as U.S. Pat. No. 8,914,634, which claims priority to U.S. Provisional Application No. 61/622, 312, filed Apr. 10, 2012 entitled, "DIGITAL RIGHTS MAN-AGEMENT SYSTEM, DEVICES, AND METHODS FOR DIGITAL CONTENT," and U.S. Provisional Application No. 61/636,460, filed Apr. 20, 2012, entitled, "DIGITAL RIGHTS MANAGEMENT SYSTEM TRANSFER OF CONTENT AND DISTRIBUTION," all of which are herein incorporated by reference in their entirety.

## BACKGROUND

Many different digital rights management ("DRM") systems have been proposed and implemented on various platforms. In general, DRM refers to technologies that are used to control the use of digital content and devices. For example, DRM is commonly used to prevent unauthorized copying of digital content.

Today, there exists a wide variety of computing devices that enable users to copy and distribute digital content, especially content that has been downloaded or stored on a storage device, such as a hard disk. Furthermore, most DRM systems to date have security weaknesses and have been circumvented. Unfortunately, due to these weaknesses of current DRM systems, content companies have limited their offerings or have employed DRM systems that are difficult to use.

## BRIEF DESCRIPTION OF THE DRAWINGS

Systems and methods which embody the various features of the invention will now be described with reference to the following drawings, in which:

FIG. **1** shows an exemplary system according to one embodiment;

FIG. **1A** show an exemplary peer-to-peer system according to another embodiment;

FIG. **1B** show an exemplary trusted server system according to another embodiment;

FIG. **10** shows an exemplary with a kiosk for distributing content to a storage device according to one embodiment;

FIG. **2** shows an exemplary audit system according to one embodiment;

FIG. **3** shows an exemplary download system according to one embodiment;

FIG. **4** shows an exemplary client system according to one embodiment;

FIG. **5** shows an exemplary storage device according to one embodiment;

FIG. **6** illustrates an exemplary process flow for generating a binding key that binds content to a storage device according to one embodiment;

FIG. **7** illustrates an exemplary process flow for provisioning content to a storage device according to one embodiment;

FIG. **7A** illustrates an exemplary process flow for peer-to-peer copying or transferring content from a primary storage device to a secondary storage device according to one embodiment;

2

FIG. **7B** illustrates an exemplary process flow for copying or transferring content from a primary storage device to a secondary storage device via a trusted server according to one embodiment;

FIG. **7C** illustrates an exemplary process flow for provisioning content from a kiosk to a storage device according to one embodiment; and

FIG. **8** illustrates an exemplary process flow for playing content from a secondary storage device according to one embodiment.

## DETAILED DESCRIPTION

In one embodiment, digital content may be securely transferred via a trusted server from one storage device to another device. In particular, digital content may be transferred based on the transfer of secure metadata, such as keys, rights, etc., from one device to another. Once transfer of the secure metadata has been accomplished, the content may be copied or transferred as well. Digital rights management ("DRM") methods and systems are provided for controlled distribution, transfer, and playback of digital content. For example, digital rights management ("DRM") methods and systems are provided for controlled distribution, for example via a kiosk, of digital content and playback of the digital content. The digital content may comprise the content itself plus metadata. The content may be text, documents, audio, video, multimedia, video games, etc. in any known format. The content metadata may be any data or information associated with the content that is used for handling of the content. The content metadata may be employed to provide for secure handling of the digital content and to provide DRM protections. The content metadata may also comprise one or more digital certificates.

In one embodiment, the DRM system enables secure copying or transfer of content, for example, from one storage device to another storage device. In this embodiment, the transfer of the content is performed based on a trusted, peer-to-peer transfer between storage devices. For example, the storage devices may employ a secure channel that is transparently tunneled through one or more host devices to transfer content directly from one storage device to another. In another embodiment, the DRM system enables secure copying or transfer of content and/or content metadata, for example, from one storage device to another storage device in a peer-to-peer fashion.

In another embodiment, the DRM system enables secure copying or transfer of content and/or content metadata, for example, from one storage device to another storage device via a trusted server. In this embodiment, the transfer of the content and the content metadata is brokered by a trusted server that is authenticated and trusted by both sets of storage devices. The trusted server may be a separate entity of the DRM system or may be a component or function of an existing server of the DRM system.

In another embodiment, a user may obtain one or more copies of content, but does not possess the content metadata, such as necessary cryptographic keys. Accordingly, in this embodiment, a user could interface with the system to obtain the secure metadata and gain access to the content. In one embodiment, the content that is encrypted may only be a portion or portions of the text, document, audio, video, multimedia, video games, etc.

Servers providing content may encrypt each copy of content based on an access key that is unique to that copy of the content. Thus, if an access key is compromised, the protection

of only one copy of the content is compromised. In another embodiment, asymmetric cryptography may be employed for securing content.

In addition, the content may be uniquely bound to specific devices, such as an intelligent storage device, based on the configuration of the access key. For example, the access key for the content is generated from at least two components. The first component is a binding key that is unique to the storage device on which the content is stored. In one embodiment, the storage device may generate the binding key using a random number and inputting the random number into a key generator. The second component is a content key that is unique to the content. In one embodiment, the algorithm for generating the access key may be implemented as a licensable or renewable function.

In one embodiment, only certain entities are provided the algorithm for generating the access key based on the two components. For example, the storage device holding content does not retain any copies of its binding key nor does it have the algorithm for generating the access key. The algorithm for generating the binding key may be licensable and renewable.

In one embodiment, two-way authentication is employed, for example, using public key infrastructure ("PKI") and public key certificate-based authentication to ensure that entities in the system are trusted. The various components of the system, such as a storage device, may be intelligent, and thus, capable of two-way authentication with each other, which was not possible in the prior art. For example, the storage device and the player or download server may mutually authenticate with each other. This form of authentication ensures that the storage device confirms a trust relationship with the player and vice versa. Conventional DVD and Blu-ray discs did not contain such features to authenticate or establish trust with a player or download server. The PKI thus provides an environment in which entities of the DRM system can register their identity and establish trust with each other.

In one embodiment, the entities of the DRM system employ public key certificates, i.e., digital certificates for authentication of their identity and determine authorization for various uses of their content. In another embodiment, a trusted party manages a certificate authority ("CA") to supervise the PKI and digital certificates. In addition, multiple levels of CA's can be accommodated in any of the embodiments.

All devices of the DRM system may be issued a certificate from one or more of the CA's. If needed, one embodiment may provide for full revocation of a certificate for an entity. As noted, two-way mutual authentication may be employed between entities to establish secure communications channels for exchanging and distributing the content. Each item of content may also be issued a digital certificate. This allows the content to play a role in determining whether a device can be trusted.

Certain embodiments of the inventions will now be described. These embodiments are presented by way of example only, and are not intended to limit the scope of the inventions. Indeed, the novel methods and systems described herein may be embodied in a variety of other forms. Furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein may be made without departing from the spirit of the inventions. To illustrate some of the embodiments, reference will now be made to the figures.

FIG. 1 shows an exemplary system 100 of the embodiments. As shown, the system 100 may comprise, among other things, an audit system 102, a download system 104, a client

system 106, and a network 108. These components and certain aspects of their operation will now be further described.

The audit system 102 serves as a trusted party for system 100. In addition, the audit system 102 may provide various management functions related to the distribution and playback of content in system 100. In one embodiment, the audit system 102 validates and certifies encryption keys as part of the PKI employed in system 100. The audit system 102 is further described with reference to FIG. 2.

The download system 104 comprises the hardware and software components for distributing content in system 100. In one embodiment, the download system 104 comprises a website, which includes links to the content. The download system 104 may also provide links to allow for transactions with the audit system 102, such as links to key servers and certificate authorities. The download system 104 is further described with reference to FIG. 3.

The client system 106 may be any device used to access content provided by the system 100. For example, the client system 106 may comprise a computer, a television, a portable or mobile device, a video game console, a portable video game console, as well as associated storage. Any device capable of downloading, storing, or playing content may be implemented as part of the client system 106. For example, the client system 106 may comprise a desktop computer, a laptop computer, a tablet, a smartphone, a television, a digital video recorder, a set-top box, a video game console, or portable video game console, or other form of electronic device. The client device 106 may also comprise a network that is wired and/or wireless and storage, such as a network attached storage ("NAS") or external drives. The embodiments may work with any form of storage device, such as solid state and flash memory storage. The client system 106 is further described with reference to FIG. 4.

The client system 106 may comprise multiple storage devices that a user may use to store and access client. For example, as shown, the client system 106 may comprise a primary storage device 110 and a secondary storage device 112. The primary storage device 110, for example, may be a hard disk drive, a flash memory drive, a hybrid drive, etc. Such storage devices are known to those skilled in the art. In another embodiment, the storage device may be a network attached storage.

The secondary storage device 112 represents any additional storage that may be used by the client system 106. For example, the secondary storage device 112 may be an additional hard drive of the client system 106, an external drive, etc. Alternatively, the secondary storage device 112 may be a backup storage to the primary storage device 110. In another embodiment, the storage device may be a network attached storage.

The network 108 provides a communication infrastructure by which the various components of system 100 communicate. Network 108 may comprise any collection of networks and network elements. For example, the network 108 may be implemented over the Internet. However, the network 108 may comprise any local area network, metropolitan area network, or wide area network and may be implemented as a private network, a public network, etc. Additionally, network 108 may comprise wired or wireless communication links.

Trusted server 114 serves as a controlling authority allowing content to be moved from one storage device to another storage device. In one embodiment, the trusted server 114 may be implemented with known hardware and software. For example, the trusted server 114 may be a server coupled to the network 108 that is separate from the other servers of the system. Alternatively, the trusted server 114 may be imple-

5

mented on the same hardware or may be integrated as a component of another component, such as download system **104** or audit system **102**. The trusted server **114** may be configured to control copying and transfer of content based on using the content's digital certificate or secure content meta-data, for example, stored in download system **104**. An exemplary process for transfer or copy of content is described further with reference to FIG. **7A**.

The system **100** may support several scenarios for downloading and playing content. For example, content can be downloaded via the network **108** to a portable storage device from client system **106**. The content may then be played on a playback device, such as a Blu-Ray player, game console, TV, by streaming the content from the storage device. As another example, the playback device may include an integrated storage device that is used for both download and playback of content. As another use case, content may be downloaded onto a NAS system in client system **106**.

Yet another implementation may comprise a client system **106** having a networked storage device or media player to which the content is bound. A user of client system **106** may then remotely access the content and play it on a mobile device, such as an iPad, iPod, iPhone, a portable video game console, such as PlayStation® portable or a Nintendo DS, etc., which is connected to the storage device or media player via a secure connection, such as a wireless connection, over a WiFi, 3G, 4G, or other communication channel. In another implementation of system **100**, the client system **106** comprises a portable storage device or media player that is accessible wirelessly, such as via Bluetooth or WiFi or similar communication system. The portable storage device or media player in client system **106** may thus act as a source of content for playback on portable and network enabled viewing devices in client system **106**.

FIG. **1A** shows another exemplary peer-to-peer system **100** of an embodiment. As shown, the system **100** may comprise, among other things, an audit system **102**, a download system **104**, a client system **106**, and a network **108**. In this embodiment, the secondary storage **112** is remote from the client system **106**, such as a network backup storage system, a network attached storage, or cloud storage system.

Secondary storage system **112** may be any system and service that provides client system **106** backup and storage for files, including content protected by the DRM of system **100**. The storage system **112** may be implemented based on known hardware and software. For example, secondary storage system **112** may be a server, a file hosting service, a content locker, and the like. In one embodiment, the secondary storage **112** may employ HTTP and FTP access for access to the files. In addition, the secondary storage system **112** may provide automatic or periodic backups of primary storage **110**, encryption, file-by-file restoration, file synchronization, data compression, versioning, etc.

FIG. **1B** shows another exemplary trusted server system **100** of an embodiment. As shown, the system **100** may comprise, among other things, an audit system **102**, a download system **104**, a client system **106**, a network **108**, and the trusted server **114**. In this embodiment, the secondary storage **112** is implemented as part of a remote backup storage system **116**. Alternatively, the secondary storage **112** may be a network attached storage.

Backup storage system **116** may be any system and service that provides client system **106** backup and storage for files, including content protected by the DRM of system **100**. Backup storage system **116** may be implemented based on known hardware and software. For example, backup storage system **116** may be a server, a file hosting service, a content

6

locker, and the like. In one embodiment, the backup storage system **116** may employ HTTP and FTP access for access to the files.

Backup storage system **116** may also provide various features to secure secondary storage **112**. For example, the backup storage system **116** may provide automatic or periodic backups of primary storage **110**, encryption, file-by-file restoration, file synchronization, data compression, versioning, etc. As shown, the dotted line shows a functional relationship. In one embodiment, the secure connection is brokered through the client system as a secure tunnel that is transparent to the client system.

FIG. **10** shows an exemplary system **100** of the embodiments having a kiosk for distributing content to a storage device. As shown, the system **100** may comprise, among other things, an audit system **102**, a download system **104**, a kiosk **106'**, and a network **108**. These components and certain aspects of their operation will now be further described.

The audit system **102** serves as a trusted party for system **100**. In addition, the audit system **102** may provide various management functions related to the distribution and playback of content in system **100**. In one embodiment, the audit system **102** validates and certifies encryption keys as part of the PKI employed in system **100**. The audit system **102** is further described with reference to FIG. **2**.

The download system **104** comprises the hardware and software components for distributing content in system **100**. In one embodiment, the download system **104** comprises a website, which includes links to the content. The download system **104** may also provide links to allow for transactions with the audit system **102**, such as links to key servers and certificate authorities. The download system **104** is further described with reference to FIG. **3**.

The kiosk **106'** may be any device used to access and distribute content provided by the system **100**. For example, the kiosk **106'** may be implemented as a self-service computer terminal. In one embodiment, the kiosk **106'** may comprise specialized hardware and software that is designed such that kiosk **106'** is placed in a public environment. The kiosk **106'** may comprise various user interface equipment, such as a keyboard, display, etc. to allow use of the kiosk **106'**.

As shown, the kiosk **106'** may be coupled, directly or indirectly, to a local content database **110**. The local content database **110** serves as a local storage infrastructure for a plurality of content downloaded, for example, from the download system **104**. Thus, as shown, a user may connect a storage device **112** to the kiosk **106'** and download content from the local content database **110** or the download system **104**. The kiosk **106'** is further described with reference to FIG. **4**.

The network **108** provides a communication infrastructure by which the various components of system **100** communicate. Network **108** may comprise any collection of networks and network elements. For example, the network **108** may be implemented over the Internet. However, the network **108** may comprise any local area network, metropolitan area network, or wide area network and may be implemented as a private network, a public network, etc. Additionally, network **108** may comprise wired or wireless communication links.

The system **100** may support several scenarios for downloading and playing content. For example, content can be downloaded via the network **108** to a portable storage device **112** from kiosk **106'**. The content may then be played on a playback device, such as a Blu-Ray player, game console, TV, by streaming the content from the storage device. As another

example, the playback device may include an integrated storage device that is used for both download and playback of content.

Yet another implementation may comprise a kiosk **106'** having a high speed interface, such as USB 3.0 interface, etc., to which a storage device or media player may connect. A user of kiosk **106'** may then access the content in local database **110** or download content from the download system **104** for later play on a mobile device, such as an iPad, iPod, iPhone, etc. In one embodiment, the kiosk **106'** is connected to the storage device or media player via a secure connection, such as a wireless connection, over a WiFi, 3G, 4G, or other communication channel, such as USB 3.0.

FIG. **2** shows an exemplary audit system of the embodiments. As shown, the audit system **102** may comprise a key server **200**, a key database **202**, and a certificate authority **204**.

The key server **200** is a server that receives and serves various cryptographic keys used in one embodiment. The key server **200** may be implemented using known hardware and software. In one embodiment, the key server **200** distributes keys as part of a digital certificate. The digital certificate may contain the key and also information about the owner of the key. The key server **200** may provide certificates in a known format, such as X.509, PKCS, Open PGP, etc.

The key database **202** stores the keys and other related information used by the key server **200**. The key database **202** may be implemented using well-known database management systems, such as Oracle, DB2, Microsoft SQL, PostgreSQL, and MySQL.

The certificate authority (or CA) **204** issues digital certificates for the system **100**. Certificate format and contents may be customized for each trusted party in system **100**. In addition, in one embodiment, each item of content may have a trusted party certificate as part of its metadata. The certificates allow software associated with the content to independently determine if a player in client system **106** is attempting to access the content can be trusted. For example, software associated with the content could restrict high definition content or other portions of content from being accessible to a player, if the player in client system **106** is not trusted. In system **100**, any trusted party can revoke all certificates, revoke certain certificates, or certain portions of certificates that have been issued

In one embodiment, public key infrastructure (PKI) is used for certificate signing. For example, in system **100**, PKI is used in client system **106** during device authentication and to establish a secure communications channel between a storage device, download system **104**, or playback device. In one embodiment, two-way authentication is employed between the various entities in system **100**. For example, the storage device may be an intelligent device that is configured to actively authenticate and establish a trust relation with a playback device or download server **104** based on a full two-way authentication.

Between entities of system **100**, each secure session may use unique security parameters. For example, the session key, session ID, initialization vector ("IV"), hash-based message authentication code ("HMAC") key may be made unique for each session. In one embodiment, the system **100** uses secure channels of communication that are protected based on symmetric cryptography. In another embodiment, the system **100** may use PKI to establish secure channels.

FIG. **3** shows an exemplary download system of the embodiments. As shown, the download system **104** may comprise a download server **300** and a content database **302**.

The download server **300** delivers the content for the system **100**, for example, to client system **106**. In one embodi-

ment, download server **30** encrypts the content with an access key that may be derived from a binding key and a content key. The binding key and content key are further described below.

As shown, the download server **300** may comprise a web server that provides various web pages **306** to client system **106** to make content in content database **302** accessible. In one embodiment, the download server **200** provides one or more websites having a collection of web pages **306** in order to serve the content.

In one embodiment, each copy of content is uniquely encrypted. The content may be uniquely encrypted in its entirety or certain portions of the content may be uniquely encrypted. Thus, if an item of content or its access encryption is ever compromised, the compromise is limited to that item of content. As will be described further below, only the download server **300** and a player have the algorithm to generate the access key. In addition, as noted, the algorithm for generating the access key may be licensable or renewable function.

The content database **302** stores the content, content metadata, and related information served by the download server. Provides a storage and access infrastructure for providing the items of content. Such database management systems are known to those skilled in the art.

The content providers **304** conceptually represent the source of the content. For example, the content providers **304** may represent other databases or content repositories, content delivery networks, and the like. Any source of content may be included in any of the embodiments.

FIG. **4** shows an exemplary client system **106** of the embodiments. A concern of many content providers is software-based players in client systems are considered a high security risk due to their ease of modification and susceptibility to hacking. One benefit of the embodiments is that client system **106** includes devices having a hardware root of trust. A hardware root of trust in a device comprises secure cryptographic hardware that enables playback of the content that is not just software based, but instead makes use of the cryptographic hardware provided in the hardware root of trust.

For example, in one embodiment, media players may include dedicated hardware cryptographic processing circuits and cryptographic boundaries for performing secure computations and secure storage of critical cryptographic parameters. As another example, network attached storage ("NAS") controllers may include dedicated hardware that can serve as a root of trust. Accordingly, one embodiment may provide a secure DRM system enabling secure download of content, secure storage of content, and secure playback of content.

As will be further described, the client system **106** comprises intelligent storage devices, such as a primary storage device **110** having a storage medium **402** and controller **408** that includes a hardware root of trust as part of a cryptographic processing module **409**. In the embodiments, the cryptographic processing module **409** is isolated from the other controller functionality. Clear text asymmetric and symmetric key access is limited to the cryptographic module. In this embodiment, asymmetric and symmetric keys may be generated within the cryptographic module. Public/private key pairs are used with the DRM of system **100**. Any keys stored outside the cryptographic module are cryptographically protected. Since the asymmetric and symmetric keys are inside the cryptographic module **409**, it is difficult for an attacker to gain access to the private keys. This allows for a secure PKI implementation as part of the DRM of system **100**. In another embodiment, various keys or encryption data may be injected or securely stored on the storage device **110**.

For example, one or more keys may be injected on to the storage device **110** in a secure manufacturing environment.

In one embodiment, the cryptographic module **409** is used to generate additional keys securely inside its boundaries. For example, the cryptographic module **409** may be configured to generate a binding key that is used to bind content to the storage device **110**. The cryptographic module **409** may also include a capability to digitally sign secure information and store it in non-secure memory, and digitally sign and encrypt secure information and store it in non-secure memory.

In one embodiment, playback devices in client system **106** may also be issued certificates from a certificate authority **204**. This certificate may be stored in a secure area not accessible by the processor of the player in one embodiment. In another embodiment, the player running, for example, on a host device may store the certificate anywhere, such as, in a user area of the storage medium **402** or other non-secure area. The playback device may store the certificate in encrypted form or protected form, such as with a digital signature. When the player and storage device **110** perform authentication, the cryptographic modules in both devices will be the only entities that have access to the secure data to perform authentication and to establish a secure communication channel.

In one embodiment, the content and content metadata does not provide access for accessing the content. Instead, once a secure communication channel is established, the playback device will request the binding and content key. Responsive to this request, the storage device may then send the binding and content keys to the player so that it can generate the access key. The access key is used to decrypt and render the content. Those skilled in the art will recognize that by using these secure cryptographic modules for security related communications and handling of security parameters, content metadata (such as the binding and content keys), and keys, the DRM of system **100** is more difficult to attack and compromise than existing systems.

As shown, the client system **106** may comprise a host device **400** and a storage device **110**. The host device **400** may comprise, among other things, a processor **404**, a host cryptographic module **405**, and an output device **406**. These components of host device **400** will now be further described.

The processor **404** comprises the hardware for executing instructions directing the operations of the host device **400**. Such processors are known to those skilled in the art.

The host cryptographic module **405** comprises the hardware for carrying out cryptographic operations for the host device. In addition, the host cryptographic module **405** may be packaged or embedded with various security measures to resist tampering.

The output device **406** represents any device intended to output content. For example, the output device **406** may comprise a display, audio speakers, etc. Such output devices are well-known to those skilled in the art.

The storage device **110** may comprise, among other things, a storage medium **402**, a controller **408**, and a cryptographic module **409**. These components of storage device **110** will now be further described.

The controller **408** comprises the hardware and firmware that controls the operation of the storage device **110** and enables communications with the host device **400**. Controller **408** may be implemented using known hardware and components.

The cryptographic module **409** provides a basis of trust, such as a hardware root of trust, for the storage device **110**. In one embodiment, the cryptographic module **409** is a secure crypto-processor that is configured to perform various cryptographic operations. In one embodiment, cryptographic

module **409** may be implemented as an external system on chip that is packaged with various security measures to detect tampering and make it tamper resistant. In another embodiment a cryptographic module **409** may be implemented as part of or embedded within another system-on-chip or other hardware that is packaged with various security measures to make tamper detection or resistant. The cryptographic module may or may not be isolated from the other system-on-chip ("SoC") functions.

The storage media **402** refers to the physical media used by the storage device **110** to store information. In one embodiment, the storage media **402** may comprise magnetic media, optical media, semiconductor media, such as flash memory, and the like. The storage media **402** may comprise any combination of these media in one embodiment.

FIG. **5** further shows an exemplary storage device **110** of the embodiments. As shown, the cryptographic module **409** may comprise a secured memory **502**. In addition, the storage media **410** may comprise a user area **504** and a non-user area **506**.

The secured memory **502** provides a secure area to store sensitive information, such as content metadata, related to the DRM provided by system **100**. In one embodiment, the secured memory **502** is implemented as a one-time programmable non-volatile memory ("OTP NVM"). As an OTP NVM, the secured memory **502** can only be programmed once and is difficult to alter. In addition, the secured memory **502** may also comprise one or more memories, such as a ROM, static RAM, and dynamic RAM.

As to user area **504**, this area of storage media **410** is provided as storage space that is accessible by the host device **400**. For example, the user area **504** may be addressable based on logical block addresses ("LBA") used by the host device **400**.

The storage device **110** can be configured to contain a partition in the user space **504** that is secured. That is, data in this partition may be encrypted using a separate key generated by the cryptographic module **409**. Access to this partition would only granted to authenticated download clients or players. In one embodiment, all or certain data from this partition in user space **504** may only be sent over a secure authenticated channel.

This partition of user space **504** can be used, for example, for additional content metadata files and information related to the DRM of system **100**. The actual content itself may be sent from the download server **300** or to a player in client system **106** only in encrypted form, so the content can be stored in the user space **504**.

As shown, the storage device **110** may also comprise a non-user area **506**. The non-user area **506** is a reserved area of the storage media **410** that is not directly accessible by the host. For example, the non-user area **506** may refer to an area that is not addressable by the host system. In one embodiment, the non-user area **506** is reserved for use by the controller **408**, and cryptographic module. For example, to store various sensitive information, such as content metadata information, related to the DRM of system **100**.

In one embodiment, the cryptographic module **409** may create new secure keys and allow the storage device **110** to create a secure unique disk encryption key for a special partition area of the medium that is not visible in the user LBA space, such as the non-user area **506**. The cryptographic module **409** using this key may thus encrypt all data to this non-user area **506**.

The non-user area **506** may be used to store secure metadata related to the DRM of system **100**. This metadata may include, for example, certificates, key files, license files, etc.

11

For example, the storage device **110** will have a certificate issued to it from certificate authority **204**. This certificate may be stored in this non-user area **506** and will be encrypted with the key for this area. This will bind the certificate to the storage device **110**. Thus, if a clone copy of the drive is somehow fabricated, the clone will not include the encryption key used for the non-user area **506**, and thus, the data stored in this area cannot be correctly decrypted.

Alternatively, critical security parameters, such as keys, certificates, or other objects, may be individually cryptographically protected and stored to the storage media.

Accordingly, in one embodiment, in order to access content, the controller **408** and the recording medium **410** cannot function separately from each other. In other words, a complete copy of either the controller **408** or the medium **410** individually will not be sufficient to access content.

FIG. **6** illustrates an exemplary process flow for generating a binding key that binds content to a storage device. In one embodiment, the storage device may generate the binding key using a random number and inputting the random number into a key generator. The key generator may be software running in the storage device or a hardware component of the storage device. In one embodiment, the binding key is made from two parts. In one embodiment, the first part is based on the defect list of the storage device. The second part is based on a key concealed by a cryptographic module on the storage device. In order to protect the binding key, the binding key is not stored with the content or with the content metadata in the storage device **110**. Instead, the parts of the binding key are stored separately. In addition, in one embodiment, the binding key is generated as an ephemeral key, and thus, computed by the storage device only when needed. This method also includes the capability for renewable functions. As noted, the binding key may be unique to individual storage devices or unique to a class of devices, such as devices of the same type, etc.

As shown, first, the storage device **110** is prompted to determine or identify a unique characteristic about itself. For example, the storage device **110** may determine or identify a defect list **600**. In one embodiment, the defect list **600** corresponds to the P-list or time-zero list of defects that were present on storage media **410** at the time of manufacture. Of course, in other embodiments, the unique characteristic may be derived or originate from other portions of the storage device **110**.

Second, the cryptographic module **409** cryptographically processes the defect list **600** and generates a unique identifier **602**. For example, the cryptographic module **409** may calculate a hash of information from the defect list **600**. In addition, the cryptographic module **409** may digitally sign the unique identifier **602**. Alternatively, the unique identifier **602** may be generated by using a random number generator to generate a random number that is unique to the storage device **110**. For example, the cryptographic module **409** may comprise a random number generator that is a physical device or component within cryptographic module **409** or software running in the cryptographic module **409**. Alternatively, the random number generator may be separate software or a hardware device running on the storage device.

Third, the cryptographic module **409** may store the unique identifier **602** in a secure area. For example, as shown, the cryptographic module **409** may also store the cryptographically protected unique identifier **602** in the non-user area **506**.

Fourth, the cryptographic module **409** may generate a concealed key **604**. In one embodiment, the key **604** is concealed in that it is not stored with the other content metadata and instead resides in the secured memory **502**. The crypto-

12

graphic module **409** may generate one or a set of multiple concealed keys **604**. Thus, if one of these keys becomes compromised, the cryptographic module **409** may switch to the next key in the set. If all the keys are used, or if it is not desired to create and store a set of keys, then the cryptographic module **409** may generate a new concealed key **604** upon request. Of note, the controller **408** may be configured to track which content is bound to which key.

Based on the unique identifier **602** and the concealed key **604**, the storage device **110** may generate a binding key **606** that is derived from information provided by both the controller **408** and from unique characteristics of the storage medium **410**. In one embodiment, the cryptographic module **409** ephemerally generates the binding key **606**.

The binding key **606** cryptographically binds content to the storage device **110**. For example, the binding key **606** may be sent as part of the content's metadata over a secure communications channel to the download server **300** in download system **104**. The download server **300** may then use the binding key as one component of an access key used to encrypt the content.

At appropriate times, the binding key **606** may also be made available to authenticated players over a secure channel for use during playback of the content. For example, the storage device **110** may be configured with a special command that is only accepted when the sending device has been authenticated and is communicating over a secure channel.

Based on the binding key **606**, even if an exact bit-by-bit copy of the entire media **410** is accomplished, the cloned media will not be usable for rendering the content since the concealed key in storage device unique and securely stored in the secured memory **502** of the cryptographic module **409** and is not copy-able or clone-able to another drive.

FIG. **7** illustrates an exemplary process flow for provisioning content to a storage device. In this embodiment, revocability and renewability are attributes of the DRM system. As an additional security system component, the process flow illustrated may comprise various renewability features. For example, keys may be retired or random keys pre-generated can be used with a secure allocation algorithm that can either be varied from time to time or which makes use of multiple keys in a random fashion for each item of content to be provisioned to the storage device **110**. For example, the embodiments may utilize tokenizing of an update file that could be suitable for all players.

In one embodiment, the process relates to provisioning of content and content metadata, such as a binding key and content key. Other metadata, such as digital certificates, etc., may also be provisioned as part of an embodiment.

As shown, first, the storage device **110** and the download server **300** establish a secure communication channel with each other. For example, the download server **300** and the storage device **110** may employ PKI to establish a secure communications channel. In particular, the host **400** may request a certificate from the storage device **110**. The storage device **110** may retrieve its certificate, for example, from its non-user area **506** in media **510**. The storage device **110** may then send a device session ID and its certificate. The certificate includes its public key; Public$_{Device}$.

In one embodiment, the host **400** verifies the certificate. For example, the host **400** may check the signature on the certificate. Host **400** may also checks its revocation list to make sure the certificate from storage device **110** is not revoked. Alternatively, host **400** may communicate over network **108** with audit system **102** and certificate authority **204** to verify the certificate and check revocation status of the certificate.

13

Host **400** then responds by sending a host session ID and its certificate, which includes its public key, Public$_{Host}$, to storage device **110**. The storage device **110** verifies the host certificate and checks the signature. The storage device **110** may also check its own revocation list to make sure the host **400** is not revoked.

Next, the host **400** may request a session key from the storage device **110**. In response, in one embodiment, the storage device **110** encrypts a random session key, a random device initialization vector ("IV"), and random device hash-based message authentication code ("HMAC") key with Public$_{Host}$, and sends it to host **400**.

Host **400** decrypts the information with Private$_{Host}$, to recover the device session key, the device IV, and the device HMAC key. Host **400** encrypts a random host session key, a random host IV, and random host HMAC key with Public$_{Device}$, and sends this information to storage device **110**. The storage device **110** then decrypts this information with Private$_{Device}$, to recover the host's **400** session key, host IV, and host HMAC key.

The host **400** may also encrypt a random challenge with the device session key and sends it to the storage device **110**. The storage device **110** decrypts the host random challenge with the device session key, and then encrypts the host random challenge with the host session key, and sends this information back to the host **400**. The host **400** decrypts the host random challenge with the host session key and confirms it matches what was originally sent to the storage device **110**. This proves the storage device **110** knows the private key that corresponds to the public key that was sent with its device certificate.

For further confirmation, the host **400** may request a random challenge from the storage device **110**. The storage device **110** encrypts a device random challenge with the host session key and sends this information to the host **400**. The host **400** then decrypts the device random challenge with the host session key and encrypts the device random challenge with the device session key and sends this information back to the storage device **110**. The storage device decrypts the device random challenge with the device session key and confirms it matches what was originally sent to the host **400**. This proves the host **400** thus knows the private key that corresponds to the public key that was sent with the host's **400** certificate

In one embodiment, the storage device **110** may use AES encryption with the host session key and host IV for secure messages to the host **400**. The host **400** also uses AES encryption with a device session key and device IV for secure messages to the storage device **110**.

Once the secure session has been established, session communications may be carried out using asymmetric or symmetric algorithms. In one embodiment, each secure message may include a header with a sequence number and message length, a body message AES encrypted with appropriate session key and IV, and a footer having a SHA-256 HMAC of message body. In one embodiment, session communications are established based on asymmetric encryption and then secured based on symmetric encryption. For example, once the secure session has been established, session communications may be carried out based on symmetric encryption, such as AES encryption and AES decryption with the session keys and IV's established. Each secure message may include a header with a sequence number and message length, a body message AES encrypted with appropriate session key and IV, and a footer having a SHA-256 HMAC of message body. In another embodiment, asymmetric encryption may be employed to secure traffic during the session, as well.

14

Second, now that secure channel has been established, the download server **300** requests the binding key from the storage device **110**. In particular, the download server **300** may send a message via the secure channel to the storage device **110**. As noted, in one embodiment, the binding key **606** is initially absent from the content's metadata and is generated when needed.

Third, the storage device **110** generates the binding key **606**. In particular, the cryptographic module **409** generates the binding key **606** based on the unique key **602** and the concealed key **604**.

In one embodiment, the cryptographic module **409** employs a one-way hash algorithm or an Advance Encryption Standard (AES) algorithm to generate the binding key, Kb, where:

Kb=F(Kroot, IDm)

Where F is a one-way function,

Kroot is a key generated by the cryptographic module **409**, i.e., the concealed key **604**,

IDm is a unique media identifier number assigned during manufacture of the storage device **110**, such as unique identifier **602**.

Alternatively, the cryptographic module **409** may generate the binding key using a random number, such as from a random number generator, and inputting this random number into a key generator. The key generator may be software or a hardware component in the cryptographic module **409**.

Fourth, the download server **300** requests from the key server **200** a content key for protecting the content. The content key may be assigned to the content in various ways. For example, the key server **200** may assign a content key that is unique to each item of content. In one embodiment, the content key **700** is provided as part of the content's metadata and stored on the storage device **110**. The content key **700** may be cryptographically protected when sent to the host **400**.

Fifth, the key server **200** provides the content key **700** to the download server **300**. In particular, the key server **200** may establish a secure channel with the download server **300**, for example, based on PKI.

Sixth, the download server **300** generates an access key **706** based on the binding key **606** and the content key **700**. In particular, the download server **300** may employ a unique algorithm to cryptographically combine the binding key **606** and content key **700** and generate the access key **706**, for example, based on a one-way hash algorithm. The unique algorithm may be known only to certain entities of the system **100**, such as the download server **300** and trusted playback devices in client system **106**. The algorithm may be a licensable or renewable function. In addition, one or more algorithms may be passed from the download server **300** to trusted components in client system **106** via a field or portion in the secure metadata of the content. For example, a set of multiple algorithms may be initially configured or established within trusted components of client system **106**. The download server **300** may then provide a pointer or indicator in a content's secure metadata which of the set algorithms to employ when generating the access key.

In one embodiment, the access key **706** is not included in the content metadata nor is it stored on download server **300**. For example, instead, the download server **300** may be configured to ephemerally generate the access key **706**. Alternatively, information for generating the access key **706** may be archived to a secure remote storage by the download server **300**. For example, the audit system **102** may serve as a secure repository for securely storing the binding key **606** and/or the content key **700**.

Seventh, the download server **300** provides the content key **700** to the storage device **110**. The storage device **110** then securely stores the content key **700**. For example, the storage device **110** may store the content key **700** in the non-user area **506**.

Eighth, the download server **300** encrypts all or portions of the content **702** into encrypted content **704**. For example, the download server **300** may employ AES encryption to encrypt the content **702** based on the access key **706**.

Ninth, the download server **300** provides the encrypted content **704** to the storage device **110**. The storage device **110** may then store the encrypted content **704**, for example, in its user area.

FIG. 7A illustrates an exemplary process flow for copying or transferring content from a primary storage device to a secondary storage device according to one embodiment. As shown, first, the storage device **110** and the secondary storage device **112** establish a secure communication channel with each other. For example, these entities may employ PKI to establish a secure communications channel with each other that is tunneled transparently through one or more host systems **400**.

Once the secure session has been established, session communications may be carried out based on symmetric encryption, such as AES encryption and AES decryption with the session keys and IV's established. Each secure message may include a header with a sequence number and message length, a body message AES encrypted with appropriate session key and IV, and a footer having a SHA-256 HMAC of message body. In another embodiment, asymmetric encryption may be employed to secure traffic during the session, as well.

In one embodiment, the storage device **110** may use the host device **400** to proxy the secure channel through which it is transparently tunneled. For example, the storage device **110** may be a direct attached USB drive that is connected to a host. In this embodiment, the host provides a proxy for assisting in the establishment of the secure channel, but the secure channel is implemented as a secure tunnel through the host. For purposes of illustration, the tunneling through a host is omitted for sake of clarity of the figures.

Second, now that secure channels have been established, the primary storage device **110** and the secondary storage **112** each request permission to transfer or copy content. For example, the primary storage device **110** and secondary storage device **112** may each request permission from each other for the transfer of content. Secondary storage **112** and primary storage **110** may individually determine permission based on various criteria. In one embodiment, the storage devices **110** and **112** may analyze one or more digital certificates to determine authorization and access limits for transferring content and/or the content metadata.

Third, the storage device **110** generates the binding key **606**. In particular, the cryptographic module **409** generates the binding key **606** based on the unique key **602** and the concealed key **604**. Of note, this feature of the binding key **606** binding to the storage device **110** creates an ownership chain and forensic traceability of the content.

In addition, the secondary storage **112** may obtain the content key **700** from the storage device **110** as well. In one embodiment, the primary storage device **110** provides both the binding key **606** and the content key **700** to the secondary storage device **112**. In one embodiment, the content key is sourced from primary storage **110**.

In another embodiment, the secondary storage **112** obtains the content key **700** from another source, such as the trusted server **114**, the download system **104**, or the audit system **102**. For example, the secondary storage **112** may be configured to

establish a secure communication channel to one of these entities and request the content key **700**. This request by the secondary storage **112** may also be confirmed or authorized by the trusted system **114**. In one embodiment, the storage devices avoid the need for a third party or trusted system, and instead, establish a peer-to-peer secure connection. The peer-to-peer connection may be established in a variety of ways, including, for example, policy restrictions specified in one or more digital certificates for the storage devices **110** or **112**, the content, etc.

Fourth, the primary storage device **110** may transfer the encrypted content **704** via the trusted server **114** and to the secondary storage **112**. This transfer may be performed using known protocols for file transfer, streaming, etc. In one embodiment, the primary storage device **110** transfers secure metadata for the content **704** via the trusted server **114** to the secondary storage **112**. The content **704** may then be transferred from the primary storage device **110** to the secondary storage **112** via the trusted server **114** or via a peer-to-peer connection between the primary storage device **110** and the second storage device **112**.

FIG. 7B illustrates an exemplary process flow for copying or transferring content from a primary storage device to a secondary storage device via a trusted server according to one embodiment. As shown, first, the storage device **110** and the secondary storage device **112** establish a secure communication channel with the trusted server **114**. For example, these entities may employ PKI to establish a secure communications channel with each other and the trusted server **114**. The trusted server **114** may then control and supervise the transfer of content from the storage device **110** to the secondary storage device **112** as will be described below.

Once the secure session has been established, session communications may be carried out based on symmetric encryption, such as AES encryption and AES decryption with the session keys and IV's established. Each secure message may include a header with a sequence number and message length, a body message AES encrypted with appropriate session key and IV, and a footer having a SHA-256 HMAC of message body. In another embodiment, asymmetric encryption may be employed to secure traffic during the session, as well.

In one embodiment, the storage device **110** may use the host device **400** to proxy the secure channel through which is transparently tunneled. For example, the storage device **110** may be a direct attached USB drive that is connected to a host. In this embodiment, the host provides a proxy for assisting in the establishment of the secure channel, but the secure channel is implemented as a secure tunnel through the host. For purposes of illustration, the tunneling through a host is omitted for sake of clarity of the figures.

Second, now that secure channels have been established, the primary storage device **110** and the secondary storage **112** each request permission to transfer or copy content. For example, the primary storage device **110** and secondary storage device **112** may request permission from trusted server **114** to transfer content. Trusted server **114** may determine permission based on various criteria. In one embodiment, the trusted server **114** may analyze one or more digital certificates, such as the digital certificate of the storage devices **110** and **112** and the content.

Third, the storage device **110** generates the binding key **606**. In particular, the cryptographic module **409** generates the binding key **606** based on the unique key **602** and the concealed key **604**. Of note, this feature of the binding key **606** binding to the storage device **110** creates an ownership chain and forensic traceability of the content. For example, in one embodiment, the binding key **606** from the storage device

110 may be sent over a secure channel to the secondary storage device 112. The secondary storage device 112 may then encrypt the binding key 606 with its own concealed key, and thus, the binding key 606 of the primary storage device 110 is also cryptographically bound to the secondary storage device 112.

In addition, the secondary storage 112 may obtain the content key 700 from the storage device 110 as well. In one embodiment, the primary storage device 110 provides both the binding key 606 and the content key 700 to the secondary storage device 112.

In another embodiment, the secondary storage 112 obtains the content key 700 from another source, such as the trusted server 114, the download system 104, or the audit system 102. For example, the secondary storage 112 may be configured to establish a secure communication channel to one of these entities and request the content key 700. This request by the secondary storage 112 may also be confirmed or authorized by the trusted system 114.

Fourth, the primary storage device 110 may transfer the encrypted content 704 to the secondary storage device 112. This transfer may be performed using known protocols for file transfer, streaming, etc. In one embodiment, the transfer of the content occurs directly between the primary storage device 110 and the secondary storage 112. In another embodiment, the transfer occurs via the trusted server 114. In another embodiment, the first storage 110 demonstrates ownership of the content. Then, the content is re-bound to the second storage 112 by generating a new binding key and transferring meta-data. In other words, the trusted server re-provisions the content to the secondary storage device.

FIG. 8 illustrates an exemplary process flow for playing content from the secondary storage device 112 in accordance with one embodiment. As shown, first, the host system 400 and the secondary storage device 112 may establish a secure communication channel with each other. For purposes of brevity, an example of the establishment of a secure channel based on PKI was provided above with reference to FIG. 7. In one embodiment, the storage device 110 will evaluate content's digital certificate and the player certificate to determine eligibility of the player to receive the content and/or content metadata.

Second, the host system 400 requests the binding key 606 from the secondary storage device 112. Of note, in one embodiment, the storage device 112 securely retains the binding key 506 of the primary storage device 110 to which the content was originally provisioned. As noted, this feature may provide forensic information and ownership traceability of the content if needed, for example, for recovery, theft detection, etc.

Accordingly, third, the storage device 112 provides the binding key 606 of the primary storage device 110. In one embodiment, the secondary storage device 112 stores the binding key 606 in encrypted form within its secured storage area 506 and uses concealed key 605 from its cryptographic module 409. As noted above, this the binding key 606 of the primary storage device 110 is cryptographically bound to the secondary storage device 112.

Fourth, the host system 400 requests the content key 700 from the storage device 110. In one embodiment, the content key 700 may be retrieved from the content metadata stored in the non-user area on the storage device. In particular, the host system 400 may request or specify the content key 700 based on a variety of parameters, such as a content identifier, and the like.

Fifth, the storage device 110 provides the content key 700 to the host system 400. For example, the storage device 110

may access the non-user area 506 and transmit the content key 700 to the host system 400. When retrieving the content key 700, the cryptographic module 409 may need to perform various cryptographic functions, such as decryption, checking of digital signatures, etc.

Sixth, the host system 400 generates the access key 706 in order to decrypt the content. In particular, the host's cryptographic module 405 generates the access key 706 based on a cryptographic combination of the binding key 606 and the content key 700. The cryptographic module 405 is programmed with the unique algorithm that is known only within the cryptographic module 405. For example, the cryptographic module 405 of the host system 400 may comprise an OTP NVM that is programmed with the algorithm for generating the access key 706.

Seventh, the storage device 110 provides the encrypted content 704 to the host system 400. In one embodiment, the storage device 110 streams the encrypted content 704 to the host system 400.

Eighth, the host system 400 cryptographically processes the encrypted content 704 to recover the content 702 in unencrypted form. As noted, in one embodiment, content is encrypted based on symmetric cryptography, such as AES 128, using the access key 706. Once in decoded or unencrypted form, the host system 400 may then output the content 702 to an output 406. Of note, the host system 400 may re-encrypt the content for delivery to the output 406. For example, if the output 406 is a high definition multimedia interface ("HDMI") device, then host 400 may re-encrypt the content using High-bandwidth Digital Content Protection ("HDCP") encryption currently specified for HDMI devices and transmit the content in this secure form. In one embodiment, the host 400 may decrypt the content and then re-encrypt the content using a secure transport encryption protocol, such as high bandwidth content protocol (HDCP), and outputting the re-encrypted content to a display device, such as TV, a monitor, etc. In another embodiment, the host 400 decrypts the content, then re-encrypts the content using, for example, digital transmission content protection (DTCP), and sends the re-encrypted content to a playback device, such as a TV, a monitor, etc. Accordingly, in one embodiment, the content may always in a secured form when in transit between entities of the system 100.

FIG. 7C illustrates an exemplary process flow for provisioning content from the kiosk to a storage device. In this embodiment, revocability and renewability are attributes of the DRM system. As an additional security system component, the process flow illustrated may comprise various renewability features. For example, keys may be retired or random keys pre-generated can be used with a secure allocation algorithm that can either be varied from time to time or which makes use of multiple keys in a random fashion for each item of content to be provisioned to the storage device 112. For example, the embodiments may utilize tokenizing of an update file that could be suitable for all players.

As shown, first, the storage device 112 and the kiosk 106 establish a secure communication channel with each other. As noted, the communication may be conducted over a wired interface, such as a USB 3.0 interface, or a wireless interface, such as WiFi, 3G, 4G, etc. For example, the kiosk 106 and the storage device 112 may employ PKI to establish a secure communications channel. In particular, the kiosk 106 may request a certificate from the storage device 112. The storage device 112 may retrieve its certificate, for example, from its non-user area 506 in media 510. The storage device 112 may then send a device session ID and its certificate. The certificate includes its public key; Public$_{Device}$.

Kiosk **106** verifies the certificate. For example, the kiosk **106** may check the signature on the certificate. Kiosk **106** may also checks its revocation list to make sure the certificate from storage device **112** is not revoked. Alternatively, kiosk **106** may communicate over network **108** with audit system **102** and certificate authority **204** to verify the certificate and check revocation status of the certificate.

Kiosk **106** then responds by sending a host session ID and its certificate, which includes its public key, Public$_{Host}$, to storage device **112**. The storage device **112** verifies the host certificate and checks the signature. The storage device **112** may also check its revocation list to make sure the kiosk **106** is not revoked.

Next, the kiosk **106** requests a session key from the storage device **112**. In response, in one embodiment, the storage device **112** encrypts a random session key, a random device initialization vector ("IV"), and random device hash-based message authentication code ("HMAC") key with Public$_{Host}$, and sends it to kiosk **106**.

Kiosk **106** decrypts the information with Private$_{Host}$ to recover the device session key, the device IV, and the device HMAC key. Kiosk **106** encrypts a random host session key, a random host IV, and random host HMAC key with Public$_{Device}$, and sends this information to storage device **112**. The storage device **112** then decrypts this information with Private$_{Device}$, to recover the kiosk's session key, host IV, and host HMAC key.

The kiosk **106** may also encrypt a random challenge with the device session key and sends it to the storage device **112**. The storage device **112** decrypts the host random challenge with the device session key, and then encrypts the host random challenge with the host session key, and sends this information back to the kiosk **106**. The kiosk **106** decrypts the host random challenge with the host session key and confirms it matches what was originally sent to the storage device **112**. This proves the storage device **112** knows the private key that corresponds to the public key that was sent with its device certificate.

For further confirmation, the kiosk **106** may request a random challenge from the storage device **112**. The storage device **112** encrypts a device random challenge with the host session key and sends this information to the kiosk **106**. The kiosk **106** then decrypts the device random challenge with the host session key and encrypts the device random challenge with the device session key and sends this information back to the storage device **112**. The storage device decrypts the device random challenge with the device session key and confirms it matches what was originally sent to the kiosk **106**. This proves the kiosk **106** thus knows the private key that corresponds to the public key that was sent with the kiosk's certificate.

In one embodiment, the storage device **112** may use AES encryption with the kiosk session key and host IV for secure messages to the kiosk **106**. The kiosk **106** also uses AES encryption with a device session key and device IV for secure messages to the storage device **112**.

Once the secure session has been established, session communications may be carried out using symmetric algorithms. In one embodiment, each secure message may include a header with a sequence number and message length, a body message AES encrypted with appropriate session key and IV, and a footer having a SHA-256 HMAC of message body. In another embodiment, session communications are established based on asymmetric encryption and then secured based on symmetric encryption. For example, once the secure session has been established, session communications may be carried out based on symmetric encryption, such as AES

encryption and AES decryption with the session keys and IV's established. Each secure message may include a header with a sequence number and message length, a body message AES encrypted with appropriate session key and IV, and a footer having a SHA-256 HMAC of message body. In another embodiment, asymmetric encryption may be employed to secure traffic during the session, as well.

Second, now that secure channel has been established, the download kiosk **106** may request the binding key from the storage device **112**. In particular, the kiosk **106** may send a message via the secure channel to the storage device **112**. As noted, in one embodiment, the binding key **606** is initially absent from the content's metadata provided by the kiosk **106**, and instead, is generated when needed.

Third, the storage device **112** generates the binding key **606**. In particular, the cryptographic module **409** generates the binding key **606** based on the unique key **602** and the concealed key **604**.

In one embodiment, the cryptographic module **409** employs a one-way hash algorithm or an Advance Encryption Standard (AES) algorithm to generate the binding key, Kb, where:

Kb=F(Kroot, IDm)

Where F is a one-way function,

Kroot is a key generated by the cryptographic module **409**, i.e., the concealed key **604**,

IDm is a unique media identifier number assigned during manufacture of the storage device **112**, such as unique identifier **602**.

Fourth, the kiosk **106** may request from the key server **200** a content key for protecting the content. The content key may be assigned to the content in various ways. For example, the key server **200** may assign a content key that is unique to each item of content. In one embodiment, the content key is provided as part of the content's metadata and stored on the storage device.

Fifth, the key server **200** provides a content key **700** to the kiosk **106**. In particular, the kiosk **106** may establish a secure channel with the download server **300**, for example, based on PKI.

Sixth, the kiosk **106** generates an access key **706** based on the binding key **606** and the content key **700**. In particular, the download server **300** may employ a unique algorithm to cryptographically combine the binding key **606** and content key **700** and generate the access key **706**, for example, based on a one-way hash algorithm. The unique algorithm may be known only to certain entities of the system **100**, such as the kiosk **106** and trusted playback devices in host **400**.

In one embodiment, the kiosk **106** may be configured to ephemerally generate the access key **706** such that it is not stored on the kiosk **106**. Alternatively, information for generating the access key **706** may be archived to a secure remote storage by the kiosk **106**. For example, the audit system **102** may serve as a secure repository for securely storing the binding key and/or the content key.

Seventh, the kiosk **106** provides the content key **700** to the storage device **112**. The storage device **112** then securely stores the content key **700**. For example, the storage device **112** may store the content key **700** in the non-user area **506**.

Eighth, the kiosk **106** encrypts all or portions of the content **702** into encrypted content **704**. For example, the kiosk **106** may employ AES encryption to encrypt the content **702** based on the access key **706**.

Ninth, the kiosk **106** provides the encrypted content **704** to the storage device **112**. The storage device **112** may then store the encrypted content **704**.

FIG. **8** illustrates an exemplary process flow for playing content. As shown, first, the host system **400** and the storage device **112** may establish a secure communication channel with each other. For purposes of brevity, an example of the establishment of a secure channel based on PKI was provided above with reference to FIG. **7**.

Second, the host system **400** requests the binding key **606** from the storage device **112** because it is absent from the content metadata. Of note, in one embodiment, the storage device **112** does not retain the binding key **606**. In another embodiment, the host system **400** requests for the binding key **606** are specific to the content to be played. This allows, for example, the storage device **112** to employ different algorithms for generating the binding key **606**. The algorithms used may depend on various criteria, such as the specific item of content, the type of content, source of the content, number of copies of the content, etc.

Accordingly, third, the storage device **112** ephemerally generates the binding key **606**. In particular, as noted above, cryptographic module **409** generates the binding key **606** based on a cryptographic combination of the concealed key **604** and the unique identifier **602**. Once generated, the storage device **112** may transmit the binding key **606** to the host system **400**.

Fourth, the host system **400** requests the content key **700** from the storage device **112**. In one embodiment, the content key **700** may be retrieved from the content metadata stored in non-user area **506** on storage device **402**. The host system **400** may specify the content key **700** based on a variety of parameters, such as a content identifier, and the like.

Fifth, the storage device **112** provides the content key **700** to the host system **400**. For example, the storage device **112** may access the non-user area **506** and transmit the content key **700** to the host system **400**. When retrieving the content key **700**, the cryptographic module **409** may need to perform various cryptographic functions, such as decryption, checking of digital signatures, etc.

Sixth, the host system **400** generates the access key **706** in order to decrypt the content. In particular, the host's cryptographic module **405** generates the access key **706** based on a cryptographic combination of the binding key **606** and the content key **700**. The cryptographic module **405** may be programmed with the unique algorithm that is known only within the cryptographic module **405**. For example, the cryptographic module **405** may comprise an OTP NVM that is programmed with the algorithm for generating the access key **706**. This feature allows, among other things, the access key **706** to be substantially absent from the content metadata.

Seventh, the storage device **112** provides the encrypted content **704** to the host system **400**. In one embodiment, the storage device **112** streams the encrypted content **704** to the host system **400**.

Eighth, the host system **400** cryptographically processes the encrypted content **704** to recover the content **702** in unencrypted form. As noted, in one embodiment, content is encrypted based on symmetric cryptography, such as AES **128**, using the access key **706**. Once decoded or unencrypted form, the host system **400** may then output the content **702** as an output **406**. Of note, the host system **400** may re-encrypt the content for delivery to the output **406**. For example, if the output **406** is a high definition multimedia interface ("HDMI") device, then host **400** may re-encrypt the content using High-bandwidth Digital Content Protection ("HDCP") encryption currently specified for HDMI devices and transmit the content in this secure form. In one embodiment, the host **400** may decrypt the content and then re-encrypt the content using a secure transport encryption pro-

tocol, such as high bandwidth content protocol (HDCP), and outputting the re-encrypted content to a display device, such as TV, a monitor, etc. In another embodiment, the host **400** decrypts the content, then re-encrypts the content using, for example, digital transmission content protection (DTCP), and sends the re-encrypted content to a playback device, such as a TV, a monitor, etc. Accordingly, in one embodiment, the content may always be in a secured form when in transit between entities of the system **100**.

The features and attributes of the specific embodiments disclosed above may be combined in different ways to form additional embodiments, all of which fall within the scope of the present disclosure. For example, in the case of Network Attached Storage (NAS), the NAS storage may contain one or more storage devices and implement various technologies (like RAID), which result in content that may be spread across multiple storage devices. In the case of a NAS comprising a single drive, the NAS controller may be configured to bind the content to the storage device of the single drive in similar fashion described above. In the case of a NAS comprising multiple drives, the content may be bound to the NAS subsystem instead of or in addition to a specific storage device or storage medium. Accordingly, the NAS subsystem may contain a secure cryptographic module. In this variation of the embodiments, for a NAS storage, a unique set of keys may be generated by the NAS controller and securely stored in the secure storage of the NAS. Then, content binding to the NAS may be performed in similar fashion as described above. Thus, even if a clone copy of a drive is accomplished, this drive will not be usable unless it is installed into exactly the same NAS system. This method may be useful in enabling replacement of a damaged drive in a NAS RAID system, while ensuring that a cloned drive is not useful.

Although the present disclosure provides certain embodiments and applications, other embodiments that are apparent to those of ordinary skill in the art, including embodiments, which do not provide all of the features and advantages set forth herein, are also within the scope of this disclosure. Accordingly, the scope of the present disclosure is intended to be defined only by reference to the appended claims.

What is claimed is:

**1**. A kiosk for provisioning secure media content to a plurality of portable data storage devices, the kiosk comprising:

a first data interface configured to communicate with a portable data storage device;

a second data interface configured to communicate, over a network, with a remote trusted server; and

a processor configured to:

obtain a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;

authenticate the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and

in response to the authentication, provide to the portable data storage device an encrypted first media content and a corresponding access key.

**2**. The kiosk of claim **1**, further comprising a local data storage storing a plurality of encrypted media content.

**3**. The kiosk of claim **2**, further comprising a user interface for receiving a selection of the first media content from the local data storage, wherein the selection causes the kiosk to provide the encrypted first media content to the portable data storage device.

**4**. The kiosk of claim **1**, wherein the portable data storage device comprises:

    a user area for storing the encrypted first media content that is accessible by a playback device; and

    a non-user area for storing cryptographic data that is not accessible by the playback device.

**5**. The kiosk of claim **1**, wherein the first data interface is a USB interface.

**6**. The kiosk of claim **1**, wherein the second data interface is a network interface.

**7**. The kiosk of claim **1**, wherein the access key is an ephemeral key that is not stored on the kiosk after being generated.

**8**. The kiosk of claim **1**, wherein the kiosk is located in a public environment.

**9**. A method for provisioning secure media content to a plurality of portable data storage devices from a kiosk, the method comprising:

    establishing communications with a portable data storage device over a first data interface;

    establishing communications with a remote trusted server via a second data interface over a network;

    obtaining a unique identifier from the portable data storage device, wherein the unique identifier is specific to the portable data storage device and is concealed by the portable data storage device;

    authenticating the portable data storage device, using at least the unique identifier, by communicating with the remote trusted server over the second data interface; and

    in response to the authentication, providing to the portable data storage device an encrypted first media content and a corresponding access key.

**10**. The method of claim **9**, wherein the kiosk comprises a local data storage storing a plurality of encrypted media content.

**11**. The method of claim **10**, further comprising:

    receiving, on a user interface, a selection of the first media content from the local data storage; and

    in response to the selection, providing the encrypted first media content to the portable data storage device.

**12**. The method of claim **9**, wherein the first data interface is a USB interface.

**13**. The method of claim **9**, wherein the second data interface is a network interface.

**14**. The method of claim **9**, wherein the access key is an ephemeral key that is not stored on the kiosk after being generated.

**15**. The method of claim **9**, further comprising authorizing copying of the content based on at least one of a digital certificate or a permission specified in secure metadata of the content.

**16**. The method of claim **9**, further comprising encrypting a digital certificate and storing the encrypted digital certificate in a secure area of the portable data storage device.

**17**. The method of claim **9**, wherein the kiosk is located in a public environment.

\* \* \* \* \*



US010447667B2

## (12) United States Patent
### Jenkins et al.

(10) Patent No.: **US 10,447,667 B2**
(45) Date of Patent: **\*Oct. 15, 2019**

(54) **SECURE STREAM BUFFER ON NETWORK ATTACHED STORAGE**

(71) Applicant: **Western Digital Technologies, Inc.,** San Jose, CA (US)

(72) Inventors: **Dean M. Jenkins**, La Canada-Flintridge, CA (US); **Robert P. Ryan**, Mission Viejo, CA (US)

(73) Assignee: **Western Digital Technologies, Inc.,** San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/954,359**

(22) Filed: **Apr. 16, 2018**

(65) **Prior Publication Data**

US 2018/0234398 A1 Aug. 16, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 14/615,367, filed on Feb. 5, 2015, now Pat. No. 9,948,618.

(51) **Int. Cl.**
*H04L 29/06* (2006.01)
*H04L 29/08* (2006.01)

(52) **U.S. Cl.**
CPC ...... *H04L 63/0457* (2013.01); *H04L 63/0428* (2013.01); *H04L 63/205* (2013.01); *H04L 65/4084* (2013.01); *H04L 67/10* (2013.01); *H04L 67/1097* (2013.01)

(58) **Field of Classification Search**
CPC .. H04L 63/0457; H04L 67/10; H04L 67/1097
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,948,618 B2 * | 4/2018 | Jenkins ............... H04L 63/0457 |
| 2013/0268771 A1 * | 10/2013 | Blankenbeckler .... H04L 9/0866 |
| | | | 713/189 |
| 2014/0195805 A1 * | 7/2014 | Koo ................... H04L 67/1095 |
| | | | 713/168 |

\* cited by examiner

*Primary Examiner* — Baotran N To
(74) *Attorney, Agent, or Firm* — Chang & Hale LLP

(57) **ABSTRACT**

A network attached storage device coupled to a local network and including a network interface configured to receive digital content from a remote content provider outside the local network. The network attached storage device includes storage having a first region accessible by a user of the local network and a secure region. The network attached storage device includes a processor coupled to the storage, the processor configured to control access to the secure region of the storage based on instructions received from a remote content provider.

**20 Claims, 8 Drawing Sheets**



Network
Attached Storage
Media

100



102    User media area

104    Secure streamed content media area
       Access controlled by stream provider/partner

**FIG. 1**



**FIG. 2**



300

306

Network Attached Storage Device

312 → Network Interface

314 → Processor

Storage — 322

Secure Region — 324

Stream Provider

302

ISP Network

304

User's Network

310

308

308

308

308

**FIG. 3**



**Network
Attached Storage
Media**

400

User media area ⌐ 402

Secure media area ⌐ 404

Secure sigital content
media area

Access controlled by
content provider/partner
through secure keys

**FIG. 4A**

**Network
Attached Storage
Media**

400

User media area ⌐ 402

⌐ 404

Purchased content
reassigned to user area
along with access control

**FIG. 4B**



**FIG. 5**



600

**602**
Negotiate with remote content provider to receive instructions for receiving and storing content from the remote content provider

**604**
Receive content from the remote content provider

**610**
Use VPN to receive the content

**606**
Store the content in a secure region of an NAS device

**612**
Store the content using encryption and secure content to the drive

**614**
Buffer content for presentation at a display device

**608**
Control access to the stored content based on instructions from the remote content provider

**616**
Control amount of data stored

**618**
Control encryption type

**620**
Transfer a digital object to a user accessible region

**622**
Allocate the portion of the NAS device storing the digital object to a user accessible region

**624**
Present buffered content from the secure region to display as encrypted content

**FIG. 6**



**FIG. 7**



**FIG. 8**

# SECURE STREAM BUFFER ON NETWORK ATTACHED STORAGE

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application is a continuation of U.S. patent application Ser. No. 14/615,367, filed on Feb. 5, 2015, entitled SECURE STREAM BUFFER ON NETWORK ATTACHED STORAGE, the disclosure of which is hereby incorporated by reference in its entirety.

## BACKGROUND

Network providers are continually attempting to increase their revenue. One method of generating revenue is to control the transmission of streaming data on their network, sometimes called "throttling." Bandwidth throttling includes the intentional slowing of internet service by an Internet Service Provider (ISP). It can be employed in communication networks in an attempt to regulate network traffic and minimize bandwidth congestion. Throttling may include limiting a user's upload and download rates on programs such as video streaming Throttling the data transmission in a stream environment may cause deterioration in a display of the received transmission. For example, throttling may cause the end display to hic-up or stall while waiting for the next packet. Network operators are currently receiving payment from content streamers, Netflix®, Hulu®, etc., in exchange for guaranteed Quality of Service (QoS).

Display devices often have very limited display buffers. Such limited display buffers keep the cost of the display low. Limited buffer size also limits content from being misappropriated from the buffer. Streaming content providers prefer to stream the content to the user in order to maintain control over the content, e.g., by controlling the client to which the content is being transmitted and how much content is transmitted at a time.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagram illustrating aspects of an example Network Attached Storage device having a secure region.

FIG. 2 is a diagram illustrating aspects of a Network Attached Storage device connected to a stream content provider.

FIG. 3 is a diagram illustrating aspects of a Network Attached Storage device connected to a stream content provider.

FIGS. 4A and 4B are diagrams of a Network Attached Storage device providing user access to purchased content.

FIG. 5 is a flow diagram, illustrating aspects of a method of streaming content to a network attached storage device having a secure region.

FIG. 6 is a flow diagram, illustrating aspects of a method of receiving streaming content at a network attached storage device having a secure region.

FIG. 7 is an example system diagram of various hardware components and other features for use in accordance with aspects presented herein.

FIG. 8 is a diagram of various example system components, in accordance with aspects presented herein.

## DETAILED DESCRIPTION

The detailed description set forth below in connection with the appended drawings is intended as a description of

various configurations and is not intended to represent the only configurations in which the concepts described herein may be practiced. The detailed description includes specific details for the purpose of providing a thorough understanding of various concepts. However, it will be apparent to those skilled in the art that these concepts may be practiced without these specific details. In some instances, well known structures and components are shown in block diagram form in order to avoid obscuring such concepts.

Several aspects of buffering streaming content using a secure portion of a network attached storage will now be presented with reference to various apparatus and methods. These apparatus and methods will be described in the following detailed description and illustrated in the accompanying drawings by various blocks, modules, components, circuits, steps, processes, algorithms, etc. (collectively referred to as "elements"). These elements may be implemented using electronic hardware, computer software, or any combination thereof. Whether such elements are implemented as software or hardware depends upon the particular application and design constraints imposed on the overall system.

Network streaming of media content such as movies and televisions shows, among other types of content, has become commonplace. At times, network providers, such as ISPs limit or throttle certain streaming hosts, for example, to extract financial gains for providing Quality of Service (QoS).

Aspects presented herein provide a way to maintain smaller sizes of buffers on display device and to maintain control over content while ensuring that content can be viewed without deterioration due to throttling through the use of a Network Attached Storage (NAS) device having a secure portion for buffering streaming content. Such a NAS device may be used, e.g., as part of a home network to provide for private buffering of streaming content for any number of display devices.

As most display devices have very limited buffering capability, such buffering at a NAS device may help to ensure QoS at the display device.

Additionally, by buffering the media at the NAS device, the media content can be viewed without the hiccups or stalling due to throttling, because the content is already buffered and can be viewed without being streamed over the Internet.

Control of the media may be maintained by the stream content provider through the security employed by the secure portion of the storage device. This portion may be secured, e.g., by designating the media as private. Access to the private buffer may be sold on a subscription model to streaming content providers.

Additionally, individual display devices do not require additional buffering capability thereby avoiding an increase in cost for the devices that would be involved in increasing the size of their buffers.

FIG. 1 illustrates an example embodiment of an NAS device 100 having a secure portion controlled by a remote content provider as a buffer for digital content. Among others, a content provider may include a media streamer that streams media such as movies, televisions shows, etc. to a user, such as Netflix®, Hulu®, Vudu®, Amazon®, or iTunes®. A NAS device may comprise one or more storage devices, a network interface, and one or more processors, as described in more detail in connection with FIG. 3. The one or more storage devices may include any of a hard disk drive (HDD), a solid state drive (SSD), a solid state hybrid drive, etc. The storage may comprise, for example, magnetic

non-volatile storage, solid state non-volatile storage or hybrid forms of magnetic and solid state storage. The storage may be configured, for example, as a Redundant Array of Inexpensive Disks (RAID).

For example, the network interface of the NAS device **100** may be configured to enable the NAS device **100** to access, among others, Ethernet, the Internet, a Local Area Network (LAN), a Wide Area Network (WAN), Wi-Fi a cloud computing environment, a remote NAS device, a network share, a personal computer and/or a tablet. The NAS device **100** may also couple to a USB-connected device, such as a USB storage device. The NAS device **100** may also be configured to access any other external devices and/or services directly (e.g., locally) or indirectly coupled thereto. The NAS device **100** may also be configured to couple to any externally accessible storage device, for example, an ESATA device, a Thunderbolt device, a FireWire device or any secondary storage device that is accessible to the NAS device **100**.

The NAS device **100** includes a user media area **102** that may be accessible by a user of the local network. The device **100** includes a secure region **104**, e.g., a secure content media area, for which access may be controlled by the remote content provider. For example, the secure region may be a non-user accessible area on a hard drive, SSD, or other data storage device. Thus, access to the secure region of the NAS storage for the NAS device may be controlled based on instructions received from a remote content provider outside of the local network.

The secure region may be used, e.g., to store a streamed movie or television show, among other types of received content.

The secure region may be inaccessible by the user without permission from the content provider. The secure region may be hidden from the user. This allows the content provider to continue to maintain control of the media content even once it has been pushed to the NAS device, e.g., in a user's home.

Digital content may be stored in the secure region **104** using encryption that secures the streamed content to the secure region **104** of the NAS. For example, a type of Digital Rights Management (DRM) encryption may be employed to store the digital content in the secure region **104**. Among other types of DRM encryption that may be used, one example of DRM encryption that may be employed is Secure Content Storage Association (SCSA) type encryption. Such encryption may secure the digital content to the drive of the secure region and require keys in order to access the content.

The NAS device may configured so that the amount of data stored at the secure region and/or the type of encryption used to store streamed content in the secure region **104** may be controlled by the stream content provider.

FIG. **2** illustrates a computer system **200** including an NAS device **206** coupled to a local network. The NAS device **206** is configured to connect to a remote content provider **202** outside of the local network via ISP network **204** in order to receive streamed content from the stream content provider **202**. Among others, a content provider may include a media streamer that streams media such as movies, televisions shows, etc. to a user, such as Netflix®, Hulu®, Vudu®, Amazon®, or iTunes®. NAS device **206** includes a secure buffer region **210**. Secure buffer region comprises at least a portion of the storage at NAS device **206**. NAS device **206** may also be connected via the local network to any number of display devices **208**, such as smart TVs, tablets, mobile phones, personal computers, media streaming devices and/or the like.

FIG. **3** illustrates an example system **300** in which NAS device **306** is coupled to multiple display devices **308** via local network **310**, such as a user's home network.

The secure memory region **210** of NAS device **206** may be configured as a buffer for receiving steaming content for the at least one display device **208** in a manner controlled by the stream content provider **202**. Display devices **208** may have minimal buffer storage for a number of reasons. For example, the cost of the display device may be reduced by requiring a smaller amount of buffer storage in the display device. Additionally, content providers may prefer smaller buffers in display devices because this allows them to maintain control of their content by providing smaller amounts at a time to the display device.

By providing a larger buffer in the secure region of the NAS device **206**, **306** that can be used by the display device enables the content provider **202**, **302** to use burst transmission to stream the content in larger bursts than might be possible for transmissions to a smaller buffer. Also, as the streamed content continues to be controlled by the stream content provider, the stream content provider can use burst transmission without risking misappropriation of the streamed content by the user.

For example, once a user requests content from a stream content provider via a display device **208**, the NAS device **206** may negotiate with the stream content provider **202** to receive the desired content and to buffer an encrypted stream of the content in the secure region **210**. Such negotiation may include, e.g., informing the stream content provider of a secure region within the NAS device that is not accessible by a user. The NAS device may inform the stream content provider of the available size of the secure region or may negotiate with the stream content provider to agree on a size of a secure buffer. Among other negotiated aspects, the NAS device may negotiate with the stream content provider to agree on a length of time for which the content will be retained at the secure region of the NAS device, requirements for the user to access the streamed content, whether the streamed data is encrypted, and keys for accessing encrypted content. For example, requirements for accessing the streamed content may be time based, user based, etc. If the streamed content is encrypted, a description key may also be obtained. The keys may be obtained based on payment, a license server, etc. The NAS device **206** may then present the streamed content from the secure region to the display device **208** as encrypted content.

As illustrated in FIG. **3**, the NAS device may comprise a network interface **312** configured to couple the NAS device **306** to access one or more networks, such as the user's network **310** and/or the ISP network **304**. This network interface may enable the NAS device **306** to be accessed by a display device **308** and to enable the NAS device **306** to access remote content providers **302** outside the user's network, e.g., via ISP **304**. For example, the network interface of the NAS device **100** may be configured to enable the NAS device **100** to access, among others, Ethernet, the Internet, a Local Area Network (LAN), a Wide Area Network (WAN), Wi-Fi a cloud computing environment, a remote NAS device, a network share, a personal computer and/or a tablet. The network interface may enable communications according to the Standards of the Institute of Electrical and Electronic Engineering (IEEE), Standards 802.11. The NAS device **100** may also couple to a USB-connected device, such as a USB storage device. The NAS device **100** may also be configured to access any other external devices and/or services directly (e.g., locally) or indirectly coupled thereto. The NAS device **100** may also be

configured to couple to any externally accessible storage device, for example, an ESATA device, a Thunderbolt device, a FireWire device or any secondary storage device that is accessible to the NAS device **100**.

NAS device **306** may further comprise a processor **314** configured to control storage of content in the secure region **324** and to control access to the secure region **324** of the storage based on instructions received from a remote content provider, in addition to control of user accessible storage **322**.

FIGS. **4**A and **4**B illustrate an example, in which previously buffered content can be purchased by the user and reassigned to the user accessible region **402** of the NAS device. Among other times, an opportunity to purchase the content may be presented to the user after the content has been viewed. For example, as illustrated in FIG. **4**A, the NAS device **400** may include a user accessible media area **402** and a secure region **404**. Streamed content in secure region **404** may be inaccessible to the user and may instead be controlled by a stream content provider.

In one example, the NAS device **400** may be configured to move a received digital object stored in the secure region **404** to the first region, e.g., **402** along with keys for accessing the digital object based on instructions from the remote content provider, as illustrated in FIG. **4**B. The digital object secured by the remote content provider may be moved to the user accessible area **402** along with the appropriate keys for their account. The account may be, among other types of accounts providing DRM, an SCSA account.

In another example, the NAS device may be configured to reallocate a portion of the secure region storing a streamed object to the first region based on instructions from the remote content provider. For example, the digital object may be stored in a Shingled Magnetic Recording (SMR) zone, where the zone itself is protected and the entire zone is re-allocated to the user area when content is purchased. An unused portion of the user accessible region **402** can be designated to replace the portion of the secure region **404** that is re-allocated to the user area **402**.

In one aspect, NAS device my use Virtual Private Network (VPN) encryption to receive the streaming content. The addition of VPN encryption on the NAS may help to avoid throttling on the stream, because it may avoid detection of the stream, e.g., by the ISP. As the ISP does not detect the destination, ISP selective throttling may be avoided. Additionally, the use of VPN encryption further secures the digital content.

Display devices may have their application software altered to "look" for a secure host, e.g., a NAS device having a secure region, within the home network prior to making a connection to the host provider, e.g., stream content provider. This information can then be sent from the display device to the stream provider to allow the content provider to make use of the secure network storage. Thus, the content provider may be informed of the presence of a NAS device having a secure region that can be used as a secure buffer for a display device that is requesting streaming content. The stream provider may also discover a secure stream buffer on network attached storage in other ways.

The secure region of the NAS device may be managed, e.g., between an NAS device application, DRM controls and the remote content provider. For example, display devices may go to the NAS device for content. The NAS device may then negotiate with the content provider for the digital content. The content may be preloaded and buffered using a desired encrypted stream, as specified by the content pro-

vider, across the ISP network to the secure area in the NAS device. The stream data may then be presented from the secure area of the NAS device as standard encrypted content to the display device.

Remote content providers can pre-load the secure region of the NAS device without opening themselves up to misappropriation of the content, because they continue to control the secure portion of the in-home media storage, and therefore, control access to the media after it is stored at the NAS device. Thus, the remote content providers can stream, or push, content to users at selected times that are beneficial for the stream content provider. This allows the content provider to transmit the content at appropriate times, e.g., to stage the desired content in the home network. This may lower the cost of such streaming, because the time of the streaming may be selected to be beneficial to the content provider. For example, times of lower network usage, or for which QoS costs are reduced may be selected for streaming the content to the user. Pre-loading the secure portion of the NAS device may allow for the content provider to extent storage to the edge of the network at relatively low cost per unit per month. A simple user queue or a user profile may be used by the content provider to determine the content to pre-store in the secure buffer.

FIG. **5** is a flow chart **500** of a computer assisted method of transmitting content to a secured buffer at a storage device for a remote local network. The method may be performed by a computer at a content provider, such as a stream content provider, for transmitting content to a secured buffer at a network attached storage device. For example, the content may be streamed from a stream content provider. The remote local network may be, for example a user's home network. At **502**, the content provider receives an indication of an NAS device associated with a user and having a secure region. At **504**, the content provider transmits content for viewing by the user to a secure region within the NAS device. The content may be transmitted in response to a request from a user for content, or may involve preloading content to the user's NAS device. At **506**, the content provider transmits instructions to the NAS device to control the user's access to the content.

Transmitting the content may optionally include preloading the content to the NAS device, at **508**. Preloading the content helps to ensure an enjoyable viewing experience by helping to prevent hic-ups or stalling, for example while a display waits for the next packet of streamed content to be received. Optional aspects are illustrated in FIGS. **5** and **6** as having a dashed line. The content may be selected based on a user queue list of desired content and/or a user profile, at **510**. For example, the system can review your "to watch" queue and pre-download those to speed up watching. By pre-downloading (in whole or in part) content, very high definition (4K) movies that would otherwise be too large to realistically stream can be pre-stored on the NAS device.

Additionally, the system can be used to time-shift downloads to a time with more available bandwidth, e.g., during a time of reduced use in a home or neighborhood, when a shared line such as cable is used, in order to avoid congestion and video stuttering. For example, at **512**, the transmission of preload content may be scheduled by selecting a transmission time based on bandwidth availability to transmit the content.

The transmission of instructions to the NAS device to control the user's access to the content at **506** may include controlling an amount of data stored at the secure region of the NAS device and/or controlling an encryption type used in the secure region of the NAS device. Although the NAS

7

device may be configured to allow the content provider to control an amount of data stored in the secure region, there may be a limit to the amount of storage that can be used by the remote content provider. For example, the secure region may be limited to a predetermined amount of the storage of the NAS device. This limit on the secure region maintains a certain amount of storage for the user accessible region of the NAS device.

The secure region of the NAS device may be treated as a buffer for a display device attached to the NAS device via the remote local network.

At **514**, the content provider may instruct the NAS device to transfer a digital object stored in the secure region to the user accessible region along with keys for accessing the digital object, as described in connection with FIGS. **4**A and **4**B.

Alternately, the content provider may instruct the NAS device to allocate to the user accessible region a portion of the secure region of the NAS device storing the digital object at **516**.

FIG. **6** is a flow chart **600** of a computer assisted method of receiving, at an NAS device, receiving content from a remote content provider. The method may be performed by an NAS device having a user accessible region and a secure region. The NAS device may be configured to couple, for example, to a user's home network. At **602**, the NAS device negotiates with the remote content provider to receive instructions for receiving and storing content from the remote content provider. Such negotiation may be made in response to a request for content from a connected display device in the user's home network. Such negotiation may also be initiated by the remote content provider after it has been informed of the presence of the NAS device. The remote content provider may, for example, receive an indication of the NAS device from a display device coupled to the NAS device, and/or may discover the presence of an NAS having secure storage in a different manner. An indication of the NAS device with secure storage may be transmitted from the display device in connection with a request for content from the display device.

At **604**, the NAS device receives the digital content from the remote content provider. At **606**, the NAS device stores the digital content in the secure region of the NAS device.

At **608**, the NAS device controls access by the user to the digital content stored in the secure region based on instructions from the remote content provider. For example, the digital content stored in the secure region may be inaccessible by the user of the display device without permission from the remote content provider. The secure region of the NAS device may be, for example, hidden from the user.

As part of storing the digital content in the secure region at **606**, the NAS device may store the digital content using encryption at **612**, wherein the stored digital content is secured to the secure region of the NAS device. The type of encryption used may be controlled based on instructions from the remote content provider. A connection may be established at the NAS device with a display device, such that storing the content in the secure region comprises buffering the digital content for presentation to a user at the display device in a manner controlled by the stream content provider, as at **614**.

At **616**, an amount of data stored at the secure region of the NAS device may be controlled, e.g., based on instructions from the remote content provider. The amount of storage that can be controlled by the remote content provider may have an upper limit. At **618**, an encryption type used to

8

store the digital content in the secure region of the NAS device may be controlled based on instructions from the remote content provider.

Content stored in the secure region may be reassigned to the user accessible region.

In one example, at **620**, the NAS device may move a digital object stored in the secure region of the NAS device to the user accessible region along with keys for accessing the digital object based on instructions from the remote content provider.

In another example, at **622**, the NAS device may allocate, to the user accessible region, a portion of the secure region of the NAS device storing a digital object based on instructions from the remote content provider.

The NAS device may use virtual private network encryption at **610** to receive the streaming content from the stream content provider.

At **624**, the NAS device may present the stored content from the secure region to a display device as encrypted content. This maintains protection of the content. The display device may include a decryption module that decodes the encrypted content as it is transmitted from the secure region of the NAS device to the display device.

By way of example, an element, or any portion of an element, or any combination of elements may be implemented with a "processing system" that includes one or more processors. Examples of processors include microprocessors, microcontrollers, digital signal processors (DSPs), field programmable gate arrays (FPGAs), programmable logic devices (PLDs), state machines, gated logic, discrete hardware circuits, and other suitable hardware configured to perform the various functionality described throughout this disclosure. One or more processors in the processing system may execute software. Software shall be construed broadly to mean instructions, instruction sets, code, code segments, program code, programs, subprograms, software modules, applications, software applications, software packages, routines, subroutines, objects, executables, threads of execution, procedures, functions, etc., whether referred to as software, firmware, middleware, microcode, hardware description language, or otherwise.

Accordingly, in one or more exemplary embodiments, the functions described may be implemented in hardware, software, firmware, or any combination thereof. If implemented in software, the functions may be stored on or encoded as one or more instructions or code on a computer-readable medium. Computer-readable media includes computer storage media. Storage media may be any available media that can be accessed by a computer. By way of example, and not limitation, such computer-readable media can comprise a random-access memory (RAM), a read-only memory (ROM), an electrically erasable programmable ROM (EE-PROM), compact disk ROM (CD-ROM) or other optical disk storage, magnetic disk storage or other magnetic storage devices, or any other medium that can be used to carry or store desired program code in the form of instructions or data structures and that can be accessed by a computer. Disk and disc, as used herein, includes CD, laser disc, optical disc, digital versatile disc (DVD), and floppy disk where disks usually reproduce data magnetically, while discs reproduce data optically with lasers. Combinations of the above should also be included within the scope of computer-readable media.

FIG. **7** presents an example system diagram of various hardware components and other features, for use in accordance with aspects presented herein. Certain aspects may be implemented using software, hardware, or a combination

thereof and may be implemented using one or more computer systems or other processing systems. One implementation may include one or more computer systems capable of carrying out the functionality described herein. An example of such a computer system **700** is shown in FIG. **7**.

Computer system **700** includes one or more processors, such as processor **704**. The processor **704** is connected to a communication infrastructure **706** (e.g., a communications bus, cross-over bar, or network). Various software implementations are described in terms of this example computer system. After reading this description, it will become apparent to a person skilled in the relevant art(s) that other computer systems and/or architectures can be used to implement the VBT.

Computer system **700** can include a display interface **702** that forwards graphics, text, and other data from the communication infrastructure **706** (or from a frame buffer not shown) for display on a display unit **730**. Computer system **700** also includes a main memory **708**, preferably RAM, and may also include a secondary memory **710**. The secondary memory **710** may include, for example, a hard disk drive **712** (or hybrid and/or solid state drives) and/or a removable storage drive **714**, representing a floppy disk drive, a magnetic tape drive, an optical disk drive, etc. The removable storage drive **714** reads from and/or writes to a removable storage unit **718** in a well-known manner Removable storage unit **718**, represents a floppy disk, magnetic tape, optical disk, etc., which is read by and written to removable storage drive **714**. As will be appreciated, the removable storage unit **718** includes a computer usable storage medium having stored therein computer software and/or data.

In alternative implementations, secondary memory **710** may include other similar devices for allowing computer programs or other instructions to be loaded into computer system **700**. Such devices may include, for example, a removable storage unit **42722** and an interface **720**. Examples of such may include a program cartridge and cartridge interface (such as that found in video game devices), a removable memory chip (such as an EPROM, or programmable read only memory (PROM)) and associated socket, and other removable storage units **42722** and interfaces **720**, which allow software and data to be transferred from the removable storage unit **42722** to computer system **700**.

Computer system **700** may also include a communications interface **724**. Communications interface **724** allows software and data to be transferred between computer system **700** and external devices. Examples of communications interface **724** may include a modem, a network interface (such as an Ethernet card), a communications port, a Personal Computer Memory Card International Association (PCMCIA) slot and card, etc. Software and data transferred via communications interface **724** are in the form of signals **728**, which may be electronic, electromagnetic, optical or other signals capable of being received by communications interface **724**. These signals **728** are provided to communications interface **724** via a communications path (e.g., channel) **726**. This path **726** carries signals **728** and may be implemented using wire or cable, fiber optics, a telephone line, a cellular link, a radio frequency (RF) link and/or other communications channels. In this document, the terms "computer program medium" and "computer usable medium" are used to refer generally to media such as a removable storage drive **714**, a hard disk installed in hard disk drive **712**, and signals **728**. These computer program

products provide software to the computer system **700**. Some embodiments presented herein may include such computer program products.

Computer programs (also referred to as computer control logic) are stored in main memory **708** and/or secondary memory **710**. Computer programs may also be received via communications interface **724**. Such computer programs, when executed, enable the computer system **700** to perform the features presented herein. In particular, the computer programs, when executed, enable the processor **704** to perform the features presented herein. Accordingly, such computer programs represent controllers of the computer system **700**.

In an implementation using software, the software may be stored in a computer program product and loaded into computer system **700** using removable storage drive **714**, hard drive **712**, or communications interface **720**. The control logic (software), when executed by the processor **704**, causes the processor **704** to perform the functions described herein. Another implementation may primarily be implemented in hardware using, for example, hardware components, such as application specific integrated circuits (ASICs). Implementation of the hardware state machine so as to perform the functions described herein will be apparent to persons skilled in the relevant art(s).

In yet another implementation, certain aspects may be implemented using a combination of both hardware and software.

FIG. **8** is a block diagram of various example system components, in accordance with some embodiments presented herein. FIG. **8** shows a communication system **800** usable in accordance with the embodiments presented herein. The communication system **800** includes one or more accessors **860**, **862** (also referred to interchangeably herein as one or more "users" or clients) and one or more terminals **842**, **866**. In an implementation, data for use in accordance with some embodiments may be, for example, input and/or accessed by accessors **860**, **864** via terminals **842**, **866**, such as personal computers (PCs), minicomputers, mainframe computers, microcomputers, telephonic devices, or wireless devices, such as personal digital assistants ("PDAs") or a hand-held wireless devices coupled to a server **843**, such as a PC, minicomputer, mainframe computer, microcomputer, or other device having a processor and a repository for data and/or connection to a repository for data, via, for example, a network **844**, such as the Internet or an intranet, and couplings **845**, **846**, **864**. The couplings **845**, **846**, **864** include, for example, wired, wireless, or fiber optic links.

The various exemplary embodiments are provided to enable one of ordinary skill in the art to practice various aspects of the present invention. Modifications to exemplary embodiments presented throughout this disclosure will be readily apparent to those skilled in the art, and the concepts disclosed herein may be extended to other devices. All structural and functional equivalents to the various components of the exemplary embodiments described throughout this disclosure that are known or later come to be known to those of ordinary skill in the art are expressly incorporated herein by reference.

What is claimed is:

1. A media streaming system comprising:
   a network interface adapter configured to transmit digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN); and
   one or more hardware processors configured to:

receive an indication of the NAS device having a secure region comprising a buffer for streaming media on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;

transmit the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and

transmit instructions to the NAS device to control streaming access to the digital content stored on the buffer.

**2**. The media streaming system of claim **1**, wherein the separate display device comprises a smart television.

**3**. The media streaming system of claim **1**, wherein transmitting the digital content comprises time-shifting to a time with more available bandwidth on a connection to the NAS device.

**4**. The media streaming system of claim **1**, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.

**5**. The media streaming system of claim **1**, wherein the one or more processors are further configured to:

cause the NAS device to use encryption that secures the digital content to the secure region.

**6**. The media streaming system of claim **1**, wherein the one or more processors are further configured to:

provide instructions to the NAS device for controlling an amount of data stored in the secure region.

**7**. The media streaming system of claim **1**, wherein the one or more processors are further configured to:

provide instructions to the NAS device for controlling an encryption type used in the secure region.

**8**. The media streaming system of claim **1**, wherein the one or more processors are further configured to:

provide instructions to the NAS device for moving a received digital object stored in the secure region to an accessible region along with keys for accessing the digital object.

**9**. The media streaming system of claim **1**, wherein the one or more processors are further configured to:

provide instructions to the NAS device to reallocate a portion of the secure region storing a digital object to an accessible region.

**10**. The media streaming system of claim **1**, wherein the one or more processors are further configured to:

in response to the NAS device receiving a request for content from the separate display device, negotiate transmission of the digital content with the NAS device.

**11**. A method of transmitting media content from a media streaming system, the method comprising:

establishing a connection, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN);

receiving an indication of the NAS device having a secure region comprising a buffer for streaming media on a

separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;

transmitting media content to the secure region within the NAS device for playback by the display device from the buffer; and

transmitting instructions to the NAS device to control streaming access to the media content stored on the buffer.

**12**. The method of claim **11**, wherein transmitting the media content to the secure region comprises:

time-shifting the transmitting of the media content to a time with more available bandwidth on a connection to the NAS device.

**13**. The method of claim **11**, wherein the secure region is inaccessible by a user of the NAS device without permission from the media streaming system.

**14**. The method of claim **11** further comprising:

causing the NAS device to use encryption that secures the media content to the secure region.

**15**. The method of claim **11** further comprising:

providing instructions to the NAS device for controlling an amount of data stored in the secure region.

**16**. The method of claim **11** further comprising:

providing instructions to the NAS device for controlling an encryption type used in the secure region.

**17**. The method of claim **11** further comprising:

providing instructions to the NAS device for moving a received digital object stored in the secure region to an accessible region along with keys for accessing the digital object.

**18**. The method of claim **11** further comprising:

providing instructions to the NAS device to reallocate a portion of the secure region storing a digital object to an accessible region.

**19**. The method of claim **11** further comprising:

in response to the NAS device receiving a request for content from the display device, negotiating transmission of the media content with the NAS device.

**20**. A media streaming system comprising:

means for transmitting digital content, via a wide area network (WAN), to a network attached storage (NAS) device operating on a local area network (LAN);

means for receiving an indication of the NAS device having a secure region comprising a buffer for streaming on a separate display device on the local area network, wherein access to the secure region is controlled by the media streaming system;

means for transmitting the digital content to the secure region within the NAS device for playback by the separate display device from the buffer; and

means for transmitting instructions to the NAS device to control streaming access to the digital content stored on the buffer.

* * * * *

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b)(1) because it contains 13,925 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point.

Dated: February 25, 2026

/Brian M. Buroker/

Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
(202) 955-8500
bburoker@gibsondunn.com

## CERTIFICATE OF COMPLIANCE WITH RULE 25.1(e)(2)

I certify that the foregoing brief complies with the limitations set forth in Federal Circuit Rule 25.1(d)(1)(A) and contains 15 unique words (including numbers and images) marked as confidential with yellow highlighting in the Confidential version.

Dated: February 25, 2026

/Brian M. Buroker/               

Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
(202) 955-8500
bburoker@gibsondunn.com

## CERTIFICATE OF SERVICE

I, Brian M. Buroker, hereby certify that on February 25, 2026 I caused Appellants' Nonconfidential Opening Brief with the Nonconfidential Addendum to be filed via the Court's CM/ECF system and served on all counsel of record via CM/ECF and I also caused Appellants' Confidential Opening Brief with the Confidential Addendum to be served by email to all counsel of record in this appeal at the following email addresses:

stevencherny@quinnemanuel.com

patrickcurran@quinnemanuel.com

nicolafelice@quinnemanueal.com

alicialai@quinnemanual.com

dzimmer@zimmercitronclarke.com, and

eclarke@zimmercitronclarke.com

Dated: February 25, 2026

/Brian M. Buroker/

Brian M. Buroker
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
(202) 955-8500
bburoker@gibsondunn.com